**In the United States District Court
for the
Northern District of Illinois**

**Eastern Division**

| | | |
|---|---|---|
| IN RE: AT&T MOBILITY WIRELESS DATA | ) | |
| SERVICES SALES TAX LITIGATION | ) | **MDL No: 2147** |
| | ) | **Case No. 10 C 2278** |
| <u>This document applies to all cases</u> | | |

**MEMORANDUM OF SETTLEMENT CLASS COUNSEL SUPPORTING MOTION FOR APPROVAL OF ATTORNEYS' FEES, COSTS AND EXPENSES AND FOR APPROVAL OF INCENTIVE AWARDS FOR CLASS REPRESENTATIVES**

"A claim for attorney's fees and related nontaxable expenses must be made by motion...." Fed. R. Civ. P. 54(d)(2)(A). "In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).

This Motion is made by Settlement Class Counsel ("Class Counsel" or "Counsel") on behalf of the 92 attorneys who together represent the Class and the state-specific Subclasses.

**STANDARDS FOR CONSIDERATION OF MOTIONS FOR ATTORNEYS' FEES**: The standards under which the Court must assess this motion are well known to the Court. They are recited here only for the sake of convenience.

This Court "must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Skelton v. General Motors Corp.,* 860 F.2d 250, 258 (7th Cir.1988), *cert. denied,* 493 U.S. 810 (1989).

This is an archetypal common fund case. The monetary relief obtained in this case will be a fund of money that belongs to the members of the various Subclasses. "This

1

Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). This use of the common fund as a basis for fees "allows a court to prevent ... inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefitted by the suit." *Id*. This common fund doctrine is based on the notion that not one plaintiff, but all " 'those who have benefitted from litigation should share its costs.' " *Florin v. Nationsbank of Georgia, N.A.,* 34 F.3d 560, 563 (7th Cir. 1994), quoting *Skelton,* 860 F.2d at 252.

Application of the percentage of the fund method for determining attorneys' fees is permitted in a common fund case. *Blum v. Stevenson*, 465 U.S. 886, 900 n.16 (1984). Indeed, by all accounts, the percentage of the fund method measured against firmly established valuation of the recovery to the Class best aligns the incentives of class counsel with those of the Class.

Seventh Circuit doctrine is emphatic. Fee awards for class actions in common fund cases must attempt to reflect the *ex ante* market price for legal services.

> We have held repeatedly that, when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of [1] the risk of nonpayment and [2] the normal rate of compensation in the market at the time.

*In re Synthroid Marketing Litigation*, 264 F.3d 712, 718 (7th Cir. 2001)("*Synthroid I*"). *Accord*, *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007). Thus, the goal in awarding a reasonable attorneys' fee under Seventh Circuit doctrine is to give the lawyer what he or she would have received in an arms-length negotiation before the litigation began. *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992). Courts must "simulate the

market" by "step[ping] in and play[ing] surrogate client." *Id.* This market rate approach has the virtue of preventing fee determinations from becoming individualized judicial Rorschach tests founded on untethered notions of fairness. *See, Montgomery v. Aetna Plywood, Inc.,* 231 F.3d 399, 408 (7th Cir. 2000)("This standard obviates ... the need to assign a value to an attorney's work based on nothing more than a subjective judgment regarding that work.)

> *Synthroid I* sets the elements for determining the *ex ante* market rate.

> The market rate for legal fees depends in part on [1] the risk of nonpayment a firm agrees to bear, in part on [2] the quality of its performance, in part on [3] the amount of work necessary to resolve the litigation, and in part on [4] the stakes of the case.

*Id*, 264 F.3d at 721. *Synthroid I* also suggests three evidentiary benchmarks to assist in determining the market rate of compensation *ex ante*: (1) actual fee agreements in the case; (2) data from large common fund cases where the parties negotiated the fees privately, and (3) bids and results from class counsel auction cases for insight into the fee levels attorneys in competition were willing to accept. *Id. at* 719-21.

The Seventh Circuit has also disapproved caps on fees because of the size of the recovery obtained for the class. In reversing a district court for capping fees at 10% in a "megafund" case, *Synthroid I* explains:

> We have never suggested that a "megafund rule" trumps these market rates, or that as a matter of law no recovery can exceed 10% of a "megafund" even if counsel considering the representation in a hypothetical arms' length bargain at the outset of the case would decline the representation if offered only that prospective return.
> * * *
> Having disapproved the megafund cap, we must remand - for the district judge did not attempt a market-based approach, even as an alternative holding.

*Id.* at 718.

**EXPERT TESTIMONY:** Respectfully, and to assist the Court in reaching the decisions required by Seventh Circuit doctrine, Counsel have provided declarations of two experts. The first is Robert Klonoff, the dean of the Lewis and Clark School of Law. Dean Klonoff, a former Jones Day partner with extensive class action experience as a litigator, is the author of the sole casebook on class action. See, Robert H. Klonoff, Edward K.M. Bilich, and Suzette Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (Thomson West 2d ed. 2006). *See generally*, Klonoff Dec., Exhibit 1.

The second expert proffered is Dr. Elisabeth Landes. Dr. Landes, a Ph.D economist, is the Senior Vice President of CompassLexecon. CompassLexecon, headquartered in Chicago, is widely regarded as one of the world's leading economic consulting firms. Dr. Landes provides the Court with the value to the Class of the injunctive relief. *See generally,* Landes Dec., Exhibit 2.

**THE RESULTS OBTAINED FOR THE CLASS AND SUBCLASSES:** ATTM and Class Counsel have requested refunds from all taxing jurisdictions totaling $1.152 billion for the class period. These requested refunds have been made to 1,193 taxing authorities in 44 states and territories. The individual state-specific subfunds range from a high of $164,662,694 (New York) to a low of $23,904 (Montana). For the sake of ease of calculation, the Court may correctly assume that the majority of the taxing jurisdictions have a three year statute of limitations for tax refunds.[1] Because the growth in sales of internet access services increased substantially during the class period, the bulk of taxes improperly charged to the Class are subject to refunds. In effect, the expected refunds are

---

[1] A few jurisdictions have longer statutes. In addition, a few states had open audit periods under which the state agreed to extend the statute of limitations beyond the statutory three years. A few jurisdictions have a shorter statute of limitations period.

4

about 83% of the improperly charged taxes, since only approximately 17% of the taxes were collected prior November, 2007. Thus, the Court may conclude roughly that the maximum aggregate amount recoverable for the Subclasses is 83% of $1.152 billion or $956,160,000. This is the maximum expected cash portion of the recovery for the Class.

In addition, the settlement provides for substantial going-forward relief which has significant, measurable value to the Class. Recently, the Seventh Circuit affirmed that the value of non-cash relief should not be discounted in arriving at a fee for counsel even in a "megafund" case. *In re Trans Union Corp. Privacy Litigation*, ___ F.3d ___ (7th Cir. 2011 (No. 10-1154, decided January 14, 2011) reversed the 11.8% fee award entered by Judge Gettleman in a case settled for $109.6 million -- $75 million in cash and an estimated value of $34.6 million in in-kind relief. The Court rejected the master's reasoning "that this in-kind relief was worth less to class members than … cash would have been worth and that the attorneys' fee awards should therefore be lower than the awards for cash relief." *Id.* Slip op. at 7-8.

Dr. Elisabeth Landes of Compass Lexecon has calculated the value to the Class of the injunctive relief from September, 2010 (when ATTM ceased collecting the taxes) until November 1, 2014 (when the Internet Tax Freedom Act[2] ("ITFA") moratorium on state and local taxation of internet access services expires). Landes Dec. Exhibit 2. That value is $2.02 billion. It is worth noting here that her calculation includes only Class members, accounts for churn rate among those Class members (the loss of current customers over time) and reduces the value of the injunctive relief to its present value.[3] The total value to the Class of the proposed settlement is therefore the combination of the

---

[2] 47 U.S.C. § 151
[3] This value does not consider the current value of the cessation of the tax to all ATTM customers until 2014. That value exceeds $4 billion.

cash received through the settlement and the prospective relief obtained – a maximum of approximately $2.02 billion plus $956,160,000 or $2,976,160,000.

There is a unique feature to this settlement regarding the state-by-state nature of the taxes collected. Taken as a whole, this may be the largest class action settlement in American history in terms of the number of individuals who will actually receive compensation for the impermissible conduct. This valuation is presented to the Court on an aggregate basis for the resolution of the entire national overtax charges. Although the aggregate value is measurable across the various Subclasses, the case may also be viewed as 44 Subfunds, each individually serving Subclass members in a particular state, each of whom paid taxes calculated at state-specific rates. And while it is true that 7 states have aggregate value greater than $72.5 million[4], the majority of the subfunds fall under that amount. Indeed, because fees are requested on the basis of what each state Subclass recovers, it may be more fruitful to examine the requested fees as arising from a series of related subclass settlements, many of which are well below the threshold for "megafunds."

> Dean Klonoff opines:
>
> These two considerations – the outstanding performance of counsel and the almost unprecedented magnitude and scope of relief (secured in a matter of months) – strongly support the fees sought here, especially given that the fees sought are well below the mean and median percentages for high-dollar settlements. This was a responsible, indeed historic, settlement that yields major benefits to the class in a timely fashion without imposing a substantial burden on our legal system. Far from being a stereotypical class settlement in which counsel benefit handsomely but the class do not, it is hard to imagine a better outcome for the class.

Klonoff Dec. ¶ 63

---

[4] California, New York, Florida., Illlinois, Pennsylvania, Texas and Washington

THE REQUESTED FEE:  As set out in the Motion for Preliminary Approval (Doc. No. 49), Cooperating Counsel seek a fee measured by the *lesser* of 25% of the actual cash recovered in each Subfund or 10% of the aggregate value of the Settlement to each Subclass, that is, actual cash recovered plus the value of the injunctive relief.  By way of explanation of this proposal, the fee requested is the *lesser* of $298 million (10%) of the aggregate or $239,040,500 (25% of $956,160,000, the maximum cash value).  Thus, the maximum fee permitted under the request is $239,040,500.  **This amounts to 8.03% of the maximum aggregate value of the settlement.**  To the extent that the actual cash value is less than the maximum possible refund amount, the fee is further reduced.  Thus, by way of example only, if the recovery is only 80% of the maximum recoverable amount ($956,160,000 x .8 = $764,928,000), the fee is proportionally reduced to 25% of that amount or $191,232,000.  This is 6.4% of the total value (which is now reduced to $2.02 billion plus $764,928,000.)

APPLICATION OF THE *SYNTHROID I* CRITERIA:

**(1)  The risk of nonpayment a firm agrees to bear**:  The *ex ante* perspective that Seventh Circuit doctrine demands requires the Court to view risk through the eyes of the attorneys considering whether to move forward with this case, when the things known clearly now were but distant hopes shrouded in doubt and uncertainty and weighed against the legal defenses, legal talent, and fiscal war chest that AT&T could bring to bear against them.  Thus, "[t]he point at which plaintiffs settle with defendants ... is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them." *Skelton*, 860 F.2d at 258.

The fee in this case is 100% contingent on the recovery of money for the class. All of the expenses of the case to date have been borne by counsel representing the class representatives. In the event that no money is recovered for the Class, neither the time nor money expended on behalf of the Class will be recovered by Counsel. As Dean Robert Klonoff notes: "Class counsel undertook enormous risk in bringing this case." Klonoff Dec. at ¶ 53.

Initially, there were significant legal and procedural impediments to succcess.[5] **First**, whether the ITFA permitted a private cause of action against ATTM. The law on this subject was not encouraging. No case had decided the precise issue. The statute did not explicitly create a private cause of action. All that remained was the hope that a court would imply a cause of action from the statute. And in that regard, there must be "clear evidence" of Congressional intent to create a private right of action under the statute and a court will not presume it. *Love v. Delta Air Lines*, 310 F.3d 1347, 1353 (11th Cir. 2002). The statute did not support such an argument on its face.

**Second**, whether various state consumer protection laws permitted private causes of action in a class setting created a substantial concern. The legal landscape in that regard was not uniform. Several states' consumer protection laws prohibit class actions under their consumer protection laws.[6] Other states have short statutes of limitations for consumer protection actions.[7] And there are wide variations in the scienter element required for liability under various consumer protection laws, some requiring intentional

---

[5] These will be discussed more fully in the Motion for Final Approval.

[6] See, e.g. Alabama: Ala.Code § 8-19-10(f); Georgia: Ga.Code Ann. § 10-1-399(a); Louisiana: La.Rev.Stat. Ann. § 51:1409; Mississippi: Miss.Code Ann. § 75-24-15(4); Montana: Mont.Code Ann. § 30-14-133(1); South Carolina: S.C.Code Ann. § 39-5-140(a).

[7] See, e.g La.Rev.Stat. Ann. § 51:1409(E); Oregon: Or.Rev.Stat. § 646.638; Tennessee: Tenn.Code Ann. § 47-18-110; Wyoming: Wyo. Stat. Ann.. § 40-12-109.

8

acts by the defendant,[8] some requiring a showing of the defendant's negligence,[9] some requiring reliance on the part of the plaintiff[10] and some foregoing any need for a showing of reliance by the Plaintiff.[11]

**Third**, Counsel were properly concerned that ATTM's arbitration clause, which is significantly less vulnerable to attack than many such clauses imposed on consumers,[12] would defeat altogether judicial resolution of the case.[13]

**Fourth**, and more importantly, if the arbitration clause controlled, whether ATTM's contractual prohibition against class arbitration would prevent resolution of these cases on an efficient basis in which all potential Class members would be represented.[14]

**Fifth,** the voluntary payment doctrine presented a potentially viable defense in a number of jurisdictions.

---

[8] Arizona: Ariz.Rev.Stat. § 44-1522; Delaware: Del.Code Ann. tit. 6, § 2513; Minnesota: Minn.Stat. Ann. § 325F.69; North Dakota: N.D. Cent.Code § 51-15-02.

[9] Kansas: Kan. Stat. Ann.. § 50-627(b); Oklahoma: Okla. Stat. tit. 15 § 753.

[10] Louisiana: *Louisiana ex rel. Guste v. General Motors Corp.,* 370 So.2d 477, 489 (La.1978); Pennsylvania: *Weinberg v. Sun Co., Inc.,* 565 Pa. 612, 777 A.2d 442, 445 (2001) (requiring proof of reliance and causation in false advertising claim). *But see Fay v. Erie Ins. Group,* 723 A.2d 712, 714 (1999) (requiring causal connection to or reliance on alleged misrepresentations); Vermont: Vt. Stat. Ann.. tit. 9, § 2461(b); Texas: Tex. Bus & Com.Code § 17.50(a)(1); Wyoming: Wyo. Stat. Ann.. § 40-12-108(a).

[11] Delaware: Del.Code Ann. tit. 6, § 2513(a); Illinois: 815 Ill. Comp. Stat.. 505/2; Kansas: Kan. Stat. ann.. § 50-626(b); Maryland: Md.Code Ann., Comm. Law I § 13-302; Massachusetts: *Sebago, Inc. v. Beazer E., Inc.,* 18 F.Supp.2d 70, 103 (D.Mass.1998); Minnesota: Minn.Stat. § 325F.69(1); **Missouri**: *State v. AreaCo Inv. Co.,* 756 S.W.2d 633, 635-36 (Mo.App.1988); New Jersey: N.J. Stat. Ann. § 56:8-2; North Dakota: N.D. Cent.Code § 51-15-02; Oregon: *Banks v. Martin,* 78 Or.App. 550, 717 P.2d 1192, 1196 (1986); South Dakota: S.D. Codified Laws § 37-24-6(1); Tennessee: *Harvey v. Ford Motor Credit Co.,* 1999 WL 486894, *2 (Tenn.Ct.App.1999) (not designated for publication).

[12] *Fay v. New Cingular Wireless*, 2010 WL 4905698 (E.D. Mo. 2010)(upholding ATTM's arbitration clause despite Missouri Supreme Court ruling that such clauses generally violate public policy).

[13] See *Johnson v. AT&T Mobility, LLC*, WL 5342825 (E.D. Tex. 2010)(sustaining motion to compel arbitration in case raising identical issues to those raised in the MDL cases).

[14] Though not directly germane to an *ex ante* consideration since the certiorari petition had not been filed when counsel first considered this case, ATTM successfully convinced the Supreme Court to accept certiorari in *AT&T Mobility LLC v. Concepcion*, cert. granted 130 S. Ct. 3322 (2010). If the Supreme Court reverses the 9th Circuit's decision and concludes that the Federal Arbitration Act pre-empts state law and state policy favoring class actions, this case could not have been brought at all.

**Sixth,** there were important standing issues. Several states arguably prohibit actions against ATTM at all under an improper taxation claim.[15] Other states appear to require a written demand of ATTM *by each individual* consumer as a condition precedent to filing a case against ATTM for improperly collecting taxes.[16] If ATTM invoked this procedural hurdle, a class action might not be viable in those states, even if the arbitration clauses' prohibition were struck down.

Each of these factors made the risk of non-payment substantial.

Then there were the factual and administrative risks: **First**, whether ATTM's tax collections counsel discovered were widespread or isolated incidents. This was the concern that the case was too small to make it worth proceeding. The only way to find out was to go forward on the assumption that ATTM had violated the ITFA on a widespread basis.

**Second**, counsel had to weigh the opposite concern. If the practice was widespread and ATTM chose to fight the case, the demand on resources on the lead firms would make this a life-of-the-firm bet. Publicly available data suggested that the case might affect as much as 1/6th of the American population. The discovery issues surrounding that amount of cellular numbers -- 50 million different numbers, each with a monthly bill over 36-60 months -- would mean discovery involving potentially 3 billion

---

[15] For example, *Heaven v. Rite Aid Corp*, 2000 WL 33711049 (Pa. Common Pleas 2000) holds that aggrieved taxpayers/purchasers have no private cause of action against the vendor who collected an excessive amount of sales tax. Under California law as it currently stands, "a court may not *directly or indirectly* enjoin or prevent the collection of a sales tax. *Loeffler v. Target Corp*, 93 Cal. Rptr. 3d 515, 519 (Cal. Ct. App. 2009) review granted 216 P.3d 520 (Cal. 2009). Moreover, a private cause of action for improper collection of sales taxes is not recognized. *Id.* at 525.

[16] *See*, e.g. Kentucky Revised Statute, § 139.771 requiring that a purchaser must provide 60 days' notice to the retailer about the claim of improper tax collection as a condition precedent to bringing an action against a retailer. See, *Hub v. Kroget Co.*, 2008 WL 746600, 2 (Ky.App. 2008)(affirming summary judgment against taxpayer for failure to provide required notice). See, also M.C.L.A. § 205.101 (same)(Michigan). The states that have adopted the Model Streamlined Sales Tax Act, have this requirement as well.

telephone number specific tax calculations and the actual taxes paid on each. Even class notice to 50 million persons or entities if class certification could be achieved -- no sure thing -- could have cost in excess of $15 million had class counsel been required to pay for it in a contested case, and if no economizing measures could be developed. The resource demands would be all-consuming both in terms of time and money. The list of experts required to advance this case if contested included tax accountants, economists, computer specialists, telecommunications experts, and state tax law specialists for 40+ jurisdictions. The scope of the data storage and retrieval demands was likewise daunting.

**Third**, there were the lost opportunity costs to the law firms. New cases that came to the lead firms would have to be turned away, and existing cases referred to other counsel. These lost opportunity costs to lead firms would be substantial.

**Fourth**, a case of this size and complexity could be expected to go on for nearly a decade, if not more. Procedural motions, substantive motions, class certification motions, class certification appeals under Rule 23(f), and ultimately a likely transfer by the MDL court to various transferee federal courts in 44 states/territories to apply state-specific law once the discovery was completed – all of this would require a multi-year, highly resource consumptive commitment to the case.

Even at the early stages, when ideas about settlement were discussed internally, it became clear that the work in this case might involve protracted litigation in a number of states to recover funds ATTM had paid to taxing authorities. Settlement would be the initial step from which substantial after-settlement efforts would be required.

These risks were compounded by ATTM's financial and legal might, which made the strength of the defenses even greater and the risk of nonpayment very real. The finest

firms would be assembled to defend the case and no expense would be spared. Thompson Coburn and Mayer Brown, the firms now before the Court, are talented firms. And the list of defense firms[17] that entered appearances in the cases prior to transfer to the MDL shows the commitment of ATTM to defend this case with the finest legal talent available.

>    **2.      The quality of counsel's performance**:   "The performance of class counsel was exceptional."  Klonoff Dec. at ¶ 58.

>    Reputations of lawyers are no measure of the quality of their work in a given case. The quality of counsel's work is ultimately (and properly) measured on a case-by-case basis by the results achieved for the Class in that case.  Indeed, the Supreme Court has concluded that in determining attorneys' fees "the most critical factor is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).

>    Here, Class Counsel set three goals that any resolution of this case must achieve: (1) termination of the tax; (2) an agreement that permitted recovery of a substantial portion of the improperly paid taxes; and (3) prompt resolution for the Class.  These goals were achieved largely through a creative mechanism that accounted for a critical financial fact in this case -- ATTM had collected the money but had not retained it.  Instead ATTM had paid all of the collected taxes to the governments to which it believed it owed them. Once this fact was confirmed, and ATTM understood that Class Counsel was prepared to

---

[17] Wyatt, Tarrant & Combs, LLP; Brown Rudnick Freed & Gesmer; Kutak Rock LLP; Butler, Snow, O'Mara, Stevens & Cannada; Nelson Mullins Riley and Scarborough; Faegre & Benson LLP; Drinker, Biddle & Reath; Brown Rudnick Berlack Israels LLP; Farfre & Benson LLP; Richards, Layton & Finger, PA; Lewis Wagner LLP; Jones Walker; Johnston Barton Proctor & Rose LLP; Adorno & Yoss LLP; McKenna Long & Aldridge.

compromise the already-filed litigation if these goals could be met, several months of arms-length negotiations resulted in the Settlement Agreement now before the Court.

But understanding the quality of Counsel's performance requires an appreciation of the very beginning of this case. This is not a case that followed a public furor nor a government investigation. This was a case that Counsel discovered, developed, researched, determined the viablity of actions in the involved states, and created litigation and settlement options from scratch. *See*, *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000)("the settlement size is particularly noteworthy as class counsel did not have the benefit of an SEC or other regulatory agency investigation and so prosecuted the case without assistance"). *In Re Synthroid Marketing Litigation*, 325 F.3d 974 (7th Cir. 2003)("Synthroid II") describes this effort as "entrepreneurial." *Id*. at 978. Indeed, ATTM itself did not know that it was improperly collecting the taxes in question. Thus, but for Counsel's work, ATTM would still be collecting these taxes -- and the Class would still be paying them.

Further, to achieve the prompt resolution goal, it was necessary not only to formulate compelling legal arguments resting on a firm factual foundation, but to give ATTM the opportunity to negotiate with a sufficiently broad spectrum of the potential cases to reach a settlement that would apply globally. In effect, putting together the litigation and settlement prospect of this case required creating a nationwide web of attorneys capable of coordinating their claims and promptly resolving issues of state-specific concern.

All of this planning, researching and virtual-firm assembly led to the settlement achieved. All three goals were met. The tax is stopped; there is a mechanism in place for

13

a substantial recovery for the Class; years have been trimmed off the litigation without sacrificing value to the Class.

Finally, there remains the public service aspect of this case. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974) reminds that class actions serve to address the claims of persons whose individual stakes would not otherwise justify the legal system considering their vindication.

The legal work, strategic planning, tactical operation and actual execution of this case by Plaintiffs' counsel was of high quality and never lost sight of the need for Counsel and Class to maintain aligned objectives.

**3.  The amount of work necessary to resolve the litigation**: Despite a potential for a decade's work on this case by both parties, this case was settled within a year of Counsel's discovery of ATTM's improper tax collections.  The reason for the relatively short duration of the case is quite simple: the settlement obtained nearly everything that could realistically be sought in the case.  Where a benefit for the class is obtained early in the litigation, the fee granted should "reward achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested...." *Lindy Bros. Builders, Inc. of Philadelphia v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 112 (3d Cir. 1976)(discussing the quality factor).

The amount-of-work factor in this case focuses on the *resolution* of the case, not just its settlement.  Thus the Court's award must necessarily reflect both (a) the work already done and (b) the work that remains after (but only if) the settlement is finally approved.

a.    **The work completed:**  This case began with two small law firms.  Its development depended on the creation of a nationwide, virtual law firm.  See Exhibit 3, Robertson Dec. at ¶¶ 5-9.  Ultimately, 92 lawyers from this virtual law firm ("Cooperating Counsel") filed 40 cases in 38 jurisdictions.

Negotiations with ATTM continued over nearly six months.  Each negotiation session was followed by independent research by and consultations with Cooperating Counsel on state-specific issues.  Robertson Dec. at ¶¶ 9, 13. At each step of the progress that led to the Settlement, the negotiating team conferred with Cooperating Counsel for suggestions and assurances that the agreement would operate to protect each state-specific Subclass. Robertson Dec. at ¶ 13.

Informal discovery took place throughout the negotiations, with ATTM providing data regarding the amount of taxes collected and the number of customers from whom it had collected those taxes in each major taxing authority.  Fees were never discussed until the agreement for the Class was finally reached.

Since preliminary approval the pace of work has accelerated.  Notice went out.  Through ARPC, Counsel monitored the sending of bill messages and text messages by ATTM to current customers and emails and postcards to former customers. Class Counsel monitored (and paid for) the construction of a web site.  Counsel authorized (and paid for) a toll free number for Class members.  Class Counsel also paid for the interim administrative efforts of ARPC.  And through ARPC, Class Counsel monitored the effect of notice by measuring hits on the website and calls to the toll-free number.  Counsel (and staff) have answered emails from the Class and telephone calls from Class members who had questions or concerns.

ATTM and Counsel have filed more than 2,000+ refund applications with 1,193 taxing authorities.[18] See, Settlement Agreement Exhibits H, K, L, M (Doc. # 50-2). Class Counsel have personally discussed the refund applications with officials in Arizona, Colorado, Michigan, Nebraska, Georgia, Mississippi, New York, and Pennsylvania and representatives of numerous cities. Class Counsel has monitored ATTM's interactions with taxing authorities daily, including those with Florida, Texas, Kentucky, Ohio, Washington, Oregon and Arkansas. The remaining jurisdictions have yet to respond.

**b.** **The work to be done.** The Settlement places ongoing obligations on Class Counsel to do the work and fund the efforts necessary to achieve recovery for the Class. Most significantly for the Class, compensation to Class Counsel is contingent upon the tax refunds actually obtained, not upon the potential recoveries. It is safe to assume that with the sums involved and the sheer number of jurisdictions and tax issues that must be engaged, there is a substantial amount of work yet to be done for the Class and for Counsel to be compensated.

**Lodestar Cross Check Issues:** Although the Seventh Circuit permits a lodestar cross check when a District Court considers a percentage of the fund fee request, no such cross check is necessary here for two reasons. First, unlike in most class action settlements, the work that needs to be done finally to resolve the litigation will continue well past final approval and, in all likelihood, will require more effort than was required to reach the initial settlement agreement and file the refund claims. Klonoff Dec. at ¶ 67. Moreover, the requested fees will be paid only out of cash received by the class, and thus

---

[18] ATTM operates several subsidiaries in most states, each of which had to file a separate claims for refund or provided data for Class Counsel to make such a filing.

there in no speculative element to the recovery, as there would be if the settlement returned non-cash recovery to the Class.

Second, as Dean Klonoff emphasizes, the fee requested here, which is tied to cash actually obtained for each Subclass, is at the low range of fees Courts have approved without a lodestar cross check. Klonoff Dec. at ¶ 68. For these reasons, *Synthroid II* counsels:

> One advantage of the contingent fee is that the client (or the judge as protector of the class's interests) need not monitor how many hours the lawyers prudently devoted to the case. The client cares about the outcome alone. Here, the district judge found (and we agree), the outcome is excellent from the class's perspective. Inefficient conduct of the litigation therefore does not afford any reason to reduce class counsel's percentage of the fund that their work produced.

*Synthroid II,* 325 F.3d at 979-80. The same holds true for efficient conduct of the litigation.

In fact, this is what courts do, as the leading academic studies confirm. Thus, Vanderbilt Law Professor Brian Fitzpatrick has concluded that a bare majority of percentage of the fund awards nationwide are made without a lodestar cross check. Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL LEGAL STUDIES 811, 833 (Dec. 2010). Within the Seventh Circuit, 61% of the cases in the study conducted by Cornell Professor Theodore Eisenberg and NYU Professor Geoffrey Miller were percentage of the fund fee awards without a lodestar cross check. Theodore Eisenberg and Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 248, 269 (2010) ("Eisenberg and Miller 2010 study").

    **4.** **The stakes of the case**: This is a high stakes case. Non-class arbitration, a real threat without ATTM's agreement to settle, would have reduced this case to a one-at-

17

a-time series of claims only for persons who were willing to prosecute personally their own claims. With this Settlement, it appears that in terms of the number of aggregate Class members (28 + million accounts/49+ million separate monthly charges) and of the amount of money involved ($1 billion+ in past damages/$2.02 billion in future damages avoided for the Class), this case is one of the largest consumer class actions ever settled. Moreover, unlike antitrust or securities cases that settle at huge discounts to the claimed harm, in this case the going-forward relief by itself has a value of approximately 64% of the total potential damages.[19] Assuming an 80% recovery of the taxes actually paid under various statutes of limitations, the recovery is 88% [20] of the total amount at stake in this litigation, an extraordinary return to the Class.

**THE BENCHMARK EVIDENCE**

1. **Actual fee agreements in the case:** Three named Plaintiffs signed contingent fee contracts in advance of filing their cases. In each instance, the client agreed to at least a 30% contingent fee. See Exhibits 4-7, Fee Agreements. The remaining Plaintiffs, all of whom are now Class Representatives, have filed declarations indicating that they expected that Counsel would be compensated on a contingent fee basis because there was no other way to provide economic incentives for Counsel to prosecute the case. These have agreed that a greater than 25% contingent fee is both acceptable to them personally and as a representative of the Subclass each represents, and that that would have been within the range they would have expected to pay for a successful result at the beginning of the case. As these declarations also address issues

---

[19] 2.02 billion (injunctive relief value) / 3.172 billion (total tax over-collection)

[20] As earlier noted, the total refund requests total $1.152 billion. Roughly speaking, the statute of limitations will likely reduce that amount by 17%, leaving the likely maximum recoverable amount at $956,160,000. 80% of that maximum recoverable under the statute of limitations is $764,928,000. (2,784,928,000/3,172,000,000)

reserved for the Court's final approval consideration, only a representative sample is filed with this motion. The remainder will be filed with the final approval papers. See Exhibits 8-16. Sample Declarations of Class Representatives

2. **Data from common fund cases:** The Seventh Circuit's mandate that a district court determine the *ex ante* market rate *ex post* has produced a number of fee decisions by district courts within the Circuit. These are the most relevant comparisons as they reflect Seventh Circuit doctrine, while those outside the Circuit may not have hewed as faithfully to the market rate line as cases within the Circuit.

The comparable case data supports the fee requested in this case. In the Northern District of Illinois, a substantial number of orders support a 30+% award. See Exhibit 17 (Table). Other federal district judges in the Northern District of Illinois have made independent judgments concerning the market rate for counsel in class actions as well. "This bench has previously found that 25 is the median fee award in cases involving recoveries of $5-15 million." *Abrams v. Van Kampen Funds, Inc.,* 2006 U.S.Dist. LEXIS 2129 *20 (N.D.Ill. 2006)(Hart, J.) (awarding 25% in securities case with $31.5 million settlement fund). "Thirty-three percent appears to be in line with what attorneys are able to command on the open market in arms-length negotiations with their clients." *Goldsmith v. Technology Solutions Co*., 1995 U.S. Dist. Court LEXIS 15093 *26 (N.D.Ill. 1995) (collecting cases). "The Court is independently aware that 33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentage in the legal marketplace for comparable commercial litigation." *Meyenburg v. Exxon Mobil Corp*., 2006 U.S.Dist LEXIS 52962 (N.D. Ill. 2006). *See*, also, *Court Awarded Attorney Fees,* Report of the Third Circuit Task Force, October 8, 1985 (Arthur R. Miller, Reporter), 108

F.R.D. 237, 247 n. 32 (1985) ("Judges systematically awarded fees in the range of twenty to twenty-five percent of the fund....").

Seventh Circuit affirmed fee awards also approve significant double digit percentage fees (or disapprove those that are too low). In *Synthroid II,* Judge Easterbrook grew impatient with the district court's fee calculations and set the fee award at 19.9% on appeal. "[W]e think it best to set the fees ourselves." *Id*. at 980. With a total at stake of $88 million, Judge Easterbrook used the bands contemplated in a related agreement to set the fee, with the bands ranging from 30% for the recovery below $10 million to 10% of the amount above $66 million.

*Taubenfield v. Aon Corp*., 415 F.3d 597 (7th Cir. 2005) affirmed a 30% fee on appeal. Although a settlement was obtained for the class "at a relatively early point in time," there were many factors supporting the 30% fee: similar awards made by courts in analogous class actions; the quality of the representation; the contingent nature of the case and significant degree of risk of nonpayment; and, the legal hurdles faced in proving liability.

*Sutton v. Bernard,* 504 F.3d 688 (7th Cir. 2007), reversed a district court's decision to set fees at 15% when counsel had requested 28%. The Court found that calculation too parsimonious, concluding that the district court abused its discretion, vacating the judgment and remanding for the district court to find the market rate.

> The trouble we have with the district court's methodology is that the fee determination began and ended with the amount actually recovered for the class; the court did not consult the market for legal services for guidance in what constituted, as an abstract matter, a "reasonable percentage." *Cf. Missouri v. Jenkins,* 491 U.S. 274, 285, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (in determining attorneys' fees, "we have consistently looked to the marketplace as our guide to what is 'reasonable' ").

*Id*. at 693.

Professor Fitzpatrick's analysis of 688 federal class action settlements in 2006 and 2007 found the median and mean percentage awarded for attorneys fees was approximately 25%. Fitzpatrick, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES at 834. Specifically, for consumer class actions, the mean was 23.5% and the median 24.6%. *Id*. at 835. Within the 7th Circuit, the mean for all class actions was 27.4% and the median 29.0%. *Id*. at 836. And finally, for class actions nationally exceeding $72.5 million (so-called "megafund" cases), the mean fee award was 18.4% and the median was 19.0%. *Id*. at 839. The range of these large cases included a $7.2 billion class action (Enron) in which the attorneys fees were set at 9.52% ($688 million), according to a blended *ex ante* contract. The *Enron* fee award skewed the fee average downward within the top range.

The Eisenberg and Miller 2010 study examined 689 settlements over a sixteen year period. The mean and median fees awarded for these class actions were 23% and 24% of the settlements respectively. Eisenberg & Miller, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES at 262. Moreover, when weighing risk, the study found that for consumer class cases deemed "high risk," the mean fee was 31.3%; cases deemed "medium/low risk" warranted a mean fee of 24.7%. *Id*. at 265.

The Court has also been provided substantial evidence demonstrating that the requested fees are well below the customary fees for complex contingency representation. Four experienced practitioners have provided declarations. See Exhibits 17-20 (Declarations of Spencer Hosie; Charles Parker; Lawrence Ward; and Edward Dowd, Jr.)

All of these evidentiary and judicial data points establish that the requested fee is well below the market for comparable contingency representation. The requested fee

here  -- 8.03% of the total value -- is well below the usual fee in comparable class action cases.  It is much less than is permitted by Congress (or actually paid by the Government) for the vindication of taxpayers' rights in cases involving hundreds of millions of dollars.[21]  It is considerably less than *ex ante* market rates would mandate.

3.        **Bids and results from class counsel auction cases:** *Synthroid I* suggests that auctions run by judges between competing law firms prior to the commencement of heated litigation also helps determine the *ex ante* market rate for legal services.  *Id*. at 720.

If *Synthroid II* is any indication, auctions sometimes produce bands for fee awards, reducing fee award  as the recovery increases.  Yet, while lowering economic incentives at the high end might make sense when the marginal difficulty in obtaining the last dollar for the class is nearly the same as obtaining the first dollar, when the sources of payment are many and the marginal difficulty increases substantially after the low hanging fruit is picked, as here, the bands actually create disincentives for Counsel to work to obtain the hard-to-get recoveries.  Thus, in *Enron*, where multiple defendants held

---

[21] By analogy, the False Claims Act, 29 USC § 3729,  provides that where an individual assists in the vindication of claims of the United States against entities who make false claims against the United States, that whistleblower is entitled to a fee of 15%-25% of the value recovered by the Government even when the Government takes over the prosecution of the case *in toto*. Under the statute, a whistleblower need only report the fraud by filing the complaint with the Government to receive the award.

(1) If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action.

29 USC § 3730(d)(1). Where the whistleblower does substantially all the work, including litigating the case to settlement or judgment, the whistleblower's share increases to as much as 30% of the Government's recovery.  29 U.S.C.  730(d)(2).

*See*, e,g, United States Department of Justice, Office of Public Affairs, "GlaxoSmithKlein to Plead Guilty & Pay $750 Million to Resolve Criminal and Civil Liability Regarding Manufacturing Deficiencies at Puerto Rico Plant", http://ww.justice.gov/opa/pr/2010/October/10-civ-1205.html.  The whistleblower received a 22% fee ("approximately $96 million") of the $436,440,000 federal civil share of the settlement.

money owed the class, the *ex ante* contract (which the court ultimately followed in setting the fee award) called for payment of 8% for amounts below $1 billion, 9% for recoveries between $1 billion and $2 billion and 10% for amounts recovered exceeding $2 billion. "[T]he [fee] agreement should provide for a modest increase in the marginal fee percentage as the recovery increased to provide counsel an adequate incentive to pursue additional sources of recovery." *In re Enron Corporation Securities, Derivative and ERISA Litigation,* 586 F.Supp. 732, 768 n. 35 (S.D. Tex. 2008). See also, John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 697 (1986)(suggesting that fees ought to increase at the high end of the recovery range).

That said, *In re Cabletron Sys. Sec. Litig.*, 239 F.R.D. 30, 43-44 (D.N.H. 2006), contains a survey of seven auctions in securities litigation, most with bands that resulted in decreased fees as recoveries increased. For a $75 million recovery, the auctions resulted in fees ranging from 4.4% to 23.2%.

We have found no cases in which consumer class actions were the focus of an auction. Even conceding that germaneness of the auction data, however, the fee requested here falls within the low range of what auctions have produced in securities cases.

**Summary as to Benchmark Evidence**: Considering the *ex ante* contracts in place in this case, the empirical data from cases in which courts have determined the proper *ex ante* fee *ex post*, and the data from auctions, the fee requested in this case -- the

lesser of 10% of the total value to the Subclass or 25% of the actual cash recovery, falls at the low end of the accepted ranges approved by courts in the Seventh Circuit.

**Expenses for which reimbursement is sought**: Counsel seek reimbursement of out-of-pocket expenses in the amount of $710,765.06.[22]   These expenses were incurred in the conduct of this litigation and were directly related to the business of and on behalf of the interests of the Class.  The expenses are itemized as Exhibit 22.

**Incentive Awards for Class Representatives:**  On occasion, many individuals are harmed by the same wrongful practice, yet individual actions are impracticable because the individual recovery would be insufficient to justify the expense of bringing separate lawsuits. *Nat'l Ass'n of Consumer Advocates: Standards and Guidelines for Litigating & Settling Consumer Class Actions,* 176 F.R.D. 375 (West 1998). Thus, class actions allow individuals to aggregate their power and enable them to take on powerful adversaries. *Id.*  The Class Representatives in this case therefore "made it possible for class members in their respective jurisdictions to pursue their claims."  Klonoff Dec. at ¶ 77.  See, *In re Continental,* 962 F.2d at 571 ("without a named plaintiff there can be no class action").

Incentive awards are "fairly typical" in class actions. *Rodriguez v. West Publ'g Corp.,* 563 F.3d 948, 958 (9th Cir.2009).  *See*, *Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993)(collecting cases). Such awards are discretionary and serve to compensate named plaintiffs for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and

---

[22] Counsel anticipate that they will be required to advance substantial aditional costs under their oblgiations to pursue refunds as rquired by the Settlement agreement following final approval (if final approval is granted).  Counsel will seek additional expense approval if such costs are incurred on behalf of the Subclasses.

to recognize a willingness to act as a private attorney general. *Id.* In deciding whether to grant an incentive award to a named plaintiff, a court should consider the actions the plaintiff has taken to protect the class's interests, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation. *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir.1998).

Here, each Class Representative stood ready and was committed to go through discovery as necessary, to be a part of any trial that would follow, reviewed the settlement agreement and approved it, and has also considered and approved the fee application filed in this case. The possibility of an incentive award, not only to compensate for time actually spent, but for the willingness to come forward on behalf of others, is deserving of the modest incentive award of $5000 requested here.

Respectfully submitted,

Dated:    January 26, 2011

/s/ Edward D. Robertson, Jr.
Edward D. Robertson, Jr.
James P. Frickleton
Mary D. Winter
BARTIMUS, FRICKLETON,
ROBERTSON & GORNY, PC
715 Swifts Highway
Jefferson City, MO. 65109
573-659-4454 (Voice)
573-659-4460 (Facsimile)

Harry Huge
The Huge Law Firm, LLP
1080 Wisconsin Ave., N.W., Suite 3016
Washington, DC  20007
202-965-4672

**Class Counsel**

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served upon all parties on this 26th day of January, 2011, via ECF and by mailing a true and accurate copy by first class mail, postage prepaid to all parties that have not established ECF notification.  With the exception of Thompson Coburn – St. Louis, and Mayer Brown - Chicago, ATTM has agreed to waive service on all defense counsel that are not registered for ECF notification.


/s/ Edward D. Robertson, Jr.
Counsel for Cooperating Interested Parties