```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   IN RE AT&T MOBILITY WIRELESS        ) Docket No. 10 C 2278
     DATA SERVICES TAX LITIGATION        )
 4                                       )
                                         ) Chicago, Illinois
 5                                       ) March 10, 2011
                                         ) 9:30 o'clock a.m.
 6
             TRANSCRIPT OF PROCEEDINGS - FAIRNESS HEARING
 7              BEFORE THE HONORABLE AMY J. ST. EVE

 8   APPEARANCES:

 9   For the Settlement        BARTIMUS, FRICKLETON, ROBERTSON
     Class:                      & GORNY
10                            BY:  MR. EDWARD D. ROBERTSON, JR.
                                   MR. JAMES P. FRICKLETON
11                                 MS. MARY WINTER
                              11150 Overbrook Road, Suite 200
12                            Leawood, Kansas  66211

13                            MR. HARRY HUGE
                              1250 24th Street, N.W.
14                            Washington, D.C.  20037

15                            MR. SAMUEL ISSACHAROFF
                              40 Washington Square South, 411J
16                            New York, NY 10012

17   For Karen Wiand:         MARK S. BAUMKEL & ASSOCIATES
                              BY:  MR. MARK S. BAUMKEL
18                            30200 Telegraph Road, Suite 200
                              Bingham Farms, Michigan  48025
19
     For Angela Vrana and     WEINSTEIN LAW
20   Barbara Fisher:          BY:  MR. BONNER C. WALSH
                              518 East Tyler
21                            Athens, Texas  75751

22   For John Gaffigan:       STEWARD LAW FIRM, LLC
                              BY:  MR. JOHN S. STEWARD
23                            5201 Hampton Avenue
                              St. Louis, Missouri  63109
24

25
```

```
 1   APPEARANCES (Cont'd):

 2   For AT&T Mobility:          MAYER BROWN, LLP
                                 BY:  MR. THOMAS M. DURKIN
 3                               71 South Wacker Drive
                                 Chicago, Illinois  60606
 4
                                 MAYER BROWN, LLP
 5                               BY:  MR. ARCHIS A. PARASHARAMI
                                 1909 K Street, N.W.
 6                               Washington, D.C.  20006

 7                               THOMPSON COBURN, LLP
                                 BY:  MR. ROMAN P. WULLER
 8                                    MR. ROBERT J. WAGNER
                                 One US Bank Plaza
 9                               St. Louis, Missouri  63101

10   Court Reporter:            MR. JOSEPH RICKHOFF
                                 Official Court Reporter
11                               219 S. Dearborn St., Suite 1232
                                 Chicago, Illinois  60604
12                               (312) 435-5562

13                  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

14
                            PROCEEDINGS RECORDED BY
15                         MECHANICAL STENOGRAPHY
                       TRANSCRIPT PRODUCED BY COMPUTER
16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  10 C 2278, In Re AT&T Mobility Wireless

2    Tax Data Litigation.

3          THE COURT:  Good morning.

4          Does somebody want to step up, please, for each side?

5          MR. DURKIN:  Good morning, your Honor, Tom Durkin for

6    AT&T, along with Roman Wuller, Archis Parasharami and Robert

7    Wagner.  And Tom Green from AT&T is present.

8          MR. ROBERTSON:  Your Honor, Chip Robertson on behalf

9    of the class, along with Jim Frickleton and Sam Issacharoff

10   and Harry Huge and Mary Winter.

11         All of them may have speaking roles today, depending

12   upon how this goes.

13         THE COURT:  Good morning.

14         MS. WINTER:  Good morning.

15         MR. FRICKLETON:  Good morning.

16         MR. HUGE:  Good morning.

17         THE COURT:  And I will get to if there are any

18   objectors here in a moment.  Just a couple of things.

19         I received last night -- I received a letter from the

20   Colorado Tax Department and from the Ohio Tax Department.  You

21   can divide those and share.  Katie will put them on the

22   docket.  But when they are e-mailed to us, we cannot get them

23   immediately uploaded to the docket.  So, they will be put on

24   the docket and I will give you time to respond.

25         Do you plan on putting any witness on today?  What do

1  you plan on doing?  And, if so, who are they?

2       MR. ROBERTSON:  Well, your Honor, we do plan on

3  putting on some witnesses.  And they're going to be hopefully

4  to assist you in having all the information you need to make

5  your decision in this matter.  In particular, we're going to

6  pay -- we have paid -- it's been read and read and reread, the

7  Footnote 7 about the information that you needed.

8       And the first witness will be Dr. Elisabeth Landes,

9  who will address the third of your questions in Footnote 7;

10  which is:  What is the value of the contractual agreement

11  between AT&T and the class in the settlement to cease the

12  collection of the tax?

13       And, then, following her, we will have Dr. Tom

14  Florence from ARPC, who will be available to discuss a number

15  of issues.  Among them, the amount of tax refund that has been

16  requested from the states and data that's consistent with the

17  Court's request on Point No. 2.

18       And, then, your first question was the amount of

19  money that's been lost.  And that, Dr. Florence will also

20  address.  And that's been, of course, in the papers.

21       THE COURT:  Yes.

22       MR. ROBERTSON:  Dr. Landes has refined her

23  calculation a bit since she filed her report, and she will

24  testify to that, given some more current data that's available

25  to her now on AT&T's churn rate.

1          THE COURT:  Okay.

2          MR. ROBERTSON:  Following that, your Honor, we

3   thought if the Court would like -- and, obviously, whatever

4   direction you want to give we're going to take, but we put up

5   a couple of members of the lawyers who worked in the states,

6   but who were not part of the negotiating team, so that the

7   Court can get a flavor of what work they did in this process.

8          And, then, depending upon whatever else is necessary,

9   there's some reluctance on my part, but some think I should

10  testify a little bit about what we did.  But I'd be happy to

11  do it by standing here and answering your questions.

12         THE COURT:  I will definitely have some questions for

13  you, although there may be some who want to cross-examine you.

14         (Laughter.)

15         MR. ROBERTSON:  Well, your Honor, I fought against

16  this, but I've lost.

17         And, then, finally, Dr. -- sorry, Dean Robert Klonoff

18  will testify.  He's provided to you a couple of declarations,

19  and we'll put a little color on those for you.

20         THE COURT:  Okay.

21         MR. ROBERTSON:  We hope to have this completed all

22  for you today.  We're going to move as quickly as we can.  We

23  know there's some people who would like to come in and suggest

24  that we did some things that could have been done better, and

25  they surely have a right to be here.  And we don't know who is

1    here except for Mr. Baumkel.  And, so --

2            THE COURT:  I am about to find out.  So, we will see.

3            And I have all day today and I have tomorrow set

4    aside, and I will go -- we will have a full day today.  So, we

5    will see if we can get it done in one day.  If not, we can

6    spill over into tomorrow.

7            MR. ROBERTSON:  Thank you.

8            THE COURT:  You will have a full day here today.

9            Mr. Durkin, do you plan on putting anyone on besides

10   what class counsel is doing?

11           MR. DURKIN:  We do not, your Honor.

12           THE COURT:  Now, are there any objectors here who

13   plan on either speaking or putting on evidence?  If there are,

14   please come forward.

15           MR. WALSH:  Good morning, your Honor.

16           THE COURT:  Good morning.

17           MR. WALSH:  Bonnie Walsh here for the Vrana and

18   Fisher objectors.

19           THE COURT:  And I did receive your submission, Mr.

20   Walsh.

21           Do you plan on putting on any evidence today?

22           MR. WALSH:  I would only like to cross-examine one of

23   the witnesses that they've already noted will be presenting

24   evidence.

25           THE COURT:  Who is that?

```
 1          MR. WALSH:  Mr. Klonoff.  I hope I said that
 2   correctly.
 3          THE COURT:  Dr. Florence or --
 4          MR. WALSH:  I'm sorry.  Klonoff.  The name is
 5   Klonoff, K-l-o-n-o-f-f.
 6          THE COURT:  Klonoff.  Okay.
 7          And you do not plan on putting on any witnesses
 8   yourself?
 9          MR. WALSH:  No, I do not.
10          THE COURT:  Good morning, sir.
11          MR. STEWARD:  Good morning, your Honor, John Steward
12   for plaintiff class member John Gaffigan.
13          THE COURT:  And, Mr. Steward, do you plan on putting
14   on any evidence?
15          MR. STEWARD:  No, your Honor.
16          THE COURT:  Do you plan on cross-examining?
17          MR. STEWARD:  No, your Honor.
18          THE COURT:  I will give you the opportunity if --
19   once you hear the testimony, if -- you want to for any reason.
20          Thank you.
21          And, Mr. Baumkel, good morning.
22          MR. BAUMKEL:  Good morning.  Nice to see you, again,
23   your Honor.  I'm here on behalf of Mrs. Wiand.
24          I'm not going to call any witnesses.
25          Your Honor, I do have a collection of documents that
```

1   was the subject of our hearing a few weeks ago.  They're all

2   marked "confidential."  I'm sort of baffled when I see them as

3   to why they're all marked "confidential."  But I want to, at

4   some point when the Court deems it appropriate, give those to

5   you.  I'd like to give you the originals so they're in the

6   record and -- however you and AT&T agree, until such time as

7   you get to look at them and determine whether they warrant

8   being confidential, that the Court will hold them in whatever

9   fashion you and AT&T think is appropriate in accord with the

10  stamp on them --

11           THE COURT:  Okay.

12           MR. BAUMKEL:  -- "confidential."

13           THE COURT:  And I will certainly give you the

14  opportunity to do so.  Hopefully, you are going to give me

15  some explanation of them, one way or the other, as to what

16  they are and --

17           MR. BAUMKEL:  Right.

18           THE COURT:  -- why you think they are relevant.

19           MR. BAUMKEL:  Yeah.  I don't want to belabor it, even

20  though the explanation would be very short, right now, so that

21  we can get rolling, because I don't know if the Hyatt will

22  have me, again, tonight.  So, I'd like to get out of here

23  today also, like everybody else.

24           THE COURT:  Okay.

25           Anything else you anticipate doing?

```
 1              MR. BAUMKEL:  I may have some cross-examination
 2    because I don't know what their witnesses are going to say.
 3              THE COURT:  I will give you the opportunity.
 4              MR. BAUMKEL:  And I'll have, you know, some
 5    generalized statements as to, you know, my thoughts at
 6    whatever point in the proceedings the Court thinks that's
 7    appropriate.
 8              THE COURT:  I will take -- at the end of all the
 9    evidence, I will take -- whatever statements anybody wants to
10    make.  I will have questions then.  I want to get through the
11    evidence first.
12              Any other objectors in the audience who want to put
13    anything on the record or who anticipate calling any
14    witnesses?
15              Speak now if you do.
16              (No response.)
17              THE COURT:  Okay.  Thank you.
18              One thing I feel compelled to say at the beginning,
19    and based on the tone of some of the submissions to the Court,
20    I will remind you all of your professional obligations and
21    assume that there will not be any personal attacks on anybody
22    individually.  You can argue whatever you would like in a
23    professional manner.  I am interested in hearing what you have
24    to say.  But I stress the professionalism, and I expect and
25    assume and I know that you will keep it at that.
```

1          Mr. Robertson, please call your first witness.

2          MR. ROBERTSON:  Your Honor, let me, just as one

3    preliminary thing, indicate that most of these people in the

4    back are certainly not all of the ones who were working with

5    us, but they're interested and are here; and, if the Court has

6    any desire to hear from any of them beyond the ones we bring,

7    we'll be happy to do that.

8          Mr. Frickleton will put on the first witness, your

9    Honor.

10         THE COURT:  Okay.

11         Mr. Frickleton?

12         MR. FRICKLETON:  Thank you, your Honor.

13         As a matter of housekeeping, before we begin, I

14   provided to your clerk, who, I think, has provided to you, two

15   notebooks, one of which --

16         THE COURT:  Yes, I have them.

17         MR. FRICKLETON:  -- includes Exhibits 1 through 56.

18   Exhibits No. 54 and 55 are voluminous and in a separate

19   notebook.  And there is a disc including electronic versions

20   of all of them.

21         THE COURT:  Thank you.

22         MR. FRICKLETON:  In addition to that, your Honor,

23   there was one exhibit we were not able to premark, Exhibit

24   57 --

25         THE COURT:  Okay.

Landes - direct

1          MR. FRICKLETON:  -- which I'll be using with

2   Mr. Florence.

3          THE COURT:  Are you going to use both of these

4   binders with your first witness?

5          MR. FRICKLETON:  No, your Honor, just the smaller

6   one.

7          THE COURT:  Help me out a little.

8          MR. FRICKLETON:  The one without the two stickers on

9   it.

10          (Laughter.)

11          THE COURT:  Okay.  Thank you.

12          Whenever you are ready, go ahead.

13          MR. FRICKLETON:  Thank you, your Honor.

14          The plaintiff class calls Elisabeth Landes --

15   Dr. Elisabeth Landes.

16          ELISABETH LANDES, PLAINTIFFS' WITNESS, SWORN

17          MR. FRICKLETON:  Your Honor, may I approach the

18   witness with a copy of the exhibits?

19          THE COURT:  You may.

20          (Document tendered.)

21                    DIRECT EXAMINATION

22   BY MR. FRICKLETON:

23   Q.  Dr. Landes, would you introduce yourself to the Court,

24   please?

25   A.  Yes.  I'm Elisabeth Landes.

Landes - direct

12

1   Q.  And what is your business or profession?

2   A.  I am an economist.  I am employed by Compass Lexecon.  I'm

3   in the Chicago office here.  I have -- I'm a senior vice

4   president at Compass Lexecon.  I've been there for 30 years.

5   And I have a Ph.D. in Economics from Columbia University in

6   New York.

7   Q.  Doctor, among the exhibits in the notebook in front of you

8   is Exhibit 10.  Is that a copy of your current resume or

9   curriculum vitae?

10  A.  Yes, it is.

11  Q.  An does that summarize your education, your employment

12  history, your professional accomplishments and also list a

13  number of legal cases that you have worked on, either in a

14  consulting capacity or for purposes of giving testimony?

15  A.  Yes, it does.

16  Q.  Okay.

17        You indicated that you had a Ph.D.  Let's start with

18  your more basic education.

19        Where did you go to college?

20  A.  I went -- I graduated in 1967 from Radcliffe College in

21  Cambridge.

22  Q.  Studying, what?

23  A.  Mathematics.

24  Q.  And your graduate studies were where?

25  A.  I studied for one year at the University of Chicago and,

Landes - direct

13

 1   then, I transferred to Columbia.

 2   Q.  All right.

 3          And what sort of degree did you obtain at Columbia?

 4   A.  I obtained my Ph.D. in Economics.

 5   Q.  Prior to going to work with Lexecon -- what is now Compass

 6   Lexecon -- what did you do?

 7   A.  I was, for many years, a post-doctoral fellow, first at

 8   the National Bureau of Economic Research in New York and, at

 9   the same time, at the University of Chicago in the Economics

10   Department.

11          I then was a post-doctoral -- had a post-doctoral --

12   fellowship at the business school at the University of

13   Chicago, now the Booth School, but then not.

14          I also taught.  I was a visiting assistant professor

15   at the graduate school of business at the University of

16   Chicago.  I think that's -- that covers it.

17   Q.  Now, you're here today because we have asked you to help

18   us with some expert testimony in this case; is that correct?

19   A.  That is correct.

20   Q.  Have you done that sort of work in the past?

21   A.  Yes.  Yes, I have.

22   Q.  Can you share with the Court some of the more significant

23   engagements you have had with respect to offering consulting

24   work or expert testimony in matters of economics as they

25   relate to the law?

Landes - direct

14

1   A.  I was most recently -- well, in Chicago, for example, I

2   was a testifying expert in the BAGC vs. The City of Chicago,

3   which was an employment discrimination case here.

4           I also testified on matters of antitrust and

5   antitrust damages in a variety of cases here, in San

6   Francisco.  I've worked on employment discrimination cases.

7           I've also been involved in cases such as Playtex

8   Products vs. Procter & Gamble, where I testified on the

9   damages in an unfair competition -- actually, advertising --

10  case.

11  Q.  In this case, Dr. Landes, did we ask you to assist us by

12  applying your expertise to certain questions about the damages

13  in this class action settlement?

14  A.  Yes, you did.

15  Q.  And in that regard, did we ask you if you would be able to

16  provide an opinion concerning the value of the continuing tax

17  savings in the future to class members resulting from AT&T

18  ceasing this tax collection?

19  A.  Yes.  Yes, you did.

20  Q.  And in that regard, did you prepare a report for the Court

21  that is in the notebook and marked Exhibit 11?

22  A.  I did prepare a report, and it is marked as Exhibit 11.

23  Q.  Okay.

24          Now, Dr. Landes, that report was prepared some weeks

25  ago and, between that time and the current time, did new data

Landes - direct

1  come out regarding certain financial projections and other

2  financial matters regarding AT&T?

3  A.  Yes.  Just a very few days after this report was

4  submitted, AT&T came out with its fourth quarter earnings

5  report.  And that affected, to some extent, the data -- the

6  actual AT&T data -- on which I relied, and also affected the

7  estimates and projections that the financial analysts made

8  with respect to AT&T's future revenues.

9  Q.  And when you advised us of that, did we ask you to revisit

10  the numbers with the newer data -- more recent data -- and

11  evaluate what effect that would have on your opinions?

12  A.  Yes.

13  Q.  And did you do that?

14  A.  I did.

15  Q.  Okay.

16  A.  Yes, I did.

17  Q.  In the notebook under Tab No. 26, Exhibit 26, can you tell

18  us, does that exhibit contain the new tables that you prepared

19  as a result of that work?

20  A.  Yes, it does.

21  Q.  Okay.

22          We'll get into the weeds in those in just a moment,

23  but before we do that, I would like to ask you, generally

24  speaking, as you approached this engagement, conceptually how

25  did you believe that you would have to gather data and analyze

Landes - direct

16

1    data in order to evaluate the issues we asked you to evaluate?

2    A.  Well, initially, because the states have different tax

3    rates and different numbers of persons in the class, I thought

4    about trying to get into the varied details of the state tax

5    collections and the members of the class that are -- state by

6    state.

7            That actually -- it became very difficult to do.

8    And, also, going into that, I decided it wasn't going to

9    change my opinion, but it would lead to a sense of false

10   precision that I really wasn't going to be able -- I wasn't

11   going to be able to bring that -- that degree of precision to

12   the estimate.

13           So, I then went to the aggregate data.  I was

14   provided with data on state-by-state tax collections --

15   unauthorized tax collections, I should say.  I relied on AT&T

16   data for what their actual data revenues were.  I was able to

17   combine those two bits of information to determine in the

18   aggregate how much the tax -- it's not actually a tax rate,

19   but the average tax rate, I should say.

20           The AT&T data also provided me with information on

21   the number of subscribers that AT&T had to its wireless

22   service.  It provided me with information on the average data

23   revenue per subscriber, although I use the word "subscriber"

24   somewhat loosely.  It's really per subscription because people

25   can have more than one -- one subscription.

Landes - direct

17

1        And the financial analysts whose business it is to

2    advise their clients -- their investment clients -- how they

3    should proceed with respect to investments in AT&T take those

4    data also have -- also have -- also, I think, probably have --

5    further conversations with AT&T, and they make projections

6    going forward on the basis of those data.

7        So, I -- in addition to the actual AT&T data, I --

8    relied on the projections made by the financial analysts.

9    Q.  Let's identify those one at a time.  And, first of all,

10    let me ask you if you would look at Exhibit 24 just very

11    briefly.

12        Is Exhibit 24 a spreadsheet that we provided you that

13    is a compilation by month of the data that was generated by

14    AT&T to support the sales tax refund applications that were

15    made last fall?

16    A.  Yes.

17    Q.  Okay.

18        And did that give you, on a state-by-state basis and

19    a month-by-month basis, the amount of money that was actually

20    remitted to the various states by AT&T?

21    A.  Yes.

22    Q.  And this relates to taxes collected on Internet access

23    only; is that correct?

24    A.  That's my understanding.

25    Q.  All right.

Landes - direct

18

 1              Now, in addition to that data, you said that you

 2    researched various industry independent investment analyst

 3    predictions regarding AT&T; is that correct?

 4    A.  Yes, that's correct.

 5    Q.  Let's identify those first.

 6              In your report, which is Exhibit 11, you had an

 7    Exhibit B to that report, which listed 13 items that you used

 8    as reference materials.  And we've marked those as additional

 9    exhibits, No. 13 through 23, correct?

10    A.  If you would give me a moment?

11              Yes.

12    Q.  All right.

13              I won't go through all of those, but, for example,

14    there are reports from Merrill Lynch, from Collins Stewart,

15    from Morgan Stanley, from a whole bunch of the big investment

16    analysts and banking firms, correct?

17    A.  That's correct.

18    Q.  All right.

19              Why did you gather that information?

20    A.  I gathered that information in order to -- or I relied on

21    that information, I should say.  I gathered it in order to

22    provide me with their projections of what AT&T's future

23    revenues from wireless data service would be.

24    Q.  All right.

25              And is that the type of information that is typically

Landes - direct

19

 1    reasonably relied on by experts such as yourself when doing

 2    this kind of work?

 3    A.  Yes, absolutely.

 4    Q.  Now, I mentioned earlier that you did some updated tables.

 5    Once you had the data from AT&T regarding the tax remittance

 6    and you had these materials from the various mortgage banking

 7    companies and you had AT&T's 2010 final financial and

 8    operational results, did that give you what you believed you

 9    needed in order to do the work in this case?

10    A.  Yes.

11    Q.  All right.

12          So, let's jump to the most recent tables that you

13    have done, which are Exhibit 26, okay?

14    A.  Uh-huh.

15    Q.  Conceptually and just so we know where we are, when you

16    looked at the new data regarding projections and churn rate

17    for AT&T, did it change your calculations somewhat?

18    A.  It did.  AT&T's actual fourth quarter financial results,

19    particularly for data services, came in somewhat under the

20    analyst projections.  So, they -- so, in addition to -- in the

21    first report, I relied on the analyst projections for fourth

22    quarter of 2010.  In this, I rely on AT&T's actual results for

23    2010.

24          And the change in AT&T's financial results caused the

25    analysts to update or revise somewhat their own projections.

Landes - direct

1    So, I then relied on the revised projections.

2    Q.   And the revised projections that you relied on, were you

3    able to get projections from each of the 10 or 11 financial

4    firms that you had previously gathered information from?

5    A.   No, not all.   But I was able to obtain -- or I used the

6    most recent data from -- for the two critical inputs on

7    which -- that I used in my calculations, which were the

8    average revenue per unit, I think, is the actual -- for the

9    wireless data revenue and the monthly churn rates, which are

10   an important element to what I've done.

11   Q.   Okay.

12          And, specifically, were you able to get updated

13   projections from Collins Stewart, Deutsche Bank, Morgan

14   Stanley and Oppenheimer Financial?

15   A.   Yes, I was.

16   Q.   And we have marked those as Exhibits 27, 28, 29 and 30,

17   respectively, correct?

18   A.   Yes.

19   Q.   All right.

20          Now, with that background, Dr. Landes, let me ask you

21   to turn to Table 1 of Exhibit 26.   These are your updated

22   numbers?

23   A.   That's correct.

24   Q.   First of all, what is Table 1 designed to show?

25   A.   What Table 1 is designed to show, the data on which I

1   relied for my projections -- or for my estimates -- of the

2   value of the continuing tax savings.

3   Q.  All right.

4        This period of time deals with the fourth quarter of

5   2010 all the way to 2014?

6   A.  That is correct.

7   Q.  And when in 2014?

8   A.  I think until November 1st of 2014.

9   Q.  And why did you stop your projections then?

10  A.  My understanding is that that is when the Internet Tax

11  Freedom Act expires.

12  Q.  Okay.

13       And we asked you not to project anything beyond that;

14  is that correct?

15  A.  That's correct.

16  Q.  Did we also make it clear to you, Dr. Landes, that when

17  evaluating the future savings to the class, you should limit

18  that evaluation to just class members as opposed to the

19  economy as a whole?

20  A.  Yes, that's correct, because clearly the benefits of the

21  settlement extend beyond the benefits that will be enjoyed by

22  the class members.

23  Q.  All right.  We'll come back to that a little bit later.

24       Is that why you needed to know what's called in the

25  industry the churn rate?

Landes - direct

1   A.  Yes.  Because my understanding was, I was to estimate the

2   benefit to the existing class members.  I had to estimate the

3   number of class members who would continue to subscribe to AT

4   and wireless data service in the future ongoing through the

5   1st of November, 2014.

6   Q.  Okay.

7         So, turning back to Table 1, the top part of Table 1

8   is labeled "Wireless Data ARPU Forecasts"?

9   A.  That's correct.

10   Q.  And "ARPU" stands again for, what?

11   A.  Average revenue per unit, I believe.

12   Q.  All right.

13         And is that a reported number by these various

14   analysts?

15   A.  Yes.

16   Q.  And does that relate to the average dollar value of

17   revenue per unit of cellphone or laptop connectivity card or

18   other device that accesses the Internet?

19   A.  Well, actually, this is the average revenue per unit of a

20   subscriber to AT&T's wireless service.

21   Q.  Okay.

22   A.  So, it includes more than those who receive Internet

23   service.

24   Q.  But is it limited to -- is the wireless data ARPU limited

25   to data?

Landes - direct

1    A.   Yes.

2    Q.   Okay.

3         Now, you listed the various projections for Collins

4    Stewart, Deutsche Bank, and Oppenheimer.  And did you

5    determine the mean wireless data average revenue per unit

6    forecast for those companies?

7    A.   Yes.  And that is the row that's labeled, "Mean Forecast."

8    Q.   Beginning in the fourth quarter of 2010 at $17.50 and

9    progressing to 2014 at $22.13?

10   A.   Correct.

11        The 17.50 is actually what AT&T reported for the

12   fourth quarter of 2010.

13   Q.   Pardon me.

14        That came from their actual report at the end of the

15   year?

16   A.   Yes, it did.

17   Q.   So, the remainder of them in 2011, the mean is $18.78, for

18   example?

19   A.   That's correct.

20   Q.   And that's the mean of the three forecasts that you listed

21   above?

22   A.   Yes.

23   Q.   Okay.

24        Now, moving down to the bottom half of the chart, the

25   wireless monthly churn rate forecasts.  Did the various

Landes - direct

24

1   financial analysts that you've listed report the churn rate in

2   the years that are listed on this chart?

3   A.  Yes, that's correct.

4   Q.  And did you determine the means of those?

5   A.  I did.  And, again, that's labeled, "Mean Forecast."

6   Q.  Now, the fourth quarter 2010 number, is that a mean or an

7   actual number?

8   A.  That is an actual number.

9   Q.  Okay.

10          1.32 percent?

11  A.  That's correct.

12  Q.  Now, these are monthly churn rates as opposed to annual

13  churn rates?

14  A.  That is correct.

15  Q.  All right.

16          Now, is there anything else about Table 1 that you

17  believe you need to explain for the Court?

18  A.  No.

19  Q.  All right.

20          Moving then to Table 2, can you tell us conceptually

21  what it is you were trying to do with Table 2?

22  A.  Well, the data in Table 1 tell me the average -- either

23  the actual or the average -- forecasted value of the monthly

24  wireless data service ARPU.  That's essentially the price --

25  or it's not actually a price, but it is the average revenue

Landes - direct

 1  that AT&T collects per unit or per subscriber.

 2        The second row is the result of my combining the

 3  churn rate information with the existing -- the number of

 4  subscribers who existed at AT&T at the end of the third

 5  quarter of 2010, which was somewhere around 93 million -- 92.7

 6  million, I think.

 7        So, in order to determine how many of those

 8  subscribers who were there at the end of the third quarter of

 9  2010 would remain on average through the fourth quarter of

10  2010 or the average number that would be there, I used the

11  churn rate data.  And that result is in that fourth quarter

12  2010 column.  It was 90 -- 90 million.  Excuse me.  90.3

13  million.

14  Q.  Okay.

15        You mentioned earlier that you got the end of the

16  third quarter average number of subscribers.  Where did you

17  get that figure, the 92 or 93 million?

18  A.  That also comes from AT&T's financial statements.

19  Q.  Okay.

20        So, you had the actual numbers of their subscribers,

21  correct?

22  A.  At the end -- the actual number who were there at the end

23  of the third quarter of 2010.

24  Q.  And, then, applied the churn rate month by month by month,

25  correct?

Landes - direct

1   A.   Correct.

2   Q.   There would have been three of them to get to the end of

3   the year, I suppose?

4   A.   Correct.

5   Q.   And that results in a result of an estimate of 90,334,000

6   subscribers at the end of 2010?

7   A.   No, not the end of 2010, because there would have been

8   fewer at the end of 2010.  But since I have the average

9   revenue per subscriber, I need to know the average number of

10  subscribers.

11          So, some number of them are there in the first month,

12  some number in the second month and some number -- smaller

13  number -- are there in the -- or lasts through the third

14  month, I should say.  And it's the average of those.

15  Q.   Okay.  Thanks for that correction.

16          Now, then did you continue with that calculation

17  through 2011, 2012, 2013 and up to November of 2014?

18  A.   I did.  It's exactly the same methodology, but obviously

19  there are 12 months in the years 2011 through 2013, and there

20  were ten months in the year 2014, for which I made that

21  calculation.

22  Q.   Now, what was the purpose of applying this churn rate to

23  the number of subscribers?  What was it you were trying to get

24  at?

25  A.   I was trying to get at the number of -- a metric of the

Landes - direct

1    number of -- class members who would still be subscribers

2    through the end of the period.

3          Now, I have to say that it's -- this is in some sense

4    a draconian way of doing it, because some subscribers who

5    are -- who are churn -- who might churn -- in the fourth

6    quarter of 2010 may in 2012 come back to AT&T.  And to the

7    extent they were members of the class, then they benefit from

8    those later years, as well.  But I'm not able to estimate

9    that.

10         And, in addition, some subscribers who are listed as

11   churns are not really.  And in the same sense, some

12   subscribers who are listed as net adds, as new adds, whom I

13   don't include in the members of the class, are not really

14   either churns or new adds, but they're just continuing

15   subscribers.

16   Q.  Okay.

17         Did we ask you to be conservative in evaluating the

18   number of persons that would continue to be members of the

19   class?

20   A.  Yes.

21   Q.  And is the method by which you have applied the churn rate

22   to the number of subscribers the conservative way to approach

23   this?

24   A.  I believe it is, yes.

25   Q.  And, in summary, are you saying that a class member may

Landes - direct

1    leave and come back to AT&T, but you've not included the

2    return?

3    A.   That's correct.

4    Q.   Okay.

5         And, so, as you apply the churn rates to the number

6    of subscribers, by 2013 your calculation shows that only 58

7    million potential subscribers remain; and, by 2014, only 50

8    million remain; is that correct?

9    A.   Yes, that is correct, on average.

10   Q.   Now, the number of subscribers is not necessarily the same

11   as the number of accounts that AT&T has; is that correct?

12   A.   Well, the number of subscribers -- the way I think of it

13   is number of subscribers is not the same as the number of

14   persons who subscribe to AT&T.

15   Q.   Okay.

16   A.   Because people may have a variety of devices.  And I

17   believe -- for example, if I have a BlackBerry account with

18   AT&T but I also have an iPad account with AT&T, those are two

19   separate subscriptions.  And, so, this average revenue per

20   unit is essentially the average revenue count to me as two

21   different persons.

22   Q.   Okay.

23        Now, is there any better way that you can conceive of

24   to analyze the churn rate in the future to try and determine

25   how many class members will fall off in the future?

1    A.   No.

2    Q.   Now, I want to make clear you're not saying that there are

3    90 million class members in 2010 and 50 million class members

4    in 2014, correct?

5    A.   No, because I don't know how many -- I don't even know

6    exactly how many -- wireless data subscribers there were in

7    each of these years.  This is simply a metric.  Because I'm

8    looking at the average revenue per overall total subscribers

9    to AT&T wireless services, this gives me a metric of what I

10   should be applying that to in order to estimate the total data

11   revenue that the class would generate --

12   Q.   Okay.

13   A.   -- in those future years.

14   Q.   Now, let's then look to Line 3 of Table 2, where you have

15   done the calculation to show wireless data revenues generated

16   by the class.  Okay?

17   A.   Yes.

18   Q.   Explain that for us.

19   A.   Well, there was an actual wireless data revenues that AT&T

20   received in the fourth quarter of 2010, and that was reported

21   in their financials.  What they don't report is the number of

22   data users.  And, certainly, they don't report the number of

23   individuals in the class.

24          So, I combined the two pieces of information that I

25   was able to get from that financial data -- the average

Landes - direct

1    revenue per user; the number of users at the end of fourth --

2    of third quarter, excuse me, 2010; and, AT&T's actual churn

3    rate in fourth quarter of 2010 -- to estimate the number of

4    those subscribers who were there at the end of third quarter

5    who continued through the fourth quarter.

6         And, then, by multiplying the average revenue per

7    user in the fourth quarter by the number of those who had

8    remained from the third quarter, I had -- I could estimate the

9    wireless data revenues generated by subscribers who had been

10   there at the end of the third quarter of 2010.

11        So, that would have been -- that is, I think,

12   precisely the wireless data revenues generated by the class in

13   that period.

14   Q.  Let me jump ahead to Table 3, and then I may come back

15   just for a moment.

16        First of all, the numbers from Line 3 here, then, did

17   you carry them forward to Table 3 on the first line showing

18   the wireless data revenues?

19   A.  Yes.  Table 3 shows my computation, then.  Since I know

20   the fourth quarter wireless data revenues generated by the

21   class and I have projected the wireless data revenues

22   generated by the class out through November 1st of 2014, I can

23   use that information, combined with the tax revenue

24   information that you provided to me, to generate an estimate

25   of future tax savings.

1   Q.   Okay.

2        Now, what we're really looking for here is the ratio

3   of the revenue to the known taxes that were paid?

4   A.   That's correct.

5   Q.   Okay.

6        And we know the taxes that were paid because AT&T

7   provided that information as part of their data mining to

8   support the refund applications that were made?

9   A.   That's my understanding.

10  Q.   And if we know that amount and you also know an estimate,

11  as you've done here, of the revenue, you can see what the

12  ratio to tax payments is to the revenue generated?

13  A.   That's correct.

14  Q.   And is that what you've done in the "Tax Savings" line?

15  A.   Yes.

16  Q.   Okay.

17  A.   That's exactly what I've done.

18  Q.   The tax savings number, the numbers in that line, where do

19  they come from?

20  A.   Well, they come from the application of a projected tax

21  savings of 3.09 percent to the projections of the wireless

22  data revenues generated by the class.

23  Q.   Okay.

24  A.   And that carries through all those columns.

25  Q.   Which portion of the AT&T tax data that was provided to

Landes - direct

1    you did you use to determine this ratio of 3.09 percent?

2    A.   I believe I used the most recent fall two quarters of

3    2010.

4    Q.   All right.

5    A.   Because -- okay.

6    Q.   That would be the last two quarters of 2010?

7    A.   No, because the tax -- the unauthorized tax -- collection

8    ceased in September of 2010.

9    Q.   Right.

10   A.   So, I think it was actually the first two full quarters of

11   2010.

12   Q.   And did you apply the revenue as -- or the tax amounts as

13   -- determined from those first two quarters of 2010 to the

14   actual revenue reported from those same quarters?

15   A.   That's correct.

16   Q.   That's how you got the 3.09 percent?

17   A.   That's correct.

18   Q.   And, then, in a going-forward fashion, once you had the

19   revenues projected into the future, did you apply that same

20   3.9 percent -- 09 percent -- ratio?

21   A.   I did.  And, again, I think that's -- that's fairly

22   conservative, given the fiscal issues that face the states

23   today, to assume that tax rates will remain constant over the

24   next few years.

25   Q.   Okay.

1           Now, one thing else I want to clear up here.  Most of

2    us, when we go to the store, see the sales tax rate of six

3    percent, seven percent, eight percent, sometimes ten percent,

4    depending where we live.  Would you explain why your number

5    there is 3.09 percent?

6    A.  My number there is 3.09 percent because I'm applying it to

7    total wireless data revenues generated across the period.

8    However, the taxes apply only to the revenues actually paid by

9    the class.

10   Q.  Okay.

11          Some states don't have a sales tax?

12   A.  Some states don't have sales tax.

13   Q.  So, once again, the important thing for you was the ratio

14   of actual taxes paid to revenue?

15   A.  To revenues, correct.

16   Q.  And that allows you to apply that same ratio in the

17   future, if you can project the revenues?

18   A.  That's correct.

19   Q.  And that's what you've done?

20   A.  That's correct.

21   Q.  Now, when you do that final math, you have to also apply a

22   discount rate; is that true?

23   A.  That's correct, because --

24   Q.  Why is that?

25   A.  Well, a dollar that you would save in 2014 is not

 1   equivalent to a dollar you save today.

 2   Q.  So, let's take the column "Fourth Quarter 2010" as an

 3   example.

 4        We have $4.7 billion in revenue and a tax savings of

 5   3.09 percent of that, of $146 million, correct?

 6   A.  That's correct.

 7   Q.  And, then, you have to discount that by some number, true?

 8   A.  Yes.  Although because I actually have enjoyed those tax

 9   savings in the fourth quarter of 2010, the discount is --

10   there is no discount on those.

11   Q.  All right.

12        What -- how did you determine what the discount rate

13   should be?

14   A.  Well, as a matter of economics, the discount rate, I

15   believe, should be AT&T's debt rate.  AT&T goes out to the

16   market, sells corporate bonds and there is a yield that it --

17   that it has to pay on those bonds.  And those reflect -- that

18   yield reflects -- what AT&T has to pay borrowers -- excuse me,

19   lenders -- in order to get them to willingly lend to AT&T.

20        And since the dollars saved in, say, 2013, is

21   essentially a promise from AT&T that it won't take a dollar

22   from you or will give you a dollar in 2013, it is like a

23   forced loan.  Or put differently -- I'm sorry.  I'm being a

24   little confusing.

25        Put differently, had the class actually had to pay

 1   those through the year 2014, it would have been like a forced

 2   loan from the class members to AT&T.  And, so, the fact that

 3   they don't have to, I applied the same discount rate as though

 4   it were a forced loan.

 5   Q.  But the AT&T debt rate is not a publicly-available number?

 6   A.  I was not able to find publicly-available data.

 7   Q.  So, what did you do?

 8   A.  Well, I relied on data published by Merrill Lynch for a

 9   portfolio of corporate bonds issued by utilities and telephone

10   companies with maturities that are roughly -- that are

11   short-term, that are not more than five years.  So, those --

12   that portfolio had the characteristics of this stream of

13   payments.

14   Q.  And is that information contained in Exhibit 13?

15   A.  Yes.

16   Q.  And --

17   A.  Oh, wait.  I didn't look.  I'm sorry.  I should look.

18           (Brief pause.)

19   BY THE WITNESS:

20   A.  Yes.

21   BY MR. FRICKLETON:

22   Q.  And you have that rate changing year by year.  Why is

23   that?

24   A.  Well, because it's compounding.

25   Q.  Okay.

1        And the discount rate is 2.332 percent per year?

2   A.  Yes.  And that is the discount rate as of the date on

3   which I updated these tables, which I think is sometime in

4   March.

5   Q.  Okay.

6        So, the calculation would be, determine the amount of

7   tax savings by applying the ratio of 3.09 percent first,

8   correct?

9   A.  Correct.

10  Q.  Then apply the discount rate on a -- was it a month-by-

11  month basis or quarter by quarter?  How did you do it?

12  A.  I did it -- I made the assumption that the monies flow --

13  this is a typical assumption that's made when you're looking

14  at annual flows -- that the monies would be paid in the middle

15  of the year in which, so that the money would -- is -- all the

16  money is saved basically as of June of 2001 or June of 2012.

17  Q.  Okay.

18       And, so, in applying that discount rate, did you

19  determine the present value of the post-settlement tax savings

20  on a year-by-year basis?

21  A.  I did.

22  Q.  And those are listed on the bottom line of Table 3?

23  A.  Yes, that's correct.

24  Q.  And accumulate to a total of $1,986,263,000?

25  A.  That is correct --

Landes - direct

1   Q.   Okay.

2   A.   -- given this methodology.

3   Q.   Now, in your first calculations with the data from last

4   fall or the end of the year, that number was slightly higher?

5   A.   It was slightly higher.

6   Q.   I believe on the order of $2.02 billion?

7   A.   That's correct.

8   Q.   Can you just tell us basically what changed in terms of,

9   was it forecasted revenue?  Was it churn rate?  What changed

10  to make that happen?

11  A.   Well, the churn rates -- the projections of churn rate

12  were slightly higher as a result of the actual reported churn

13  rate that AT&T experienced in the fourth quarter, 2010.

14       Let me step back.  The actual churn rate that AT&T

15  reported in 2010 was somewhat higher than the average of the

16  projected churn rates, on which I had relied in my original

17  report.  And, so, because there are -- the actual and, in

18  addition, the newly-revised projected churn rates are slightly

19  higher, that led to a slightly lower estimate.

20       In addition, the actual average revenue per unit was

21  slightly lower than that which had been projected by the

22  analysts.  And, so, they subsequently revised their future

23  estimates based on the new information, which also led to a

24  slightly lower average revenue per churn rate.

25       The combination of those two things clearly reduced

Landes - direct

1    the wireless data revenues that I project going forward.

2            And, then, the other change:  A very small change in

3    the discount rate.

4    Q.  And the discount rate did, what?

5    A.  It actually fell very minimally.

6    Q.  Okay.

7            Which would tend to drive the number up --

8    A.  Up.

9    Q.  -- a little bit --

10   A.  Correct.

11   Q.  -- over time?

12   A.  Correct.

13   Q.  But the net result was what we see on Table 3?

14   A.  That's correct.

15   Q.  And that's the best projection you can make as you're

16   sitting here today?

17   A.  That's the best projection I can make, although I do

18   believe it is a conservative projection.

19   Q.  And why?

20   A.  Well, I think for reasons I've already tried to explain.

21   One is, I think that the churn rates are overstated -- or I

22   shouldn't say overstated -- are high relative to the actual --

23   the true -- churn rates, because they count someone who exits

24   and enters as a churn.

25           There are a number of reasons why people who exit

Landes - direct

1    aren't really churns.  For example, if I were to leave my

2    employer and I have a AT&T BlackBerry, I would be out, but I

3    probably would then go to AT&T -- or likely would go to AT&T

4    -- and have my service restored and/or my employer would hire

5    somebody to replace me and that person will be provided with

6    an AT&T BlackBerry, as well.  That person would be a net add.

7    I would be out, but in truth there would be no change because

8    my employer essentially would be the member of the class.

9         And, in addition, I think that many of the new -- of

10   the future net adds are likely to be the same subscribers

11   today, but who are adding additional devices.  But they are

12   not being counted.  They're being counted -- not being counted

13   in the churn rate.

14   Q.  Okay.

15        Now, apropos of that discussion, as you were doing

16   your work here, as part and parcel of the calculations that

17   you did, were you able to do a calculation or form an opinion

18   about the overall tax savings to the economy as a result of

19   this settlement not just to the class, but to everyone?

20   A.  I was, but, unfortunately, I don't have that here.  I

21   didn't up- -- revise that.  But that would be on the order of

22   $4 billion.

23   Q.  $4 billion?

24   A.  The total -- the present value of the total tax savings?

25   Q.  Yes.

Landes - direct

1   A.   The future tax savings?

2   Q.   Yes.

3   A.   Would be on the order of $4 billion.

4   Q.   As opposed to the savings for the class, which would be,

5   what?

6   A.   One point -- approximately, $2 billion.   $1.98 billion.

7   Q.   Now, Dr. Landes, as we approached this hearing, did we ask

8   you to make one additional calculation?

9   A.   Yes.   You asked me to estimate the -- the post-settlement

10  tax savings that had -- that the class has received to date.

11  Q.   All right.

12           And for what period did you determine that amount?

13  A.   I determined that amount for the fourth quarter of 2010.

14  And we are almost through the first quarter of 2011.   So, I

15  did it for the first quarter of 2011.

16  Q.   Basically, a six-month period of time?

17  A.   That's correct.

18  Q.   Now, do we have that information in Exhibit 25?

19  A.   We have the -- is 25 two pages?

20  Q.   Yes.

21  A.   Yes.

22  Q.   Now, we did notice a little typo here.   Let's correct that

23  first.

24           Down below you've got "wireless churn rate" twice?

25  A.   Yes.

Landes - direct

41

1  Q.  And the second wireless churn rate should actually be

2  something else?

3  A.  It should be the average ARPU -- the average data ARPU.

4  Q.  Okay.

5       Average revenue per unit?

6  A.  Yes.

7  Q.  So, again, you've looked at the churn rates.  Are these

8  the same churn rates that we talked about previously?

9  A.  Well, these are quarterly churn rates.  So, obviously,

10  this fourth quarter 2010 is the actual that was reported by

11  AT&T, and it is the same.  The first quarter 2011 is an

12  estimate.  It's a projection.  And there were only three

13  analysts who provided quarterly projections.

14  Q.  Okay.

15       Now, the lower part of this first page of Exhibit 25

16  shows the average revenue per unit from Collins Stewart and

17  Deutsche Bank.  Are these also quarterly numbers?

18  A.  These are also quarterly numbers.  And, again, these were

19  the two that -- the $17.50 is what is actually reported by

20  AT&T.  The other two are the quarterly estimates provided by

21  Collins Stewart and Deutsche Bank.

22  Q.  Page 2 of Exhibit 25 is titled, "Post-Settlement Tax

23  Savings to Date."  And, once again, you've got this listed for

24  the fourth quarter of 2010, the first quarter of 2011 and the

25  total, correct?

Landes - cross by Baumkel

42

1    A.   That's correct.

2    Q.   Did you do the same kind of calculation -- I won't go

3    through it, again -- using the average revenue per unit, the

4    number of subscribers and determine the tax savings to the

5    class?

6    A.   That is -- I used exactly the same methodology.

7    Q.   Except you didn't have to use a discount rate because it's

8    already occurred?

9    A.   That's correct.

10   Q.   All right.

11        And what, to the present time -- or to the end of the

12   first quarter of 2011, what has been saved by the members of

13   the class in the last six months?

14   A.   Approximately $285 million.

15        MR. FRICKLETON:  Your Honor, those are all my

16   questions.

17        THE COURT:  Does anybody want to ask any cross-

18   examination?

19        Go ahead.

20        CROSS-EXAMINATION ON BEHALF OF KAREN WIAND

21   BY MR. BAUMKEL:

22   Q.   Good morning.

23        Is it doctor or professor?

24   A.   It's doctor --

25   Q.   Doctor.

Landes - cross by Baumkel

43

1   A.  -- or Misses.

2   Q.  Good morning.

3        I was impressed with your credentials.  I couldn't

4   remember if you were teaching or you had just gone to all

5   these lofty places.

6        Dr. Landes, most of the subscribers and class members

7   are iPhone users, correct?

8   A.  I don't know that.  I don't actually have that data.  I'm

9   a subscriber to the data service, but I have a BlackBerry.

10   Q.  Me, too.

11   A.  Okay.

12   Q.  But I think we're the odd ducks; wouldn't you agree?  Or

13   you just don't know?

14   A.  This is not something that I went into.

15   Q.  And that wasn't part of any of the data that you

16   considered, was it?

17   A.  Well, no, I don't think that's correct.  I mean, I think

18   that the analysts -- I presume what -- that the -- you're

19   asking me because of the new Verizon --

20   Q.  Well, I would ask that you not assume what I'm thinking.

21   A.  Okay.

22   Q.  I may not be thinking anything at all.  Just answer my

23   question, if you would, please.

24   A.  I will do my best.

25   Q.  So, the question was:  You didn't consider the percentage

Landes - cross by Baumkel

1   or numbers of iPhone users versus people like you and me who

2   use BlackBerrys, did you?

3   A.  I relied on the estimates that the financial analysts

4   provided.  I'm sure that they do.  In fact, I know they do,

5   because in the detail of the text, they do talk about iPhone

6   users, the potential for churn as new competing technologies

7   come forward.  So, all of that is embodied or embedded in the

8   estimates that I rely on.

9   Q.  Well, how is -- maybe I'm smarter than I was giving myself

10  credit for because I was thinking about Verizon, actually.

11  A.  Okay.

12  Q.  How was that figured into the churn rates when Verizon

13  hasn't started selling its iPhones yet?

14  A.  Because all these are forward-looking estimates.  These

15  are all forward-looking projections.  So, the financial

16  analysts -- Oppenheimer, Deutsche Bank, JPMorgan, Morgan

17  Stanley -- they are all very concerned about what those --

18  what any -- competing technology -- the effect any competing

19  technology -- would have on the iPhone and on AT&T.  So, those

20  are all things that they consider very carefully in their own

21  models that they use to forecast average revenues and the

22  average number of subscribers going forward.

23  Q.  Do you have some data as to what percentage Deutsche Bank

24  attributed to Verizon iPhone accounts that left AT&T in 2012?

25  A.  To the ones that they forecast will leave --

Landes - cross by Baumkel

1    Q.   Yes.

2    A.   -- in 2012?

3    Q.   The forecast that you're using for these churn rates --

4    A.   Well, they would be --

5    Q.   -- do you know -- do you know what percentage, if any,

6    these forecasters attributed to AT&T losing customers to

7    Verizon based on the announcement that Verizon is going to be

8    having iPhones?

9    A.   Right.  I do not know.  They keep those -- their models --

10   the details of their models -- very close to the vest, as you

11   can imagine.

12   Q.   So, that could drastically impact these churn rates, so

13   that the AT&T numbers you have are way lower than the numbers

14   Merrill Lynch or Deutsche Bank projected, couldn't it?

15   A.   You mean in 2012?

16   Q.   Yes.

17   A.   Well, anything we're doing -- we're obviously projecting

18   the future.  We can't know with certainty what the future is.

19   But this is the best available information provided by the

20   most sophisticated analysts as to what the future holds.

21        Sure, they could be wrong.  Anybody can be wrong.

22   Q.   Do you know if these projections were based on a 25

23   percent attrition to Verizon, a 50 percent, a 40 percent, an

24   80 percent, a 10 percent, or anything remotely within any of

25   those ball parks?  Do you have any idea?

Landes - cross by Baumkel

 1  A.  I can't project what the future holds in that way.

 2  Q.  Okay.

 3       This 2.2 percent discount -- I'm familiar with the

 4  concept of a discount rate, and I don't want to retrace all of

 5  that ground; but, that's based on short-term borrowing or a

 6  two-year or five-year, ten-year?

 7  A.  It's a portfolio of five-year bonds.  Bonds with

 8  five-year --

 9  Q.  Is the concept of the term "value" something that you deal

10  with and make assessments concerning as an economist?

11  A.  Monetary value, yes.

12  Q.  Yes.

13       So, if you're assessing the monetary value of the

14  contingent recovery of claims -- I know that wasn't part of

15  what you testified to, but since you're here as an expert and

16  it concerns this case, I want to ask you your expert opinion.

17       If you, as an economist, are trying to assess the

18  monetary value of the contingent recovery of claims against

19  various state governmental entities, do you have to

20  incorporate into that calculation some discount for the fact

21  that the recovery is contingent?

22       In other words, it hasn't happened yet.  It's going

23  to happen if you are successful in whatever it is you

24  undertake to do to get that money.  Do you have to discount

25  the current assessment of that value for the contingency that

Landes - cross by Baumkel

1  you may or may not actually get the money?

2  A.  Well, the value of the money depends, in part, on how long

3  it's been owed.  You're correct.  In other words --

4  Q.  Well --

5  A.  -- just as you discount the future, you might want to

6  expand the value -- might want to expand the recovery.

7           But there are all kinds of legal questions here

8  that --

9  Q.  Right.

10  A.  -- I have no -- I have no information about.

11  Q.  So, you wouldn't be able to do an economic calculation a

12  mathematical way as to how much you should discount that

13  potential future recovery because of all these legal

14  questions; is that a fair statement?

15  A.  No, not in the future.  There are no legal questions in

16  the future.  In the future, the taxes are saved.  They're not

17  paid.  So, there's no -- the recovery is sure.  In the past --

18  I thought you were asking me about past --

19  Q.  Well --

20  A.  -- monies owed.

21  Q.  -- the paradigm for this case -- I don't know if it's been

22  discussed between you and class counsel.  The paradigm for

23  this case is that the class counsel is telling Judge St. Eve

24  that they're going to go out and, together with AT&T, get

25  money from these various state governments, that they haven't

1   already gotten.

2          And I'm asking, is that amount of money that they

3   hope to get, does it have to be discounted in some way for the

4   contingency that they might not get it?  And, if so, how much?

5   And, if so, how?  And, if so, by what method?

6          THE COURT:  Can you rephrase that, please?  I am not

7   sure I understand -- we are talking about future projections.

8   I am not sure --

9          MR. BAUMKEL:  I'm talking about --

10          THE COURT:  Let me finish please.

11          I am not sure if you are now asking the doctor to go

12   back for monies that customers have already paid in.

13          MR. BAUMKEL:  Yes.

14          THE COURT:  Okay.

15          I do not know if she has done that analysis.  But

16   rephrase it because I --

17          MR. BAUMKEL:  Right.

18   BY MR. BAUMKEL:

19   Q.  So, let me back up.

20          THE COURT:  It is not clear.

21   BY MR. BAUMKEL:

22   Q.  I finished discussing with you this notion of Verizon and

23   iPhones.  And I tried to make clear -- and to the extent I

24   didn't -- I'm shifting gears.

25          I understand, from what you told Mr. Frickleton, that

1  you were called here primarily to tell us what the discount or

2  present view is of the tax savings going into the future.

3  A.   That's correct.

4  Q.   And I'm saying, since I am impressed with your credentials

5  as an economist and you were put forth here as an expert in

6  economics; and, since this case primarily involves money that

7  taxpayers have already paid; and, since the paradigm here is

8  that AT&T and the class counsel are representing to the Court

9  that they're going to get that money back from the states --

10 they haven't got it yet, but they're telling the Court they're

11 going to get it -- so, as an economist, when somebody says,

12 "I'm going to get some money" but they haven't gotten it yet,

13 do you have to discount the value of that money that they say

14 they're going to get in the future?

15 A.   I'm confused because I don't know for what purpose.  If I

16 were -- if you wanted to estimate what is the value of the

17 money -- of the past money -- you have -- I guess you have a

18 projection.  There would be an actual amount.

19        For what purpose do you want me to do this?

20 Q.   Well, did you -- were you asked to ever -- were you ever

21 asked -- I understand you didn't testify today.  Were you ever

22 asked to make a projection as to the current value of these

23 uncollected refunds for previously-paid Internet access taxes?

24 A.   No.

25 Q.   Does a contingent claim still have value if the

1    contingency arrives and you don't get the money?

2    A.   Depends on where -- I guess it depends on how you estimate

3    the contingencies.

4    Q.   Well --

5    A.   I just don't -- I don't have information to --

6    Q.   If the information is that I hope to get a hundred dollars

7    from the State of Virginia sometime in the next couple of

8    years and my deadline, let's say, for the sake of my question,

9    is two years, I assume that that hundred dollars has some

10   value today as a contingent, hoped-for recovery.  I understand

11   you didn't calculate how much.  I'm not going to ask you,

12   again, to do that.

13        But if two years arrives and you don't get that

14   money, it doesn't still have a hundred dollars of value, does

15   it?

16   A.   Well, if you don't get it, it certainly doesn't.  And

17   today -- I mean, if the State of Virginia says it's going to

18   give me the money, then I guess I would go to the bond rate

19   from the State of Virginia to tell you how much --

20   Q.   What if it's --

21   A.   -- is the value.

22   Q.   -- the State of Texas and they say they're not going to

23   give you the money?  Does it have any contingent value today?

24   A.   If they -- if -- if it's not promised -- we started out

25   with the assumption that somebody promised you money.  Now

Landes - cross by Baumkel

51

 1    you're saying somebody hasn't -- has promised you no money.

 2    Q.   Right.  We're changing the subject.

 3    A.   If someone promises you no money, then I -- then you get

 4    no money.

 5    Q.   You can't give it a value today if they said that, could

 6    you?

 7    A.   Unless you think you can persuade them to change their

 8    mind.

 9    Q.   All right.

10         You used the term with Mr. Frickleton of

11    "unauthorized collections," meaning illegal collections, not

12    collections permitted by the applicable tax law.  Is that the

13    concept you had in mind?

14    A.   They were -- well, I would say they're collections of

15    unauthorized taxes.  I don't know if they were unauthorized

16    collections, but they were collections of unauthorized taxes.

17    Q.   Okay.

18         So, I understood that that was the term you used.

19    And I'm trying to better refine my understanding of what you

20    meant by that term.

21         Did you mean illegal in the sense that the taxes

22    weren't permitted by applicable law?

23    A.   The states and localities were not permitted to collect

24    those taxes.

25    Q.   Do you know the long history of Michigan case law that

1   agreements to stop doing an illegal act have no value as

2   consideration for a contract?  Do you know anything about

3   that?

4   A.   I do not.

5   Q.   Okay.

6        Were you paid for your services?

7   A.   I was.  Well, my employer was paid for my services, yes.

8   Q.   Have they all been paid or are there outstanding bills

9   still?

10  A.   I don't know.

11  Q.   Do you know what the amount is -- the total amount?

12  A.   I do not.  I do not.

13  Q.   Do you have any idea?

14  A.   No.

15  Q.   Do you know what the hourly rate is?

16  A.   I know what my hourly rate is.

17  Q.   What is that?

18  A.   I think at the time I was engaged, it was 7 -- $695 an

19  hour.

20  Q.   And were you the only person in your firm that worked on

21  this?

22  A.   For the most part.  Other people assisted me in obtaining

23  data and checking calculations.

24  Q.   Do you know how much, in terms of hours, those other

25  people put into this?

Landes - cross by Baumkel

1    A.   I don't.

2    Q.   Do you know how much, in terms of hours, you put into

3    this?

4    A.   I'm sorry.  I don't.

5    Q.   Do you have any documents that show how much time you put

6    into this that you could look at that would refresh your

7    memory?

8    A.   I presume my firm has billing documents, but I'm not privy

9    to them.  I don't have them.

10   Q.   The revenue projections on the charts that you talked to

11   Mr. Frickleton about a few minutes ago were for the whole

12   nation, correct?

13   A.   That's correct.

14   Q.   And the tax rates -- the average tax rates -- were for the

15   whole nation, correct?

16   A.   The average tax rate was computed by the tax revenues

17   collected from the specific states as a function of the

18   national revenue.  That's correct.  That's why it was three

19   percent rather than the six or, if you live in Cook County --

20   Q.   Right.

21   A.   -- ten.

22   Q.   You went around to all the states and assessed what the

23   collection rates were and came up with an average you applied

24   as a nationwide average rate; is that fair?

25   A.   Essentially.

Landes - cross by Baumkel

1  Q.  You don't know what the revenue projections are state by

2  state, do you?

3  A.  I do not, no.  I do not.  I think I explained that that

4  didn't -- that would have added a sense of false precision to

5  my estimates that --

6  Q.  Well, if the class was just a subclass of people in

7  Michigan, it wouldn't be false.  It would be precise, wouldn't

8  it?

9  A.  Well, even within Michigan, I presume there are localities

10 that impose taxes.  So, you'd have to go into the individual

11 locality.

12 Q.  Right.

13 A.  That would be an enormous burden, and it likely would not

14 come up with a much different estimate and could --

15 Q.  If you didn't do it, why can you say it likely wouldn't be

16 any different?

17 A.  Because the average is based on the average of the

18 existing tax rates at the time.  So, they are -- they do

19 inform that average.  It's not -- it's not, you know, wholly

20 divorced from the actual existing tax rates.

21 Q.  Well, if the jurisdiction in Michigan has a one percent

22 and Texas has a ten percent and the average is, therefore,

23 five-and-a-half percent, that's not close to the Michigan one

24 percent or the Texas ten percent, is it?

25 A.  It's not necessary for the question of what's the

1    benefit -- the future benefit -- to the class as a whole.

2    Q.   The class as a whole meaning everybody in the country,

3    right?

4    A.   Meaning all class members in the United States.

5    Q.   In the country, right?

6    A.   In the United States, correct.

7    Q.   Okay.

8              MR. BAUMKEL:  That's all.  Thank you.

9              THE COURT:  Anybody else have cross?

10             (No response.)

11             THE COURT:  Redirect?

12             MR. FRICKLETON:  Just one area, your Honor.

13                        REDIRECT EXAMINATION

14   BY MR. FRICKLETON:

15   Q.   Dr. Landes, I want to focus you on the churn rates and ask

16   you this:  When these financial analysts project churn rates,

17   does that include churn for all reasons?

18   A.   For all reasons.  And, in particular, the analysts and the

19   techs that surrounds the data are concerned about introduction

20   of competing -- competing technologies, competing phones,

21   Verizon.  The Verizon phone was a large part of what they were

22   focused on in making -- in their explanation of their

23   projections.

24   Q.   And do lots of very smart people with very large sums of

25   money use those analyst projections to invest?

1  A.  Yeah.  There's a lot at stake in these projections.  So,

2  they're quite reliable.

3  Q.  Thank you.

4          THE COURT:  Any recross?

5          MR. BAUMKEL:  No.  Thank you, your Honor.

6          THE COURT:  Thank you, Doctor.  You may step down.

7          (Witness excused.)

8          THE COURT:  Please call your next witness.

9          MR. FRICKLETON:  Plaintiff class calls Dr. Tom

10  Florence.

11       BARRY THOMAS FLORENCE, PLAINTIFFS' WITNESS, SWORN

12                      DIRECT EXAMINATION

13  BY MR. FRICKLETON:

14  Q.  Dr. Florence, would you give us your full name and

15  address, please?

16  A.  Barry Thomas Florence, 2924 Greendale Road, Chevy Chase,

17  Maryland.

18  Q.  And what is your business or profession?

19  A.  I'm the President of ARPC.

20  Q.  And what does "ARPC" stand for?

21  A.  ARPC is a research and consulting firm in Washington, D.C.

22  Q.  Doctor, in the notebook in front of you, we have Exhibit

23  1, which is your resume or curriculum vitae; is that correct?

24  A.  That's correct.

25  Q.  Would you run through first your educational background?

1    A.   Undergraduate degree from the University of Kentucky and a

2    Masters and Ph.D. in Research Design of Statistics from

3    Michigan State University.

4    Q.   All right.

5            And how long have you been the principal in ARPC?

6    A.   I've been a principal in ARPC for about 30 years.

7    Q.   All right.

8            What does ARPC do?

9    A.   We're a research and consulting firm that do survey

10   research, research in -- legal research, legal research from

11   the standpoint of social research as it applies to the legal

12   environment and some econometric research.

13   Q.   What is your experience in administering class action or

14   mass tort settlements?

15   A.   I've worked on a number of mass tort or class action

16   settlements, probably beginning back with Love Canal in New

17   York and Three Mile Island nuclear incident in Pennsylvania.

18   I worked on the Dalkon Shield IUD case.  I worked on both

19   breast implant matters.

20           I've worked for the recent case having to do with

21   currency conversion, foreign rates, converting purchases in

22   foreign currency related to Visa and Mastercard.  I've worked

23   for about 24 of the asbestos trusts that are mass tort trusts.

24   And I serve as the Executive Director on six of those trusts.

25   Q.   Dr. Florence, in August of 2010, this Court appointed ARPC

1    as the notice administrator for this class action settlement;

2    is that correct?

3    A.   That's correct.

4    Q.   Okay.

5         In addition to your work as notice administrator, has

6    ARPC done additional work on this case at the request of

7    settlement class counsel?

8    A.   We have.

9    Q.   Did that work include evaluating the methodology that AT&T

10   used to determine the affected customers and the amount of tax

11   in question?

12   A.   It did.

13   Q.   Did that include performing your duties, of course, as

14   notice administrator?

15   A.   It did.

16   Q.   And assisting in the interview and selection of potential

17   escrow banks for the settlement?

18   A.   Yes, it did.

19   Q.   Did it also include monitoring the status of the

20   electronic reading room that has been established, pursuant to

21   the settlement agreement, for documents maintained by AT&T

22   related to the tax refund procedures that are going on?

23   A.   It did.  We've done that, too.

24   Q.   Let's start, Dr. Florence, with your evaluation and work

25   on the AT&T methodology for determining the affected customer

Florence - direct

 1   and the amount of tax in question.

 2          As part of the submissions made to the -- by the

 3   settlement class counsel for approval, did you prepare and

 4   sign Exhibit 2, which is a declaration to the Court regarding

 5   that project?

 6   A.  I did.

 7   Q.  I'd like to walk through some of the high points of what

 8   you did.  And, of course, your written declaration is there.

 9          But, first of all, did we advise you that it was

10   important for the class to evaluate the process by which AT&T

11   retrieved the information that would prove important to the

12   successful implementation of this settlement?

13   A.  Yes, you did.

14   Q.  Are you familiar with the type of database searching that

15   was necessary for AT&T to do in this case?

16   A.  Correct.  We are.

17   Q.  Did AT&T provide you access to the means and methods that

18   they used for that project?

19   A.  Yes.  We had a number of meetings with AT&T about this.

20   Q.  Did representatives of ARPC, including yourself, travel to

21   Florida to meet with employees of AT&T to work on this

22   project?

23   A.  We did.

24   Q.  In particular, did you meet with Linda Fisher at AT&T?

25   A.  We did, yes.

Florence - direct

1   Q.   What was your understanding of her role?

2   A.   As we understood it, Linda was responsible for maintaining

3   all of the IT resources associated with this matter, the

4   databases and doing the analysis associated with this matter.

5   Q.   In some or all of those meetings, were representatives of

6   the accounting consulting firm PricewaterhouseCoopers present?

7   A.   PricewaterhouseCoopers did have a representative present.

8   I think it was the partner from PricewaterhouseCoopers in the

9   Florida meeting, yes.

10  Q.   Would you describe, in the early meetings, what the

11  purpose of the meetings were and what the results of the

12  meetings were?

13  A.   Sure.

14        We were at first trying to understand the structure

15  of these databases that maintain records on who is a

16  subscriber; what services they use; how they are charged and

17  how that billing is maintained; and, then, finally, how the

18  taxes were collected or charged on those users.

19        So, a good portion of the meeting initially was

20  trying to understand the data structures that were used by

21  AT&T to manage these charges --

22  Q.   Okay.

23  A.   -- and the billing mechanisms.

24  Q.   Were you able to ask questions and receive answers from

25  AT&T to satisfy yourself that you had sufficient knowledge of

Florence - direct

1    their system to evaluate the methods they were using?

2    A.  Yes, we did.

3    Q.  Okay.

4         Were they open and willing to discuss those things

5    with you?

6    A.  Very much so.

7    Q.  Now, Dr. Florence, as the first part of this particular

8    project, was part of the discussions -- did they include

9    looking at what we've marked as Exhibit 3, which is a listing

10   of the plan category and characteristics for the AT&T plans

11   that included Internet access services?

12   A.  Correct.  This was the definition we were working off of.

13   Q.  Okay.

14        And did you understand that the plan categories that

15   provided Internet access services would include data connect

16   plans, smartphone data features, smartphone data plans, iPhone

17   data plans, personal BlackBerry plans and something called

18   enterprise smartphone plans?

19   A.  That was our understanding, yes.

20   Q.  Enterprise smartphone plans being plans using BlackBerry,

21   Goodlink or other Microsoft applications for office servers?

22   A.  Correct.

23   Q.  In other words, were you identifying with AT&T those

24   services they offered that included Internet access?

25   A.  That was our understanding, yes.  That was our purpose.

1  Q.  Now, as part of that work, did the Tax Department of AT&T

2  identify what's called the feature and service order codes

3  that applied to these Internet access services?

4  A.  Yes.  As I -- as it was explained to us in a meeting, I

5  think the Legal Department provided the Tax Department with a

6  description of the class, which would include the

7  characteristics in Exhibit 3.  And they asked the Tax

8  Department to identify those feature and service codes that

9  would have been applicable to these types of services.

10 Q.  And are those the discrete service codes that AT&T assigns

11 to those plans which might include Internet access?

12 A.  That's correct.

13 Q.  Okay.

14       And did the Tax Department then determine that the

15 list of those feature and -- service order codes are referred

16 to in shorthand as SOC codes, S-O-C?

17 A.  Correct.

18 Q.  Did those feature and SOC code combinations then get

19 evaluated by the Tax Department to include which ones may

20 include charges for Internet access?

21 A.  That's correct.

22 Q.  And just to summarize, in the course of the work that you

23 did with AT&T, did they evaluate and identify over 20 ,000 of

24 these service order codes?

25 A.  They identified over 20,000 combinations of feature and

1   SOC codes, correct.

2   Q.   Excuse me.  Thank you for the correction.

3        About 2800 SOC codes?

4   A.   Correct.

5   Q.   And the combination of feature SOC codes was over 20,000?

6   A.   Correct.

7   Q.   Now, once that had been done, what was

8   PricewaterhouseCoopers' function?

9   A.   This was a very complicated task, primarily because of the

10  consolidation that's occurred in the -- in this industry.

11  AT&T had a number of units that were actually doing billing.

12  It was not some centralized billing unit.  And they were also

13  inheriting legacy systems and legacy records from companies

14  that they had acquired.

15       So, the data structure was very complicated.  And I

16  think -- as I understood the process, the Tax Department,

17  working with the Marketing Department, identified these code

18  combinations that were relevant to the class; and, then, they

19  asked PWC -- PricewaterhouseCoopers -- to come in and, in

20  essence, test and, in essence, redo to some extent what they

21  had done and, then, to validate the code listings that they

22  had come up with.

23  Q.   And as a result of that work -- or during that work, did

24  you continue to be a part of it and get all the information

25  and have input?

1   A.   We -- we actually sat with the PricewaterhouseCoopers

2   people and asked them questions about the methodologies that

3   they had used.  We also got access from the

4   PricewaterhouseCoopers people to interim data that they had

5   used in preparing their analysis.

6   Q.   Ultimately, did PricewaterhouseCoopers advise AT&T that it

7   had determined there were additional approximately 4,000

8   feature SOC codes that might include Internet access services?

9   A.   That's correct.

10  Q.   And as you stated in your declaration, some of those -- or

11  a determination was made where there was overlap to eliminate

12  duplication?

13  A.   Correct.

14  Q.   And there were some feature SOC codes that included

15  Internet access, but which were identified as being in

16  jurisdictions, or for whatever reason, did not involve any

17  taxation?

18  A.   Correct.

19  Q.   And the purpose of doing all this was to try and get an

20  accurate list of those feature and service -- feature and SOC

21  code combinations that both included Internet access and were

22  generating taxes for taxing jurisdictions?

23  A.   That's correct.  I mean, if you look at any of these phone

24  bills, you'll frequently see a billing code associated with a

25  charge on your bill.  And, so, the attempt here was to

1 identify those billing codes that would yield a tax

2 calculation.

3 Q.  Okay.

4 And, ultimately, as a result of that work with the

5 Tax and Marketing Department and your firm and

6 PricewaterhouseCoopers, were approximately 14,800 feature

7 service order code combinations identified?

8 A.  Yes.  It was about 14 -- 14.8 thousand.

9 Q.  And, then, was more validation work done to determine

10 whether or not that was accurate?

11 A.  Yes.  I think AT&T continued to do quality control work on

12 this to see if there were duplicates within that group --

13 duplicate SOC feature codes.

14 Q.  And, also, there were some bundled services --

15 A.  That's correct.

16 Q.  -- that are, you were advised, excluded under the Internet

17 Tax Freedom Act that had to be eliminated?

18 A.  That's correct.

19 Q.  And as a result of that process, a final -- not quite

20 final -- list, as it turned out, of 13,919 feature service

21 order code combinations were identified, correct?

22 A.  Correct.

23 Q.  And, then, an additional 41 codes were added that AT&T had

24 recently implemented?

25 A.  That's correct.

Florence - direct

1   Q.   Okay.

2   A.   Had implemented, I think, since they completed the initial

3   study.

4   Q.   All right.

5         And, ultimately, there were 13,960 feature SOC code

6   combinations?

7   A.   That's correct.

8   Q.   Now, did AT&T then apply that final list of codes to its

9   customer database?

10  A.   The billing database, correct.

11  Q.   And in addition to applying that to the billing database,

12  did they identify both foreign and current -- former and

13  current customers?

14  A.   They did.

15  Q.   All right.

16        Did they identify the amount of tax that was subject

17  to a refund for each individual customer on an individual

18  basis?

19  A.   That's correct.

20  Q.   All right.

21        Now, the total that resulted from that was

22  approximately how many customer records?

23  A.   Well, there were -- in terms of billing records, there

24  were -- about, I think, 40-some-odd million billing records.

25  Q.   Okay.

Florence - direct

1      Your declaration identifies about 46 million?

2   A.   That's right.  And, then, about 29 million actual

3   customers -- individual customers.

4   Q.   When you say "customers," are we talking about discrete,

5   what they call, basic account numbers, B-A-N?

6   A.   That's correct.

7   Q.   29 -- approximately 29 million of those?

8   A.   That's, in essence, the account holder, the person that

9   holds the account.

10  Q.   Once this process was completed, then, was this the same

11  process that AT&T used that resulted in the data that was then

12  the basis for the refund claims in these several hundred

13  taxing jurisdictions?

14  A.   That's correct.

15  Q.   All right.

16      At some later time, was ARPC provided a series of DVD

17  computer discs that contained the data that was submitted to

18  the various taxing jurisdictions as part of the refund claims?

19  A.   We did.

20  Q.   All right.  I'll come back to that in a little bit.

21      Dr. Florence, in your opinion, was the approach

22  undertaken by AT&T to evaluate these feature SOC codes and

23  mine their data to determine which Internet access services

24  resulted in taxes paid to taxing jurisdictions a reasonable

25  approach to identify those things?

Florence - direct

1   A.  Yes, it was.

2   Q.  And was it consistent with the industry of statistical and

3   data analysis that you're a part of?

4   A.  Certainly consistent with the type of data that was

5   available.  And I think the validation study that was done was

6   -- by PWC -- just reinforced that.

7   Q.  Okay.

8           I want to turn now for a minute to your function as

9   notice administrator.

10          As I mentioned earlier, the Court appointed ARPC as

11  notice administrator in August, 2010.  And as part of your

12  work in this case, did you prepare Exhibit 4, which is your

13  declaration related to the notice issues?

14  A.  Yes, I did.

15  Q.  As part of the settlement agreement, did you become aware

16  that the class notice was designed to include multiple types

17  of notice?

18  A.  Yes.

19  Q.  And, specifically, it included inserts into current

20  customers' bills?

21  A.  Correct.

22  Q.  Text messaging, correct?

23  A.  Correct.

24  Q.  Publication?

25  A.  Correct.

1  Q.  E-mail where it could be done?

2  A.  Correct.

3  Q.  And direct mail?

4  A.  Correct.

5  Q.  Now --

6  A.  The e-mail and the direct mail was primarily focused with

7  former customers.

8  Q.  Yes, sir.

9          The bill insert, the text message, the publication,

10  was that accomplished by AT&T?

11  A.  It was.

12  Q.  All right.

13          The e-mail and direct mail, was that done, in large

14  part, by ARPC with assistance from AT&T?

15  A.  Right.  We managed that process.

16  Q.  Okay.

17  A.  Correct.

18  Q.  Now, as part of the notice process, was there also set up

19  a Web site that anyone could go to -- I think it's

20  attmsettlement.com or something like that -- to get

21  information, including the settlement agreements, the Court's

22  orders, the long form notice, and so forth?

23  A.  Yes.  That seemed to be the -- given the volume of

24  information that needed to be communicated, that was the most

25  efficient way to do it, I think.

1  Q.  And, in addition, was there an 800 number set up that

2  provided for a script of frequently asked questions and

3  directions that people could go to get more information?

4  A.  There was.

5  Q.  Did ARPC set up, with others, the Web site and the 800

6  number?

7  A.  We did.

8  Q.  Did you understand that the notice program was designed to

9  get broad actual notice to current and former customers?

10  A.  I did.

11  Q.  Did you understand that the Court approved this notice

12  procedure in the preliminary approval order?

13  A.  I did.

14  Q.  Let's walk through, then, the high points of what you did.

15        First of all, did AT&T provide you with former

16  customer records on a hard drive?

17  A.  They did.

18  Q.  Did they also provide you with additional data, I think,

19  through an e-mail, that added some additional former

20  customers?

21  A.  Yes, they did.

22  Q.  Okay.

23        Doctor, we have prepared Exhibit 6, and I know you've

24  gone over this.  And I'll just keep this up on the screen as

25  we walk through this.

Florence - direct

71

1          Did the total number of former customers provided by

2     AT&T total over 11 million?

3     A.   It did.  The number 11,151,844, yes.

4     Q.   What was the first thing that you did with that data?

5     A.   Well, the first thing we did was to mount the data and

6     make sure we were reading it properly and test that with AT&T.

7          The second thing was then to identify those records

8     that had e-mail addresses, for purposes of sending the e-mail.

9     Q.   And how many of those persons had corresponding e-mail

10    addresses?

11    A.   Again, these were former customers.

12    Q.   Yes.

13    A.   So, there were e-mail addresses for about 3,522,000 former

14    customers.

15    Q.   All right.

16         And what did you do with those e-mail addresses?

17    A.   We used TeleMessage, a service that's designed to send

18    mass e-mails, which is -- which is an art these days, I guess.

19    We used TeleMessage to send the -- an e-mail message that was

20    prepared and approved, part of the notice program, to those

21    3,522,000 people.

22    Q.   And did you ask TeleMessage to send that in a way that it

23    could identify those that were successfully delivered and

24    those that were undeliverable?

25    A.   Yes.

Florence - direct

1   Q.  And how many were successfully delivered?

2   A.  Approximately 1.1 million were successfully delivered.

3   Q.  Which leaves a little over 2.4 million that were not

4   successfully delivered?

5   A.  That's correct.

6   Q.  And did you then add the number that were not successfully

7   delivered to the number of customers that did not have e-mail

8   addresses?

9   A.  Right.  Since those people had not -- we hadn't

10   successfully contacted them by e-mail, then we treated them as

11   if they didn't have an e-mail address.

12   Q.  That was roughly 10 million people?

13   A.  That was 10 million people.

14   Q.  What did you do with that number?

15   A.  Well, since these were going to involve sending postcards,

16   we checked the addresses -- the current addresses -- on those

17   10 million people by running the -- all 10 million records

18   through a notice-of-address-change database, a service

19   provided by Experian.  And if a notice of change of address

20   had been issued by one of those folks, the new address was

21   recorded, as opposed to the old address, because these were

22   former customers.  And there were -- so, some of the addresses

23   were updated based on that service and some were not.

24   Q.  Okay.

25       And once they were updated, did you analyze the data

1    to determine whether there were any duplicates?

2    A.   The final step was to check all the records to make sure

3    there were not duplicate records there.  And we found about

4    919,000 duplicate records, where a duplicate was defined as

5    every piece of information was exactly the same for the

6    record.

7    Q.   Meaning the name's exactly the same, the address is

8    exactly the same, the Zip Code's exactly the same, and on and

9    on?

10   A.   Absolutely.

11   Q.   Okay.

12          Now, what was the total number of postcards that were

13   then mailed out?

14   A.   It was 9.1 million postcards that were mailed.

15   Q.   Now, did AT&T pay for all of the postcard notice and the

16   costs of the e-mail notice and your costs as it related to the

17   notice process?

18   A.   That's my recollection, yes.

19   Q.   Okay.

20          Now, did you monitor the activity on the 800 number

21   and the Web site?

22   A.   We did.

23   Q.   As we approached this hearing, did I ask you to evaluate

24   that activity and see if you could prepare an exhibit to

25   demonstrate that?

Florence - direct

1    A.  You did.

2    Q.  And do we find that activity -- I think it's shown on

3    Exhibit 9.  Let me confirm that.

4         Exhibit 9 is on the screen right now.  Can you

5    describe what it is we're seeing there?

6    A.  Well, what you're seeing is a graph over time of the

7    number of telephone calls to the hotline and the number of

8    hits to the Web site.  The blue plot is the number of calls by

9    time, and the red line is the number of Web site hits over

10   time.

11   Q.  And, so, for example, at its peak on November 12th or 13th

12   or 14th of 2010, whatever the number is, there was something

13   over 130 million hits on the Web site -- or 130,000 hits on

14   the Web site -- that day?

15   A.  Correct.  130,000 that day.

16   Q.  Okay.

17        And you've also put in here the dates -- or

18   approximate dates -- that some of the key things happened in

19   the notice process, correct?

20   A.  That's correct.

21   Q.  So, for example, when the text messages began to go out

22   during the week of November 14th, we see very significant

23   spikes in both the calls to the 800 number and the number of

24   hits on the Web site?

25   A.  That's correct.

Florence - direct

1    Q.   And, then, when e-mail messages went out during the week

2    of November 21st, we see similar spikes, albeit not as high?

3    A.   That's correct.

4    Q.   And, then, again, another spike when the postcards went

5    out?

6    A.   Correct.

7    Q.   Okay.

8         Do you keep track of or have you evaluated the

9    cumulative number of hits, for example, on the Web site?

10   A.   Yes.  As of -- I guess, February would be about the last

11   time we looked.  February 4th.  Something like that.

12   Q.   And as of February 4th, can you give us some idea of how

13   many people had visited this settlement Web site?

14   A.   The Web site had about 1.9 million hits.

15   Q.   Total?

16   A.   Total.

17        And the hotline had received about 685,000 calls.

18   Q.   All right.

19        Now, in addition to your work as notice administrator

20   as you've described, did you assist class counsel in

21   evaluating and in choosing an escrow bank for this settlement

22   process?

23   A.   We did.

24   Q.   Because of the nature of the settlement, was it apparent

25   to you that it would be necessary to have an independent bank

 1   act as escrow agent to account for any money that would flow

 2   from taxing jurisdictions and AT&T to the class and

 3   subclasses?

 4   A.  Yes.  It was, as you can guess, a pretty complicated -- or

 5   as you know, a pretty complicated -- accounting task.

 6   Q.  With 29 million basic account numbers, we certainly have

 7   many, many millions of potential class members who may receive

 8   benefits?

 9   A.  That's correct.

10   Q.  Okay.

11        Are there only a handful of banks in this country

12   that can handle that sort of volume?

13   A.  There's a fairly small number of banks that can handle

14   that volume and have experience providing these kind of

15   services.

16   Q.  Who were the candidates here?

17   A.  Well, we talked to Mellon Bank.  We talked to Huntington

18   Bank.  We talked to U.S. Bank, Wells Fargo and JPMorgan.

19   Q.  Okay.

20        And were you involved and participate in the

21   interview process for those candidates?

22   A.  I was, yes.

23   Q.  What were the considerations for the decision?

24   A.  Well, one of the considerations was what was their

25   experience in doing things like this before and had they

Florence - direct

1   provided these kind of services before.

2           Second was whether they -- what services they were

3   willing to provide.  So, for example, you need someone to cut

4   checks.  You need someone to mail checks.  You need someone to

5   receive returned checks and account for them.  There's

6   accounting within the sub-accounts for each taxing entity.

7   And some of the banks that we talked to would provide a subset

8   of services, but not the full range of services.

9           So, it was the service offerings that they were

10  willing to provide; basically, the cost associated with the

11  service, which was a big factor; and, then, whether it was a

12  reasonable size bank that we didn't have to worry about their

13  resources that were being committed to it.

14  Q.  Okay.

15          Now, as part and parcel of that process, was there a

16  particular bank that stood out as the most capable or

17  qualified to handle this engagement?

18  A.  Yes.  Mellon.  Bank of New York.

19  Q.  And you're aware, I think it was in January of this year,

20  because some money was flowing, we asked the Court to appoint

21  Mellon as the escrow bank and the Court did so?

22  A.  That's correct.

23  Q.  All right.

24          Have you continued to work with Mellon Bank to make

25  sure that they have what they need, and they to make sure that

1    you are providing what they need, to handle this settlement as

2    it progresses?

3    A.   We have.  We probably talk to them on a weekly basis.

4    Q.   Can you give us some idea of why it is that Mellon Bank

5    was the choice that we recommended?

6    A.   One, their experience in the area.  They've done

7    settlements like this before.

8         Two, we've actually worked with them in a couple of

9    matters before and found their relationship was very open and

10   very professional.

11        Third, they were -- they had a very good team that

12   they were willing to dedicate to the project on a permanent

13   basis.

14        And, then, fourth, the cost.  They were the most cost

15   effective alternative to -- after some discussions.

16   Q.   You beat them down pretty hard?

17   A.   We pretty -- we hit them pretty hard, yes.

18   Q.   Okay.

19        Let's maybe jump to the end.  What is the final

20   negotiated amount that they will be charging for the complete

21   processing, soup to nuts, of any check that goes out to an

22   individual?

23   A.   I think the actual preparation for cutting the check, the

24   printing of the check, the mailing of the check and, then,

25   handling any returned checks averages out to about a

 1  buck-twenty.  Something like that.

 2  Q.  Now, in addition to your work with evaluating the escrow

 3  bank, did you -- ARPC -- has it assisted in the monitoring of

 4  the refund status?

 5  A.  We have.

 6  Q.  All right.

 7       Earlier, we discussed these DVD discs.  When you got

 8  the DVD discs, what did ARPC do with those?

 9  A.  Well, this is -- this was quite a large data set organized

10  by state and by customer.  There were about -- it was about 16

11  gigabytes of data.  We mounted the data set.  We created a

12  structure for using the data on a continuing basis.  We then

13  ran some -- as we would normally do, we ran some -- test

14  reports and sent those to AT&T to make sure we were reading

15  the data correctly.

16       And, then, once those were in-house and underway, we

17  ran some reports for class counsel.  And, then, we set up an

18  ongoing status reporting system where we monitor the

19  activities on a daily basis and update the tax refund status

20  on all the refund requests.

21       MR. FRICKLETON:  Your Honor, may I approach the

22  witness with an exhibit?

23       THE COURT:  You may.

24       (Document tendered.)

25       THE COURT:  Is this 57?

1          MR. FRICKLETON:  Yes, ma'am.

2     BY MR. FRICKLETON:

3     Q.  Mr. Florence, one of the exhibits we did not -- we were

4     not able to get into the notebook is Exhibit 57, which you

5     have in front of you.

6          Would you describe what this is, please?

7     A.  This is a report using that data set that was provided to

8     us by AT&T, which breaks down the number of estimated

9     customers by state and also reflects that either in the number

10    of records or the number of BANs, which would be the billing

11    account person.

12         So, when I think of customers, I think of the last

13    column in this table.

14    Q.  Okay.

15         And that's just slightly under 29 million basic

16    account numbers?

17    A.  That's correct.

18    Q.  And this exhibit separates them by state; is that correct?

19    A.  That's correct.  The state and where the tax was paid.

20    Q.  For example, in Florida, there are 2.6 million?

21    A.  That's correct.

22    Q.  In Michigan, there are 572,000?

23    A.  That's correct.

24    Q.  Now, why is it that the number of records is different

25    than the number of unique basic account numbers?

 1   A.   Well, there can be more than one record per account and --

 2   because we're looking now at tax entities and tax types, as

 3   well as customers.  So, a customer could have one record if

 4   there was only one type of tax assessed to that customer.  But

 5   if there was more than one type of tax, the person could have

 6   more than one record.

 7   Q.   Okay.  Thank you.

 8        Now, as part of your work in the case monitoring the

 9   status of the refunds, did ARPC prepare the documents that are

10   Exhibit 7 in the notebook, which are spreadsheets that detail

11   the status of the refund applications?

12   A.   Yes, we did.

13   Q.   All right.

14        And just to sort of provide some baseline here, the

15   first three pages of Exhibit 7 are the status at the state

16   level?

17   A.   That's correct.

18   Q.   All right.

19        And, so, for example, take the first one listed,

20   Alabama.  There are two petitioners there, AT&T Mobility and

21   Decatur RSA.  The refund amount is limited.  And if there, for

22   any of these, is an offer or a paid amount, that would be

23   listed on these spreadsheets?

24   A.   That's correct.  And we maintain these on a daily basis.

25   Q.   Exhibit 7 was contained in a filing to the Court a couple

Florence - direct

1   days ago on the status of the refund claimed; is that correct?

2   A.  I'm not --

3   Q.  You wouldn't know that?

4   A.  No, I wouldn't.

5   Q.  I'll just tell you it's correct --

6   A.  Okay.

7   Q.  -- and ask you to assume it.

8           THE COURT:  Mr. Frickleton, just for purposes of the

9   record, is Exhibit 7 the same as what was submitted to the

10  Court in the status report dated March 8th?

11          MR. FRICKLETON:  Yes, it is.

12          THE COURT:  Are there any changes?

13          MR. FRICKLETON:  No.  It's the same.

14  BY MR. FRICKLETON:

15  Q.  And on that subject, though, Mr. Florence, is the

16  spreadsheet that formed the basis of Exhibit 7 a dynamic sort

17  of living document that changes all the time?

18  A.  It changes all the time.

19  Q.  And, as stated in the key, this report is based on

20  correspondence posted in the electronic data room established

21  pursuant to Exhibit N, as in Nancy, of the settlement

22  agreement.

23          This report is updated daily?

24  A.  That's correct.

25  Q.  All right.

1          After the first three pages at the state level, then

2    the next two pages are a summary of the local refund

3    applications on a state-by-state basis?

4    A.  That's correct.

5    Q.  And, then, the next 31 pages are a -- the detail of each

6    individual taxing jurisdiction that is local in nature?

7    A.  That's correct.

8    Q.  Okay.

9          Now, I just want to cover just a couple of things to

10   make sure that the Court is aware of how this has been put

11   together.

12         Let's look at Alaska.

13         There's a whole bunch --

14   A.  I'm sorry.  Which table are we on?

15   Q.  I'm sorry.  The local detail.

16   A.  Okay.

17   Q.  Page 1 of the local detail.

18   A.  Okay.

19   Q.  In Alaska, there are a whole bunch of cities that are

20   listed under "Jurisdiction."  And did those come from the

21   exhibit to the settlement agreement which listed all of the

22   potential cities that may have collected taxes?

23   A.  That's correct.

24   Q.  All right.

25         Once the data analysis was done by AT&T, did it come

Florence - direct

1   to pass that, in fact, many of those cities had no tax ever

2   paid to them?

3   A.  Some of those cities, yes.

4   Q.  Okay.

5          And if that occurs, then under "Claim Status" there's

6   a notation that says, "No tax paid"?

7   A.  Correct.

8   Q.  All right.

9          And anyone can go through this list and see what the

10  response is.  And at the local level, there have, in fact,

11  been either some payments made or some offers made; is that

12  correct?

13  A.  That's correct.

14  Q.  So, for example, let's look at Page 5 of the local detail.

15  There's a $79,000 credit offered by Seaside, California; is

16  that correct?

17  A.  Correct.

18  Q.  All right.

19          There are some checks that AT&T has received, also;

20  is that right?

21  A.  That's correct.

22  Q.  Have those checks been routed to the escrow agent?

23  A.  Yes.

24  Q.  Many of those checks are small amounts, but there are some

25  in the tens of thousands; is that correct?

Florence - direct

1    A.   That's -- I believe that's correct, yes.

2    Q.   All right.

3            Now, Dr. Florence, in addition to Exhibit 7, which is

4    the refund status as of a few days ago, did we ask you to

5    prepare Exhibit 8, which is a chart showing the net tax amount

6    by month from November of '05 until August of 2010, when this

7    tax was stopped?

8    A.   Yes.

9    Q.   Now, do we see, beginning back in 2005, that the total tax

10   remitted by month in November of 2005 was -- what is that?

11   Maybe $3 million?

12   A.   Yeah, I was --

13   Q.   $4 million?

14   A.   -- looking for the table that was used to prepare that.

15   Might be able to give you the actual number.  I don't see it

16   here right now, but let me see.

17           (Brief pause.)

18   BY THE WITNESS:

19   A.   I'm sorry, Mr. Frickleton.  I'm awash with numbers here,

20   but --

21   BY MR. FRICKLETON:

22   Q.   That's okay.

23   A.   -- can't find that table.

24   Q.   It appears on the chart that it was something less than $5

25   million.  Is that consistent with your memory?

Florence - direct

1    A.   I'm sorry, the date was?

2    Q.   The very first entry, November of 2005.

3    A.   Yes, it looks like between two and three million dollars.

4    Q.   And as months progressed and we saw somewhat meteoric

5    growth of smartphones and the iPhone and other smartphones in

6    particular, did the tax remitted by month from AT&T begin to

7    sweep upward to a high of nearly $50 million in March of 2010?

8    A.   It did.

9    Q.   Okay.

10        As part of your evaluation in this case when you got

11   the data from AT&T and put together Exhibit 7, it appears the

12   total tax remitted over that five-year period of time for

13   Internet access service, if I've done my math right, is about

14   $1.15 billion?

15   A.   Correct.

16   Q.   Now, did we ask you to look at the last three years of

17   that remittance?  Because many, many taxing jurisdictions have

18   a three-year statute of limitations for refunds.

19   A.   Yes.

20   Q.   And what percentage of that total approximately has been

21   remitted within the last three years prior to November of

22   2010?

23   A.   From November '07 to prior to the November, 2010, it's

24   about 83 percent.

25   Q.   83 percent of the 1.15 billion?

1  A.  Correct.

2  Q.  For a total of something over $950 million?

3  A.  Correct.

4  Q.  Okay.

5       Has ARPC, as part of its work, also monitored any

6  requests for change of address from potential class members?

7  A.  We have.

8  Q.  What have you done in that regard?

9  A.  We have a P.O. box that's mentioned on the Web site.  It's

10  also mentioned on the -- in the letter.  Any mail that's sent

11  in there, we log in that mail, scan it and send that

12  information to class counsel with the idea that at some point

13  in time, a judgment will be made to change the -- formally

14  change the address or not.

15  Q.  Mr. Florence, what has been your experience in prior class

16  actions with respect to the phenomenon of class members who

17  have been sent checks not cashing those checks?  Does that

18  happen?

19  A.  Sure, it will happen.  It does happen sometimes, yes.

20  Q.  Is that inevitable in these sort of mass tort or class

21  action settlements?

22  A.  Yes.  With as many people involved as there are in these

23  mass torts, there will be some number of people that will lose

24  checks, misplace them, forget about them and not cash them.

25  Q.  And has the handling of that scenario, is that part of

1    your discussions with Mellon Bank, of how that was going to be

2    handled and time limits for cashing checks and reports back

3    for uncashed amounts to the courts?

4    A.   Yes.

5    Q.   Okay.

6         Now, if the Court approves this settlement and there

7    is money that flows in from a given state -- pick any one --

8    what is your expectation -- now that the systems have been put

9    in place, what is your expectation -- regarding how long it is

10   likely to take to process and send out checks to class members

11   once the Court issues an order to do so?

12   A.   It's a very quick process.  Less than, I'd say, three

13   weeks to a month to get the first checks out; and, then, once

14   they're rolling, it would be faster than that.

15   Q.   Dr. Florence, one final question.

16        In your experience in doing class actions for the

17   last 20-plus years, is it unusual to have a settlement like

18   this -- this large -- where there is no requirement at all for

19   any class member to make a claim of any type?

20   A.   It's certainly unusual in my experience.

21        MR. FRICKLETON:  Those are all my questions, your

22   Honor.

23        THE COURT:  Any cross-examination?

24        Okay.  Let us take a quick break.  We will pick up at

25   11:30.  We will pick up with cross then.

1          (Brief recess.)

2          THE COURT:  You may be seated.

3          Mr. Baumkel, go ahead.

4           CROSS-EXAMINATION ON BEHALF OF KAREN WIAND

5  BY MR. BAUMKEL:

6  Q.  Dr. Florence, good morning.

7  A.  Good morning.

8  Q.  Did you find your business card?

9  A.  I didn't.

10 Q.  Could you tell me your address, please?

11 A.  1220 19th Street, Northwest, Suite 700, Washington, D.C.

12 20036.

13 Q.  Thank you.

14         Did you have any hand, or did your firm have any

15 hand, in preparing the refund request documents submitted to

16 the various taxing jurisdictions?

17 A.  We did not, no.

18 Q.  Could you look at Exhibit 8, the one that's up on the

19 screen?

20 A.  Yes.

21 Q.  Do you have it there in front of you?

22 A.  I do.

23 Q.  And is what you have in front of you identical, as far as

24 you can tell from looking at the screen, to what's up there on

25 the screen?

Florence - cross by Baumkel

1   A.  Yes.

2   Q.  I assume you're aware that it's been represented that the

3 average statute of limitations for tax refunds across the

4 country as applicable to the claims at issue here is three

5 years?  Has that been explained to you?

6   A.  That has not been.

7   Q.  Well, if you'll take a great leap of faith and assume

8 that's in the papers that have been submitted to the Court,

9 can you go back three years on that chart that's in front of

10 you, Exhibit 8, the one that's blown up on the screen?

11   A.  So -- okay.

12   Q.  What date is that?  What month and year does that take us

13 back to?

14   A.  2007 -- 2008 -- 2007, '08.  That's August of '07, right?

15   Q.  Well, when are you going back from?  Three years from

16 where?

17   A.  From the end of this graph.

18   Q.  I see.

19        And what's the -- the end date on this graph is

20 August, 2010?

21   A.  Right.

22   Q.  And the rationale for that being the end date is what, as

23 you understand?

24   A.  That's when the tax stopped being assessed.

25   Q.  Okay.

Florence - cross by Baumkel

1          Do you know when the refund claims were first

2   submitted to the various taxing jurisdictions?

3   A.   The date they were actually submitted?

4   Q.   Yes, sir.

5   A.   I don't know.

6   Q.   You assume -- or maybe you don't assume.  Do you have any

7   idea at all?

8          In other words, do you know if it's in the last

9   couple of months, that sort of time frame?

10  A.   I don't know.  I mean, that's data that we could pull off

11  from the electronic --

12  Q.   Fair enough.

13  A.   -- data room.

14  Q.   So, if we were going back three years from that date and

15  it was in the last couple of months, then we'd be even several

16  more months more recent than the month you just identified as

17  three years back, right?

18  A.   Sure.  Three years from whatever you start.

19  Q.   But let's be generous in the exercise I'm doing.  Let's go

20  three years back just from this graph to the August, 2007,

21  date that you identified.

22         Before that date, all of these lines -- these blue

23  lines -- represent millions of dollars of taxes collected; is

24  that right?

25  A.   That's correct.

Florence - cross by Baumkel

1   Q.  And those are the taxes that are at issue, as you

2   understand this litigation?  The Internet access fee taxes?

3   A.  That's correct.

4   Q.  So, for example, if we went back to the one-month period

5   before the three-year cutoff date you just identified, how

6   many millions of dollars does that show were collected in that

7   month?

8   A.  You mean July of '07?

9   Q.  Yes, sir.

10  A.  2007?

11  Q.  Yes, sir.

12  A.  It's roughly, what, 13 -- maybe 13 million.  Something

13  like that.

14  Q.  Okay.

15          Then I'm not going to make you do the exercise for

16  each month, but I think -- I just want the record to reflect

17  the idea.

18          So, that data that comprises that $13 million

19  collected, for example, for July, 2007, your assumption is

20  that's accurate data, correct?

21  A.  Yes.

22  Q.  When it says it's net tax amount, what does that mean?

23  Net of, what?

24  A.  This is net for the clients.  This is tax for the clients.

25  Q.  Well --

1    A.   This is what the -- this is what the amount that would

2    have been paid would be -- would -- would be.

3    Q.   Well, would have been or was paid?

4    A.   Was.  I'm sorry.

5    Q.   Okay.

6            So, net of what, is what I'm not understanding.  It

7    may be a simple concept, in which case you can simply explain

8    it to me.

9    A.   I'm not sure what "net" means in this instance.

10   Q.   Okay.

11           When did you first encounter this Exhibit 8?

12   A.   Probably two, three weeks ago.

13   Q.   In connection with, what?  What exercise did that pertain

14   to that you --

15   A.   I think we were asked to put the Exhibit 8 together.

16   We've done this kind of analysis before --

17   Q.   Okay.

18   A.   -- calculating the actual taxes by month, provided that

19   analysis to class counsel.

20   Q.   Well, to be perfectly blunt, the exercise I'm now

21   undergoing is to show Judge St. Eve that there were millions

22   and millions and millions and millions -- not some trivial

23   amount, as represented in the briefs -- that were collected in

24   taxes farther back than the three-year statute of limitations.

25           Correct?  Many millions of dollars?

Florence - cross by Baumkel

94

1   A.   Certainly the difference between '05 and '07 here is

2   millions of dollars.

3   Q.   Tens of millions?

4   A.   Yes.

5   Q.   Maybe even hundreds of millions, if you add it up, right?

6   A.   I'd have to add it up.

7   Q.   Okay.

8        But you don't -- even though you prepared this, you

9   don't know -- when you were preparing it, you don't know what

10  you meant when you used the term "net"?

11  A.   I didn't put this particular table together.  So, I didn't

12  put the title on the table.

13  Q.   The text notice date, sir, was, what?

14  A.   I'm sorry?

15  Q.   The text notice date, what was that date?

16  A.   Text noticed?

17  Q.   Text notice.  You told Mr. Frickleton there were different

18  kinds of notice.  Text, e-mail --

19  A.   Oh.

20  Q.   -- postal.

21       I'm asking you the text notice date.

22       I'm sorry.  I didn't mean to be so abrupt.  I'm done

23  with the chart.

24  A.   Thank you.

25       I think that text notice was made November -- during

1    the week of November 14th, I think.

2    Q.  Well, is there something that shows the date as opposed to

3    what you think?

4    A.  We were told that it was made -- those text notices were

5    sent out the week of November 14th.

6    Q.  So, you didn't --

7    A.  We didn't send the text notices out.

8    Q.  Did you have anything to do with administering that or --

9    A.  No.  That was something that was the responsibility of

10   AT&T.

11   Q.  Was anything copied to you to confirm that it had been

12   done?

13   A.  Not that I saw.  It may have been copied to class counsel.

14   Q.  Okay.

15          So, in any event, assuming the validity of what you

16   think -- I'm not challenging your good faith --

17   A.  I did get a notice.  In fact, I got two notices that date.

18   Q.  So, you think it was in mid-November?

19   A.  Yes.

20   Q.  So, if we were to -- do you have that chart with the

21   spikes as to when there was --

22          THE COURT:  It is Exhibit 9.

23   BY MR. BAUMKEL:

24   Q.  -- when there were hits?

25          MR. BAUMKEL:  Thank you, Mr. Frickleton, or whoever.

1  BY MR. BAUMKEL:

2  Q.  So, the red is to show the number of hits on the Internet?

3  A.  That's correct.

4  Q.  And the blue is to show the number of phone calls to

5  the -- to a notice -- to a number identified in the notice?

6  A.  That's correct.

7  Q.  Do you know if the text notice gave a phone call number?

8  A.  I know it gave the Web site address.  I can probably check

9  to see if it gave a phone number.

10  Q.  If you have something there where it's not --

11  A.  I may have something here.

12          (Brief pause.)

13          MR. FRICKLETON:  Judge, if it will save time, we have

14  the text notice on the phone.

15          MR. BAUMKEL:  That's great.

16          THE COURT:  Thank you.

17          MR. BAUMKEL:  Thank you, Mr. Frickleton.

18  BY THE WITNESS:

19  A.  Yeah, it gives both.

20  BY MR. BAUMKEL:

21  Q.  I see it.  I'm looking at Mr. Frickleton's phone.

22          So, I'm assuming what he's got is what you've got.

23  It shows a Web site address and a 877 phone number?

24  A.  Yeah, it's "go to" and the Web site address or "call" and

25  then the 877 number.

 1                MR. BAUMKEL:  So, if it's not out of line, if I could

 2    just -- so we could move on past this, your Honor, Mr.

 3    Frickleton, is November 15th supposed to show the date it went

 4    out?

 5                MR. FRICKLETON:  Your Honor, based on declarations

 6    that have already been filed in the court, it went out over a

 7    period of time.

 8                THE COURT:  Correct.  The week of November 14th is

 9    what the evidence has -- that has been submitted has -- said.

10    BY MR. BAUMKEL:

11    Q.  Do you have some understanding as to who in the universe

12    of class members was intended to receive the text notice?

13    A.  Current customers.  Current customers were supposed to

14    receive the text message.

15    Q.  All current customers, correct?

16    A.  Well, I think the intent was the current customers that

17    would be impacted by the class.

18    Q.  So, there was some discussion with Judge St. Eve -- I

19    don't know if you're familiar with it -- a couple of months

20    ago about some concern that some class members said they

21    didn't get this text notice.  Do you know anything about that?

22    A.  I do not, no.

23    Q.  Were you ever asked to investigate in any way as to

24    whether, in fact, the text notice was received by everybody it

25    was supposed to be received by?

Florence - cross by Baumkel

1   A.  No, I was not.

2   Q.  This dollar-twenty, is that a dollar-twenty Mellon is

3   charging for each check they're mailing to each class member?

4   Is that your understanding?

5   A.  It actually works out to be a bit less than the dollar-

6   twenty.  It's closer to a dol- -- like a dollar, dollar-three.

7   But factored into that is the cost associated with if there's

8   a returned check and the bookkeeping that has to take place

9   with regard to canceling the check and the accounting.

10          So, I think we've -- under certain assumptions, we've

11  -- estimated that it could be around a buck-twenty.

12  Q.  Do you have your original bid from Mellon?

13  A.  I don't have it with me.  But we have a contract with

14  Mellon, and it specifies the pricing.

15  Q.  I'm wondering if you know what their original bid was for

16  that -- that ended up being, as you explained, about a dollar-

17  twenty per class member?

18  A.  It was substantially higher than that.

19  Q.  Do you have any idea what --

20  A.  What substantial means?  I don't want to disparage them as

21  to what they originally bid.  So, I'm probably safer in just

22  looking it up and giving it to class counsel and have them

23  tell you, rather than me guessing at it.

24  Q.  Fair enough.

25          Is that something you would be able to look up this

1   morning easily or you have it in your office?

2   A.  I can get it today, certainly.  Somebody in the office can

3   get it for me.

4   Q.  Did you take bids from anybody other than Mellon -- actual

5   written bids?

6   A.  Oh, yes.

7   Q.  Who else did you actually take written bids from?

8   A.  We took written bids from JPMorgan and -- for the life of

9   me, the name escapes me.  Hold on.  Huntington Bank.

10  Q.  Were those in a form that if you had them handy right now

11  would allow you to tell us how they compared with the

12  dollar-twenty that you ended up with, with Mellon?

13  A.  Sure.

14  Q.  Do you have them handy?

15  A.  I don't have them with me, but I can -- I can look.  I can

16  get that data.

17  Q.  Okay.

18          So, do you know what the total number of millions or

19  billions is that's been applied for with the various taxing

20  jurisdictions for refunds?

21  A.  I think it comes out to about 1.1 billion.

22  Q.  And do you know how much has been deposited to Mellon Bank

23  to date?

24  A.  Less than a hundred thousand.

25  Q.  And I don't know that we need to get it back up on the

Florence - cross by Baumkel

1   screen as long as you have it handy.  Exhibit 7 from which you

2   testified earlier about offers from some jurisdictions, do you

3   have that exhibit handy?

4   A.  Yeah.

5   Q.  So, not that there's any necessary rationale, but just to

6   make it easy, starting from the first offer, what's the state

7   and what's the amount of the offer?

8   A.  You're on the detail page -- the local detail page?

9   Q.  The page that shows -- that allows you to say what was

10  offered by a taxing jurisdiction.

11       You were telling Mr. Frickleton that you had data

12  there that showed an amount that was offered versus the amount

13  of total tax at issue.  I have it on my laptop, but that would

14  be even harder for me to get right now than for you to leaf

15  through your notebook.

16       THE COURT:  There are two separate charts that

17  reflect this.  Which chart are you --

18       THE WITNESS:  Right.

19       THE COURT:  -- referring to?

20       MR. BAUMKEL:  Well, either chart that would allow the

21  witness to talk about what the number is for the jurisdictions

22  that made offers.  I'm prepared to assume, for sake of our

23  current questioning, the information will be valid.  So, I

24  don't care which paper he gets it from, as long as he gets the

25  information.  Whatever he was looking at when he told

 1  Mr. Frickleton earlier about the offers that jurisdictions had

 2  made.

 3  BY THE WITNESS:

 4  A.  Well, there's a -- there's -- on Page 2 of 31, there's

 5  "Alaska, Sitka City, Borough Sales Tax," the petitioner being

 6  New Cingular Wireless.  There was an offer -- current status

 7  is an offer.  The refund amount was $37,107, and there's been

 8  an offer to $37,107.

 9  BY MR. BAUMKEL:

10  Q.  So, if we go down -- let's go past Alaska.  Is there an

11  offer for the next state on the list?

12          I'm not going to do all 50 states, but I just want to

13  do a few?

14  A.  Well, the next line, which is "Skagway Sales Tax -- "

15  Q.  No, no.  Past Alaska.  If we go down to the next state.

16  A.  Next state?

17  Q.  Yes.  Next state where there was an offer.

18  A.  We have Arizona.

19  Q.  What's the amount of the Arizona offer?

20  A.  There's -- I'm sorry.  Arizona Avondale sales and use tax.

21  There's been an offer.  The tax refund amount was $31,017.

22  The offer was $29,454.

23  Q.  What's the next state on the list?

24  A.  California.

25  Q.  Are there any offers from California?

Florence - cross by Baumkel

1   A.  It looks like there is an offer for Firebaugh utility

2   users tax, $133 tax refund amount, and an offer to pay the

3   $133.

4   Q.  Have you done any calculation -- I sort of wanted to get

5   to a point, and I can see it probably will take more time than

6   everybody has patience for.  So, I'm going to relieve

7   everybody in that regard.

8           When I look at this, I got the impression that there

9   was some glaring examples of offers being pretty puny compared

10  to the millions of tax at issue.  Did you notice any of those

11  on the list?

12  A.  I haven't gone through with that intent to find large

13  discrepancies between refund and offer amounts.

14  Q.  So, that's nothing that you've paid attention to or have

15  any particular knowledge about as you sit here?

16  A.  I can't do anything with the data other than report it to

17  counsel.

18  Q.  Fair enough.  I'll just make whatever argument I have to

19  the Judge at the end of the day, then.

20  A.  Okay.

21  Q.  Thank you very much.

22          THE COURT:  Do you want to point one out to me?  I

23  had not noticed that.

24          MR. BAUMKEL:  Well, that's -- I don't have it in

25  front of me and I don't want to --

Florence - cross by Baumkel

1              THE COURT:  I do.

2              MR. BAUMKEL:  Yeah.

3              THE COURT:  And I looked at it yesterday when it came

4    in with that -- and other things in mind, as well, but with

5    that -- in mind, and I did not notice anywhere the offer

6    amount was, I will use your word puny in relation to the --

7              MR. BAUMKEL:  The tax?

8              THE COURT:  -- submitted refund amount.

9              MR. BAUMKEL:  Yeah, so --

10             THE COURT:  They all seemed to be, where there was an

11   offer, the exact amount.  So, you can tell me later if you

12   find one.

13             MR. BAUMKEL:  I got it for the first time late last

14   night in my hotel room.  And I don't know, maybe there's some

15   good reason that the settlement people will tell you why

16   that's the way they filed it, so that it was hard for me to

17   have the time to digest it in the detail I wanted.

18             So, rather than belabor it right now, your Honor, let

19   me look at it later and, then, address it with you later in

20   the day, if I think it needs to be addressed.

21             THE COURT:  Well, I got it maybe a little bit earlier

22   than you, and my guess is they were not submitting it to me

23   with the intention that I would not have time to look at it.

24             MR. BAUMKEL:  Right.

25             THE COURT:  And I did take the time to look at it.

Case: 1:10-cv-02278 Document #: 257 Filed: 09/02/11 Page 104 of 312 PageID #:5429
Florence - cross by Baumkel
104

1          MR. BAUMKEL:  Right.

2          THE COURT:  And I do not see that discrepancy.

3          MR. BAUMKEL:  Okay.

4          THE COURT:  So, my point to you is, if you are aware

5   of a discrepancy, later on today point it out to me, please --

6          MR. BAUMKEL:  Fair enough.

7          THE COURT:  -- because I did not see it.

8          MR. BAUMKEL:  My main point with this witness was the

9   amounts at issue before the statute of limitations, and I

10  think we've covered that.

11         So, I thank you, Dr. Florence, very much.

12         THE COURT:  Thank you.

13         Redirect?

14         MR. FRICKLETON:  None, your Honor.

15         THE COURT:  Thank you, Doctor.  You may step down.

16         (Witness excused.)

17         THE COURT:  Please call your next witness.

18         MR. FRICKLETON:  Your Honor, the settlement class

19  calls Donald Sipple, S-i-p-p-l-e.

20             DONALD SIPPLE, PLAINTIFFS' WITNESS, SWORN

21                      DIRECT EXAMINATION

22  BY MR. FRICKLETON:

23  Q.  Mr. Sipple, would you state your full name and address,

24  please?

25  A.  Donald Edwin Sipple, 646 Romero Canyon Road, Montecito,

Sipple - direct

1    California.

2    Q.   What is your occupation, profession or business, sir?

3    A.   I'm basically a marketing consultant.

4    Q.   And what particularly do you do as a marketing consultant?

5    A.   I basically do adver- -- create advertising materials for

6    different corporate entities and some political efforts.

7    Q.   Political consulting on campaigns, you mean?

8    A.   Yeah.  Mostly initiative and referendum campaigns in

9    California.

10   Q.   Okay.

11           And, Mr. Sipple, you are one of the named class

12   representatives in the State of California for this

13   settlement; is that correct?

14   A.   That's correct.

15   Q.   On a day-to-day basis, you're a successful businessman in

16   the State of California?

17   A.   Right.

18   Q.   Just a couple questions, sir.

19           Why are you doing this?

20   A.   Really as a matter of principle.  I don't think I should

21   be paying taxes that I'm not obligated to pay.

22   Q.   Okay.

23           And because of that principle, did you agree to be a

24   class representative and do what was necessary to be a class

25   representative?

1   A.   Absolutely.

2   Q.   Including flying here to Chicago for some very brief

3   testimony?

4   A.   Yes.

5   Q.   Second area, Mr. Sipple:   Are you aware of the settlement

6   that has been reached and is being proposed to the Court for

7   approval?

8   A.   Yes.

9   Q.   Do you understand that AT&T, last fall, stopped collecting

10  tax on Internet access services?

11  A.   Yes.

12  Q.   And refund applications have been made to a variety of

13  taxing jurisdictions to seek refunds of taxes from the past?

14  A.   Yes.

15  Q.   Do you understand that the class counsel in this case are

16  requesting an attorney's fee as part of the work they did?

17  A.   Yes.

18  Q.   Do you understand that the fee requested amounts to a

19  maximum of 25 percent of the actual cash that is recovered?

20  A.   Yes.

21  Q.   In the course of your work as a businessman over the past

22  20 years, have you had occasion to engage lawyers for legal

23  services?

24  A.   Yes, I have.

25  Q.   Do you have any problem personally with a fee of 25

Sipple - cross by Baumkel

 1  percent of whatever cash can be recovered?

 2  A.  Absolutely none at all.

 3       MR. FRICKLETON:  Those are all the questions I have,

 4  your Honor.

 5       THE COURT:  Cross-examination.

 6       CROSS-EXAMINATION ON BEHALF OF KAREN WIAND

 7  BY MR. BAUMKEL:

 8  Q.  Good morning, Mr. Sipple.  How are you?

 9  A.  Good morning.  Fine, thanks.

10  Q.  Mr. Sipple, did you have any pre-existing relationship

11  with the attorney or attorneys who are purporting to be acting

12  on behalf of the California class members?

13  A.  Mr. Morris from San Diego is the counsel that dealt with

14  me on my being a plaintiff, and I had no pre-existing

15  relationship with him.

16  Q.  How did you end up being a plaintiff?

17  A.  I actually -- I have a long friendship with Chip

18  Robertson, and he asked me, in the course of a conversation

19  just casually, if I had an iPhone and whether I would send him

20  one of my bills.  And I did.  And, then, Mr. Morris called me

21  to ask if I would be a plaintiff in the matter.

22  Q.  So, do you remember when that was?

23  A.  That was sometime probably in the spring of 2010, I think.

24  Q.  What was your pre-existing relationship with Mr.

25  Robertson?

Sipple - cross by Baumkel

1   A.  Just we've been -- we've been friends for 30 years.

2   Q.  Ever any business relationship?

3   A.  No.

4   Q.  Did you get any letters from Mr. Robertson inviting you to

5   participate or asking you to participate?

6   A.  No.  All my communication has been with the California

7   co-counsel, which is Steven Morris from San Diego.

8   Q.  Do you have some understanding as to any compensation to

9   you in connection with your involvement?

10  A.  No.

11  Q.  Did you do anything so far as being involved other than

12  submit a copy of your bill to Mr. Moore?

13  A.  Morris?

14  Q.  Morris.

15  A.  Yeah.  He's kept me apprised of the things.  He sent me

16  different documents via e-mail.  I've signed an agreement on

17  the -- on the attorneys' fees.  Matters like that.  Just

18  mechanical things.

19  Q.  Those mechanical things would be what besides signing a

20  fee agreement?

21  A.  Just they've sent me different materials about the case

22  as -- periodically.

23  Q.  Do you have those materials with you?

24  A.  No.

25  Q.  Do you remember what, if any, of those were?

1   A.   Not particularly.

2   Q.   Did you read them?

3   A.   I browsed them.

4   Q.   Did you file them?

5   A.   File them?

6   Q.   Do you still have them?

7   A.   Probably somewhere.

8   Q.   Do you know where?

9   A.   In my desk somewhere.

10  Q.   Do you know where in your desk?  If you were asked to

11  locate them, would you be able to do so?

12  A.   Probably.

13  Q.   Probably meaning yes or you really don't know or, what?

14  A.   Well, no, I mean, they're probably in the -- in a drawer

15  in my desk.

16  Q.   Okay.  Thanks very much, Mr. Sipple.  I appreciate it.

17           THE COURT:  Any redirect?

18           MR. FRICKLETON:  No your Honor.

19           THE COURT:  Thank you, Mr. Sipple.  You may step

20  down.

21           (Witness excused.)

22           THE COURT:  Next witness?

23           MS. WINTER:  Your Honor, class counsel calls Alice

24  London.

25              ALICE LONDON, PLAINTIFFS' WITNESS, SWORN

 1                           DIRECT EXAMINATION

 2    BY MS. WINTER:

 3    Q.   Would you state your name, please?

 4    A.   Alice London.

 5    Q.   And your occupation?

 6    A.   I am an attorney.

 7    Q.   And you're an attorney with which firm?

 8    A.   Bishop, London & Dodds in Austin, Texas.

 9    Q.   And do you have a practice that is in commercial

10    litigation?

11    A.   That's correct.

12    Q.   All right.

13           And you have submitted a declaration to the Court

14    previously, which is Exhibit 43?

15    A.   Yes.

16    Q.   And we won't go over all of the points in that

17    declaration.  They are already submitted to the Court.  But if

18    you would just tell briefly how you got involved in this case?

19    A.   Yes.  The law firm that you're with and Mr. Robertson

20    contacted my law firm looking for a Texas law firm with

21    expertise in the tax code, litigation, class action matters.

22    We were interviewed with regard to our experience and,

23    apparently, we provided sufficient information to persuade

24    people that we were competent.

25    Q.   And did you do initial research, then, once we were -- we

1  retained you as co-counsel?  Did you do research in Texas law?

2  A.  Yes.  We reviewed the statute that addresses the taxation

3  issues related to Internet access, and we reviewed the

4  comptroller rulings, the regulations and pertinent case law.

5  Q.  All right.

6       And would you tell us about the class representative

7  for Texas?

8  A.  We -- as part of our research in this case, we also talked

9  to several tax experts.  And one of the tax experts that we've

10  used in the past is someone who had an iPhone from the very

11  first day they were issued.  And he and his wife were both

12  certified public accountants, familiar with the tax codes.

13  And we asked them not only their opinion on the Texas tax

14  code, but also whether they would be willing to serve as class

15  representatives.  And they agreed.

16  Q.  And once they agreed, did you review phone bills from

17  them?

18  A.  Yes.

19  Q.  And to determine whether the tax was, in fact, being

20  charged?

21  A.  Yes.  And, in fact, their bills were submitted to an

22  expert for review to determine whether or not there was a

23  separate charge, apart from everything else, just for the

24  Internet access.

25  Q.  All right.

London - direct

1           And, then, you prepared a complaint?

2    A.  Yes.

3    Q.  And that lawsuit was then filed in January 11, 2010?

4    A.  That's correct.

5    Q.  All right.

6           Did you stay informed on the status of this case,

7    then, on a national level once your complaint was filed in

8    Texas?

9    A.  Yes.  And we became aware that shortly after we filed,

10   there was a motion filed to consolidate our case with the

11   multi-district litigation.  And I attended the hearing in San

12   Diego because there was a particular issue connected with

13   Texas, and I participated in that hearing.

14   Q.  And since that time, have you also stayed informed on what

15   settlement negotiations were ongoing?

16   A.  Yes.  And we made sure that the settlement negotiations

17   included the particular requirements for Texas refund

18   procedures, so that all Texas consumers could be adequately --

19   their needs met through this settlement agreement.

20   Q.  And how were you kept informed by class counsel?

21   A.  I attended a meeting of the class counsel in Dallas.

22   There were regular phone conferences that -- where we were not

23   only apprised of what was happening, but we were required to

24   give our input.

25          We also had weekly, if not daily, communications by

1    e-mail.

2    Q.  And all discussions were open-end and you were requested

3    to provide input, were you not, on all aspects of the

4    settlement?

5    A.  Absolutely.

6    Q.  Did you review the proposed settlement?

7    A.  Yes.

8    Q.  Prior to it being presented to the Court for preliminary

9    approval?

10   A.  Yes.

11   Q.  And is it your opinion that this settlement worked well,

12   then, under Texas law?

13   A.  Yes.

14   Q.  And can you explain why?

15   A.  As part of our responsibility for representing any client,

16   we have an obligation to determine not only the merits of a

17   case, but the strategic advantage to a client.  In other

18   words, we have to be assured that any solution we choose is

19   cost effective.

20          And in looking at the AT&T contract in Texas, we

21   recognized that consumers had various options, that they could

22   pursue the claim individually; they could -- or we had this

23   class action option that was provided by this litigation; or,

24   arbitration.  And we needed to advise our client what was best

25   for the client, what was best for the class.

1          And in reviewing the settlement agreement, it

2     provides an inherent advantage in that the consumers get to

3     share the expenses, AT&T waives the defenses, which, in Texas,

4     just litigating the defenses would cost more than the benefit.

5     So, this settlement agreement is efficient.

6          In terms of time, the advantage of getting it done

7     now versus arbitrating or litigating for years is an inherent

8     advantage.  And the fact that AT&T has assumed the

9     responsibility not only in terms of the burden of proof, but

10    collecting the data and the time of going through the Texas

11    process, which is a very administrative-intense process,

12    provides an enormous advantage to Texas consumers.

13    Q.  Did you inform your class representative of the settlement

14    prior to preliminary approval?

15    A.  Yes.  And we had the advantage that as a CPA who's

16    actually filed tax refunds, he was able to give me the benefit

17    of his wisdom and his advice, and we reviewed it.  We went

18    paragraph by paragraph through it.

19    Q.  And tell us your client's reaction to the settlement.

20    A.  He was highly in favor because it involved no effort on

21    the part of consumers.  They didn't have to go back and dig up

22    four years' worth of bills; that they didn't have to document

23    it; that it did not require any time and effort on their part.

24          He particularly liked the fact that AT&T was going to

25    collect the data and submit the claim to the Texas

1   comptroller, and he felt like it was advantageous procedurally

2   in all respects.

3   Q.  And your client, as you mentioned, does have experience in

4   submitting tax refund claims as part of his profession?

5   A.  Yes.  And he advised me that he charges $275 an hour to

6   help other tax preparers file refunds.  And he felt like the

7   fact that consumers in Texas would get this done for them had

8   tremendous economic advantage.

9   Q.  Did Mr. Corn sign the settlement agreement?

10  A.  He did.

11  Q.  Through the course of this litigation, what research have

12  you done on this case?

13  A.  I have researched the case law, the Texas administrative

14  code.  And in Texas, the Texas comptroller has a specific

15  database that contains their adjudicated opinions, which are

16  considered law in Texas.  And it's called the Star System.  I

17  researched the Star System, as well.

18  Q.  And you're continuing to monitor all of these aspects of

19  the law in Texas as this case proceeds?

20  A.  Absolutely.

21  Q.  Based on your knowledge of the law and the research that

22  you've conducted in Texas and your review of the settlement

23  agreement, your contact with the class representative, is it

24  your opinion that this settlement is fair, reasonable and

25  adequate?

1  A.  Yes.

2  Q.  Have you read the letter from the Texas Attorney General

3  that was submitted to the Court and is Exhibit 56?

4  A.  Yes.

5  Q.  Does it raise any new issues that were not contemplated as

6  part of this settlement?

7  A.  It does not.

8  Q.  Does it raise any new issues of law that you had not

9  researched in anticipation of this lawsuit and of this

10  settlement?

11  A.  It does not.

12  Q.  Did you provide additional extensive research on the

13  issues that are raised in this Texas Attorney General letter

14  and provide them to class counsel to assist with the response

15  that class counsel submitted to the Court in response to this

16  letter?

17  A.  I did.

18  Q.  Did you discuss the Texas Attorney General letter with

19  your client, Mr. Corn?

20  A.  Yes.  I talked it over with him to see if any -- in fact,

21  all of the Texas objectors -- whether any of the objections

22  raised changed his opinion or raised a concern that should --

23  would change his mind about recommending the settlement.

24  Q.  And did any of these change his view of the adequacy of

25  the settlement?

1   A.  It did not.

2   Q.  And did anything raised in the Texas Attorney General

3   letter, did any issue there or in any other objection change

4   your mind that the settlement is fair, reasonable and

5   adequate?

6   A.  It did not.

7           MS. WINTER:  I have nothing further.

8           THE COURT:  Cross-examination.

9           Mr. Baumkel, go ahead.

10           CROSS-EXAMINATION ON BEHALF OF KAREN WIAND

11  BY MR. BAUMKEL:

12  Q.  Good afternoon.

13           You knew from reading the proposed settlement

14  documents early last summer that the paradigm for the proposed

15  settlement included that refunds would be sought from the

16  various taxing jurisdictions, including Texas, correct?

17  A.  Yes.

18  Q.  Did you ever contact anybody with the Texas Treasurer, or

19  whatever the comparable entity is in Texas, to ask or inquire

20  or explore firsthand with them how they would deal with such a

21  request?

22  A.  No, but I talked to -- we worked with a consultant, Ryan &

23  Company, who is the main provider of tax services in Texas.

24  And they have a great deal of experience in working with the

25  comptroller.  And I reviewed the merits of the case with them.

London - cross by Baumkel

1   Q.  Why didn't you call somebody at the controller's office to

2   say, "I represent a putative class of Texas people.  We're

3   going to ask you for refunds.  Are you going to give us the

4   refunds?"

5           Why didn't you ask them, instead of a consultant, to

6   tell you what he thought they would do?

7   A.  Because in Texas, if you call the comptroller's office,

8   there's no telling, number one, who you're going to get on the

9   phone; and, number two, they're not bound by any informal

10  discussion.

11          And I wouldn't tell a client, "I had a phone call;

12  therefore, you can assume this will be the outcome."  My

13  experience with the comptroller's office is you don't know

14  what the outcome is until you go through the process.

15  Q.  So, you didn't discern any benefit to have a phone call,

16  write a letter, have a discussion, explore in any way, shape

17  or form directly with the controller's office how they would

18  deal with the request for millions of dollars of refunds,

19  correct?

20  A.  That's correct.

21  Q.  And having viewed the Texas AG's recent letter, the

22  matters discussed by the assistant AG therein is entirely

23  consistent with your understanding as to how they would deal

24  with the refund -- as to how you contemplated they would deal

25  with the refund request?

London - cross by Baumkel

 1    A.  I'm not sure I understand your question.  Are you saying

 2    after reading the Texas AG's --

 3    Q.  Let me withdraw the question.

 4    A.  Okay.

 5    Q.  If you don't understand it, let's not try to fit a square

 6    peg into a round hole.

 7    A.  Help me -- help me to understand what you're getting at

 8    here.

 9    Q.  Right.

10          I'm assuming that you envisioned that the Texas

11    government officials would pay money in response to the refund

12    request.  That was the premise under which you operated,

13    correct?

14    A.  My experience tells me that when we have a legitimate

15    refund claim, Texas is required by law to take the appropriate

16    action, yes.

17    Q.  So, doesn't it cause you concern that the -- one of the

18    thrusts of this recent letter from the AG seems to be that

19    they don't have any intention of paying my money as part of

20    the settlement?  Doesn't that concern you?

21    A.  No.  The statute clearly says that the comptroller shall

22    issue a refund credit if there's a legitimate claim.  And I

23    will note that just recent -- as recent as last week, the

24    Texas Supreme Court overturned a comptroller opinion on

25    whether money was owed or not owed.  And sometimes the

London - cross by Baumkel

1    comptroller will take that opinion, litigate it and ultimately

2    the courts determine what a legitimate refund is.

3    Q.  Sure.

4    A.  And the fact that this refund request might have to be

5    litigated did not change my opinion about whether it was worth

6    pursuing.

7           I mean, even if the AG has taken this initial

8    position, I've looked at the law and I think the merits of

9    this case are worth pursuing, even to the point that I'm

10   willing to do it on a contingency fee.  I think this case has

11   legitimate merit on its face.

12          And if the comptroller had said, "Well, we don't

13   really want to -- we don't want to give a credit," that would

14   not change my opinion.  I would still tell my clients, "This

15   is worth pursuing.  Regardless of this initial impression,

16   let's take it to court."

17   Q.  And what if, at the end of the day, the Texas AG --

18   assistant AG -- who wrote that letter is right and no money is

19   paid in refunds as part of the settlement?  Should AT&T get a

20   release under the paradigm set forth in these documents?

21   A.  If --

22   Q.  Is that your view?

23   A.  If the courts of Texas determine that the tax is due and

24   owing and that's the law of Texas, then my clients didn't have

25   a claim.

1              If the courts of Texas determine that the tax was

2      wrongfully collected, then my clients, under this settlement,

3      not only get what they're entitled to, they get it in a very

4      cost efficient way.

5      Q.  Okay.

6      A.  And that's the objective here, is to get what they are

7      actually owed in light of Texas law.

8      Q.  And I appreciate that.

9              But getting back to my question, if the Texas

10     assistant AG is correct -- apart from whether or not tax is in

11     some theoretical sense owed, but that they have a variety of

12     reasons not to honor the request to pay refunds as part of

13     this settlement -- let's forget their letter.  If, for

14     whatever reason, they don't fund the settlement, are you okay

15     with AT&T getting a release anyway?

16     A.  Yes.

17             And you have to look at it from my client's

18     perspective.  Here's the alternative that they've got.  They

19     can go against AT&T and fight the defenses and go through the

20     arbitration, go through litigation, whatever, and spend more

21     than their claim is worth.  That's -- that's the risk they

22     get.  Or they can take this contingency fee option, which

23     costs them neither time nor money; and, if they're right, they

24     get a recovery.

25             The alternative that they have is to pursue this on

Case: 1:10-cv-02278 Document #: 257 Filed: 09/02/11 Page 122 of 312 PageID #:5447
London - cross by Baumkel
122

 1  their own and spend more than they would ever get back.

 2  That's not a viable alternative for the consumers of Texas.

 3  Q.  Do you have an individual client in this case?

 4  A.  Do I have an individual client?

 5  Q.  Right.

 6  A.  Yes, I do.

 7  Q.  So --

 8  A.  And that's exactly what he's telling me as someone who has

 9  done a refund request.  He says if he has to pursue this

10  individually, he -- just one hour of his time is more than the

11  cost of his claim; and, he much prefers to have a risk-free

12  alternative that he might lose but hasn't cost him anything

13  than to have this alternative where he pursues a claim at an

14  extraordinary cost, both time, effort and money.  It's really

15  not -- there's really no viable option here for him.

16  Q.  What is it you understand would be his burden pursuing an

17  individual claim?

18  A.  If he pursues an individual claim, he's going to -- AT&T

19  can invoke the arbitration.  If he goes to arbitration, he's

20  got the burden of proof, because Texas law would apply, which

21  means he's going to have to come up with four years' worth of,

22  you know, bills, and four years' worth of invoices.  Then he

23  has to prove that AT&T actually remitted the tax to the tax

24  jurisdiction.  And, then, he's got to -- and he's got to

25  prevail on that.

1          And if it's submitted to an arbitrator in writing,

2     he's got to draft a brief and make the arguments about the

3     Internet access tax code, which requires some legal analysis,

4     which my client might have the education to do, but a great

5     variety of Texans wouldn't have the education to go to the

6     Texas tax code and make the argument for an arbitrator.

7          He might have to attend a hearing and carry his

8     burden of proof.

9     Q.  So, apart from the other issues we've been talking about,

10    your concern is that the arbitration remedy that's described

11    in the contract isn't really an appropriate or good remedy or

12    effective remedy; is that your view?

13    A.  In this instance, it is not cost effective.

14    Q.  Okay.  That's all.  Thank you very much.

15          THE COURT:  Anybody else?

16          Mr. Walsh, did you have questions?  You are

17    representing two Texas objectors.

18          MR. WALSH:  I didn't have any questions for this

19    witness, but I will for another.

20          THE COURT:  Okay.

21          Redirect, Ms. Winter?

22          MS. WINTER:  Nothing further.

23          THE COURT:  Thank you.  You may step down.

24          (Witness excused.)

25          THE COURT:  Please call your next witness.

Woods - direct

1    MR. FRICKLETON:  The settlement class calls Grant

2  Woods.

3    GRANT WOODS, PLAINTIFFS' WITNESS, SWORN

4    DIRECT EXAMINATION

5  BY MR. FRICKLETON:

6  Q.  Mr. Woods, would you give us your full name and address,

7  please?

8  A.  Joel Grant Woods, 3322 Manor Drive, Phoenix, Arizona.

9  Q.  And give us your educational background, please.

10  A.  I graduated from Occidental College in Los Angeles and,

11  then, went to Arizona State University Law School, graduated

12  from there.

13  Q.  And once you became a member of the bar, what did you do?

14  A.  First three years of practice, I was a public defender.

15  After that, for two years I was the first Chief of Staff for

16  John McCain.  After that, I was in private practice for six

17  years.  1991, I was elected Arizona Attorney General.  I was

18  re-elected in 1994.  Chose not to run for anything, again.

19  Went back into private practice and have been in private

20  practice since then on my own.

21    I am basically a sole practitioner, although what I

22  do is try cases.  So, that means I co-counsel with firms.

23  Q.  Did you serve as the Attorney General for the State of

24  Arizona for eight total years?

25  A.  I did.  1991 to 1999.

Woods - direct

1   Q.  As Attorney General for the State of Arizona, did you --

2   were you the lawyers for the departments and divisions of the

3   state?

4   A.  That's correct.

5   Q.  Including the Department of Revenue?

6   A.  That's correct.  In Arizona, the Attorney General provides

7   all legal advice and is the attorney for virtually all of the

8   departments of the state, including the Department of Revenue.

9   Q.  You've submitted a declaration to the Court in this case

10  that's marked Exhibit 41.  And we won't repeat that, but let

11  me just ask you generically, did you have a similar

12  circumstance that Alice London had in terms of becoming

13  involved in this case for the Arizona subclass?

14  A.  Yes.

15  Q.  Okay.

16          In addition to that, did there come a point in time

17  where Mr. Robertson and I asked you to become a part of the

18  negotiating team because of your background in the Attorney

19  General's office?

20  A.  Yes.

21  Q.  When you were in the Attorney General's office, were you

22  heavily involved in the very early state tobacco litigation?

23  A.  I was.  Well, I was -- I think Arizona was the tenth state

24  to sue in my -- I was the first Republican Attorney General to

25  sue.  And I was one of the four Attorneys General who led the

Woods - direct

1   negotiating team.

2   Q.  Along with General Mike Moore and who else?

3   A.  Christine Gregoire from Washington and Bob Butterworth

4   from Florida and, then, later Dick Blumenthal from

5   Connecticut.

6   Q.  Because of that background and experience that you brought

7   to bear, did we ask you to assist us in sitting down with AT&T

8   in the negotiating sessions as part of this case?

9   A.  Yes.  I'm sure there are a variety of great reasons for

10  that, but that was probably one of them.

11  Q.  At the end of the day, obviously, you wouldn't be here if

12  you didn't agree with the settlement and approve of the

13  settlement?

14  A.  That's correct.  I think it's an outstanding settlement.

15  Q.  I just want to ask you a few questions.

16          First of all, you say you think it's an outstanding

17  settlement.  Does the fact that this tax has stopped being

18  collected, was that an important consideration for you?

19  A.  Yes.

20  Q.  Why?

21  A.  Yes.  Well, there was no -- again, AT&T, as we've heard

22  and as we know, despite the fact that a mistake was made here

23  -- and I think that's how we viewed it; it's how I view it

24  now, is that, for whatever reason, this mistake was made --

25  despite that situation, they still had a variety of defenses

1    and ways in which they could handle this.  And I think they've

2    handled it in the best way possible.

3         And one of the main concerns you have when something

4    like this is discovered is, how do we -- how and when do we

5    stop the mistake?  And that's a little tricky when you're

6    looking at an unresolved situation.

7         So, I think that first and foremost, the most

8    important thing was to stop the damages, if you will, and stop

9    this from being collected from consumers around the United

10   States.  So, I think that was critically important that that

11   didn't drag on for a long, long period of time.

12   Q.  In the context of the refund applications that have been

13   made, have you had contact with the revenue department at the

14   State of Arizona?

15   A.  I have.

16   Q.  Have you made certain that they have what they need from

17   AT&T?

18   A.  I have.

19   Q.  Have you continued to have this dialogue with them to make

20   certain that if they have questions, if they need information,

21   that you can readily respond to it?

22   A.  Yes.

23   Q.  In terms of your research in this case regarding the law

24   of the State of Arizona, can you offer your comments on the

25   fairness, reasonableness and adequacy of this settlement,

1    taking into account that there are these -- this future work

2    to be done to try and recover some money?

3    A.  Well, similarly to what you heard about Texas, when I look

4    at Arizona, I think -- again, I think everything is met here

5    to make it -- appropriate finding.  This is -- this is fair

6    and reasonable.

7            Arizona -- just a few things about Arizona.  It

8    certainly, without question, favors refunds, credits.  It's

9    all in mandatory language.  I don't believe the state has much

10   of a choice here at all.  And if the state chose to litigate

11   this, there is, again -- similar to what we heard in Texas,

12   there's -- a variety of administrative hoops you have to jump

13   through.  You have to go to different -- a variety of

14   different -- administrative steps, including ultimately the

15   Director of the Department of Revenue.

16           And when that is completed, you would then go to

17   superior court.  And, then, you could go to the Court of

18   Appeals.  And if you had to, you could try to petition the

19   Arizona Supreme Court.

20           The questions of fact would be looked at in the

21   superior court as -- for abuse of discretion.  But the

22   question of law would be looked at de novo.

23           So, the bottom line on this, as far as I can see, is

24   nothing's changed since I was Attorney General.  The

25   Department of Revenue and State of Arizona is expected to

1    follow the law.  The law is very clear in the State of

2    Arizona, and I expect that they will follow the law.

3    Q.  Mr. Woods, Exhibit 7 is the spreadsheets regarding the

4    status of refund claims.  And the third set of spreadsheet is

5    the local detail.  It's going to be about the ninth page where

6    Arizona starts, if you could try and find that.  It's Page 3

7    of 31.

8    A.  Okay.  I have it.

9    Q.  Okay.

10          I want to talk about two of the local jurisdictions,

11   Avondale and Tucson.

12          First of all, very quickly after these refund

13   applications were filed, within a matter of weeks, did Tucson

14   acknowledge a credit for the time period covered by the

15   applicable statute of limitations?

16   A.  They did.

17   Q.  And the total refund claim that was made for the five-year

18   period in Tucson was about $690,000?

19   A.  Correct.

20   Q.  And Tucson acknowledged that the three-year number was

21   $656,000?

22   A.  That's correct.

23   Q.  And they have accepted the offer made in the refund

24   application for a credit in that amount?

25   A.  That's correct.

1   Q.  I want to talk about that credit concept.

2   A.  Yes.

3   Q.  As we were negotiating this settlement, were you

4   particularly concerned, having been very active in politics,

5   with the situation in state revenue departments?

6   A.  Yes.

7   Q.  And were you insistent that as part of this settlement,

8   that AT&T would have to offer these states an ability not to

9   come up with cash now, but to offer credits in the future so

10   that budgets could be managed?

11   A.  Yes.  And I think that's a -- I think that's one of the

12   most important components of the settlement.  And it's a

13   tremendous benefit, A, to the consumers of my state, who are

14   also obviously taxpayers of the state, citizens of the state.

15   Arizona, like many states, is battling a big budget problem.

16       The -- it benefits them not just because they are

17   citizens of the state, but it benefits them because it makes

18   it more likely -- this credit situation -- that the state will

19   go along with it and not try to just buy some time by putting

20   up frivolous defenses -- I would hope they wouldn't do that;

21   but, you know, this has been known to happen in some places

22   around the country -- until maybe their revenue situation was

23   better.

24       So, the idea that -- the idea is that once we get an

25   agreement from, in this case, let's say the State of Arizona,

Woods - direct

1    and they conduct their due diligence -- they're doing an audit

2    right now -- and they arrive at the number and we agree upon

3    the number, then AT&T will write the check and the consumers

4    won't have to wait and the state will have the benefit, then,

5    of not having to come up with the money up front instead of

6    doing it over whatever period of time is negotiated.

7    Q.   And if for whatever reason they don't and that refusal is

8    inconsistent with the law, you realize that your work in

9    Arizona has just begun?

10   A.   That's correct.  The work in Arizona, again, we would have

11   to work administratively with the Department of Revenue.

12   Failing success there, we would have to go to the Director.  I

13   have spoken to the Director many times about this, and I don't

14   anticipate a problem at all.  But I'm just saying

15   theoretically that's where we'd have to go next.  Then we

16   would have to go to the Tax Board.  Then we would have to go

17   to the superior court.

18         So, there would be a lot of work ahead.  I would say

19   this would take a lot of time, effort and money.

20   Q.   And do you understand that this settlement, if it's

21   approved, commits you to pursue that litigation?

22   A.   That's correct.

23   Q.   And you're willing to do so on a contingent fee basis?

24   A.   Yes.  I'm willing to do so because the law is clear and I

25   expect the State of Arizona, much as I would expect the State

Woods - cross by Baumkel

1  of Texas and the State of Michigan, for that matter, to follow

2  the law.

3  Q.  Thank you, sir.

4          THE COURT:  Cross-examination.

5          Mr. Baumkel?

6          MR. BAUMKEL:  Thank you, your Honor.

7           CROSS-EXAMINATION ON BEHALF OF KAREN WIAND

8  BY MR. BAUMKEL:

9  Q.  Good afternoon, Mr. Wood.  I think we met briefly over the

10 last several months.

11 A.  It's Woods.

12 Q.  Oh.

13 A.  There's an "s" on it.

14 Q.  Are you aware some of the states take the position that

15 there will be no credit or refund or anything of the sort

16 unless there's first demonstration by AT&T of a refund to or

17 credit to their consumers?

18 A.  I think everybody will take the position you're going to

19 have to show that there's a reason for the refund and --

20 Q.  That's not quite what I'm asking.

21         Did you see the letter dated August 5th, 2010, that I

22 appended to my objection that the State of Michigan wrote to

23 me that now, as a matter of court order, it's not disputed, is

24 accurately stating the law that will apply here in Michigan --

25 not here in Michigan, but in Michigan -- by which AT&T has to

1    show that a refund or credit was given as a condition?

2          Have you seen that letter?

3    A.  I've seen that.  I've done more than that, though.  I did

4    go to Lansing, and I met with the Department of Revenue in

5    Michigan.  I spoke with the assistant attorneys -- Assistant

6    Attorney General and the former assistant Attorneys General

7    who now are in charge of this refund application, and I don't

8    anticipate a problem there.  But if there is a problem, it

9    will have to be litigated.

10   Q.  Do you have something in writing from them to show that

11   somehow this hurdle of demonstrating a refund or credit as a

12   condition precedent, that that's been met or will be met under

13   the paradigm that's proposed?  Do you have something that

14   documents that that's their position?

15   A.  I have nothing in writing.  What I have is what I told

16   you, is that I traveled there.  I met with them.  I listened

17   to them.  We had a very pleasant, professional discussion.

18   They requested certain information, and that information has

19   now been provided to them and the process has begun.  And this

20   is how it will work in Michigan and in every state.

21   Q.  You mean --

22          THE COURT:  When was that, Mr. Woods?  When did you

23   travel there?

24          THE WITNESS:  I would say about a month ago.

25   Something like that.

Woods - cross by Baumkel

134

1    BY MR. BAUMKEL:

2    Q.  I take it you looked at the recent letter from the

3    assistant Texas AG?

4    A.  Yes.  I'm familiar with the Texas situation somewhat.  I'm

5    familiar with Colorado.  I can address that, if you like.

6    Q.  Well, one at a time.

7    A.  Okay.

8            Let's start with Colorado.

9    Q.  Let me -- if I may, Mr. Wood.  I don't know if you've been

10   a lawyer as long as I have, maybe even longer, but you know

11   that the way this works is the questioner asks the questions

12   and the witness responds to the questions.

13   A.  Is that how it works?  I'm aware of that.

14           (Laughter.)

15   BY MR. BAUMKEL:

16   Q.  That's the paradigm I'd like to apply this afternoon.

17   A.  Let's apply that.

18   Q.  So --

19           THE COURT:  If you want me to tell you how it works,

20   I will, too.

21           (Laughter.)

22           THE COURT:  Ask your question, please.

23   BY MR. BAUMKEL:

24   Q.  So, in Texas, did you look at the recent letter, was my

25   only question, from the assistant AG?

Woods - cross by Baumkel

1    A.   I kind of scanned the letter.  I'm familiar with it

2    somewhat.

3    Q.   Did you scan that part where the assistant AG referenced

4    the very concept that I was talking to you about a few minutes

5    ago, that there was a concern about fully refunding or

6    crediting customers and that this debit off the top of

7    hundreds of millions of dollars seemed to contradict that

8    concern, at least as the assistant Texas AG saw?

9         Did you read that part of the letter?

10   A.   I did.

11   Q.   So, there were similar statements in some of the other

12   letters, weren't there?

13   A.   Yes.

14   Q.   So, is AT&T now offering to do this credit procedure that

15   you described was such a good thing, are they now offering to

16   do that in all of the states?

17   A.   It's my understanding that's what will happen.

18   Q.   So, how will that address former customers, as you

19   understand it?

20        I understand how they can credit current customers.

21   In other words --

22   A.   No, no, no, no.  No, I'm sorry.  They're not going to

23   offer credit.  The credit that they're offering is that -- is

24   a way for the consumers to be paid now.  So, what we're

25   talking about is AT&T receiving a credit in exchange for

Woods - cross by Baumkel

1    making the upfront payments.  So, they will get a credit.

2    Q.  Oh.  I thought you said AT&T was going to -- was doing

3    this great thing to accommodate the settlement happening by

4    giving a current credit and, then, going to the states.

5         You don't understand that's happening?

6    A.  That's not going to happen.

7    Q.  That AT&T --

8    A.  They're going to write a check for the entire amount.  I

9    do view that as significant.

10   Q.  And, so, the paradigm remains that in many of the states

11   at least, for the funding to happen, the states have to first

12   give that funding, either as a credit or as money?

13   A.  The state always has the option of paying in full or, in

14   this situation, they can do it as a credit.  That will be up

15   to the state.  As you can see, the City of Tucson is prepared

16   to probably work with us and do whatever we want.  I imagine,

17   ultimately, we'll do a credit of some sort.

18   Q.  So, if the State of Michigan takes the position similar to

19   some of these other states who have written letters to Judge

20   St. Eve that this idea of taking $300 million off the top

21   doesn't satisfy them as showing AT&T has first refunded or

22   credited all their customers, how is it that you envision this

23   settlement will get consummated?

24   A.  Well, the way it will work -- well, first, again -- and

25   I'll just say in my experience as Attorney General and with

Woods - cross by Baumkel

1   Attorneys General, with letters such as the ones that have

2   been submitted to the Court -- and I won't necessarily say

3   this is specific to them, but certainly could be; let's put it

4   that way -- for example, Colorado, that did not come from the

5   Attorney General's Office.  That came from the Department of

6   Revenue.  I would say that may or may not reflect the legal

7   opinion of the Attorney General of Colorado or the Attorney

8   General's Office.

9         The Department of Revenue itself in how it handles

10  its cases at this stage is free to go its own way, if you

11  will.  However, once we get to court, the -- in most states,

12  including Arizona, the Attorney General will decide what the

13  law is and they will follow the law.

14        So, in some of those letters, there could be all

15  sorts of things at play in my experience other than what the

16  law actually requires.

17        As far as the Texas Attorney General's Office, I

18  would say we'll see what their ultimate position is.  I

19  understand it's a very big office.  And I understand that a

20  letter has been written.  And I did review the letter.  And

21  maybe that will end up being their position and maybe it won't

22  be.

23  Q.  So, doesn't Judge St. Eve have to, Mr. Wood -- doesn't she

24  have to wait until we find out which of the states in the

25  settlement paradigm are obligated to make a refund as a

1  condition to AT&T's obligations, doesn't she have to wait to

2  see whether they actually do that --

3  A.  No.

4  Q.  -- before she says, "Okay, I give my blessing to your

5  proposed settlement"?

6  A.  No, of course not.

7  Q.  That --

8  A.  Of course not.

9  Q.  As you view it, it's okay for the Judge to give her

10  approval on the assumption that you'll prevail sometime in

11  some distant date in the future in litigating these matters

12  with states like Texas or Michigan, if they take a similar

13  position?

14  A.  No.  I think the previous witness explained it very well.

15  What we're given the opportunity to do on behalf of the

16  clients that we represent is to make that case in our states.

17  And, if, ultimately, the final authority in the state says

18  that there is no claim, then that means there was no claim

19  originally; and, in our view, then that's the end of it and

20  that's appropriate.

21       So, I have no problem with that.

22  Q.  What if the final --

23  A.  And I don't think the Judge would have a problem.

24  Q.  I'm sorry.  I didn't mean to interrupt.  I apologize.

25       What if the final authority says there is a claim,

 1    but the State of Michigan and other similar states have a

 2    protocol where when we say a refund has to be made to the

 3    customers as a condition for you coming to us and claiming a

 4    refund, it can't be a refund that takes off the top $300

 5    million to Mr. Frickleton and Mr. Wood and everybody else

 6    that's part of your group?

 7            What if that's the position they ultimately take and

 8    that's the legal position?  That's different than saying that

 9    they had no valid claim, isn't it?

10    A.  It is different, that's correct.  I would think that we're

11    going to see -- we've got a whole -- besides having 50 states,

12    we have all these other jurisdictions, and there's going to be

13    a lot of twists and turns in the road.  That's one of the

14    challenges of the 90-plus lawyers who have done all of this

15    work and who are going to continue to do all of this work.

16            We have to fight through this for our clients.  But

17    as experienced as you are, I'm sure you understand that's not

18    unusual.

19    Q.  So, this case, in most of the jurisdictions, was started

20    as a breach-of-contract claim -- essentially as a breach-of-

21    contract claim -- against AT&T, correct?

22    A.  That's -- that's one of the theories, yes.

23    Q.  Well, wasn't that the main theory in the Arizona case?

24    A.  It is a theory in the Arizona case.  We didn't ever have

25    to get to the point where we had to delineate which was our

Woods - cross by Baumkel

140

 1 | main theory.  We have many theories.

 2 | Q.  So, why are we talking about, in comparing whether this

 3 | settlement is good or not, what would have to be done for

 4 | consumers to pursue tax refund claims individually with their

 5 | state governments when the lawsuits had nothing to do with

 6 | that?

 7 |         The lawsuits were breach-of-contract claims against

 8 | AT&T.  So, why are we talking about how hard it would be for

 9 | my client or your client to sue the State of Michigan?

10 | A.  Why are we talking about that?  Well, we're talking about

11 | that because we're here -- this is -- I don't know that this

12 | is the end of the road.  It's really not.  It's probably the

13 | middle of the road.

14 |         But as I indicated to the Court earlier, the

15 | beginning of the road really was we sat down and we said we

16 | got a problem here, and the problem is we've got an

17 | incredible, almost unprecedented number of customers/clients

18 | who have had money taken from them improperly not for a

19 | nefarious purpose, but because of a mistake.

20 |         And, so, what we did as lawyers, is we tried to come

21 | up with a just result.  A way to -- in this country, with all

22 | of these people and our judicial system, figure out a way --

23 | the best possible way -- to get as much of this money back to

24 | this -- these millions and millions of customers as possible.

25 |         And, so, the way -- the reason we're talking about it

1    today is, ultimately, the best way was to put everybody

2    together and to come up with a reasonable solution.  Come to

3    one court and see if we can't go forward, then, into all of

4    these jurisdictions and make this work.

5           And that's why we're here today.  And that's why

6    we're talking in this manner.  Because the alternatives don't

7    work.

8    Q.  I'm just about done with my questioning, but I'd like to

9    see if we can focus on the actual question.

10          The question is:  If I'm suing AT&T for breach

11   of contract, is it fair to argue to Judge St. Eve that she

12   should approve this because it would be really hard for me to

13   pursue a breach of -- I mean, a tax refund claim from

14   Michigan?

15          I haven't sued Michigan for a tax refund.  Why are

16   you telling Judge St. Eve that it would be hard for me to do

17   that as a reason for her to settle my breach-of-contract

18   claim?

19          There may be lots of other good reasons on which you

20   and I disagree, but why are you making that one of your

21   reasons?

22          I didn't sue the State of Michigan.  Why are you

23   telling her that should be part of her analysis?

24   A.  Well, because you're not alone.

25   Q.  Did anybody sue their individual states in this

1    litigation?

2    A.   The answer is that you're not alone.  As I said, we have a

3    problem.  We have millions and millions and millions of people

4    here that as -- trying to find some justice.  We have to come

5    up with a way to do it.  And we can't just deal with you and

6    your idiosyncrasies personally and in the case.  We can't do

7    that.  Everybody has to come up with a solution here or there

8    will be no solution for anyone.  So, this is the best

9    solution.

10           And part of that decision making is that for these

11   millions and millions of people, it is impractical and

12   virtually impossible, frankly, for them to pursue other

13   remedies on their own.  They're not going to do it.  You

14   might.  Maybe you've got somebody who will do it.  But we've

15   got 9,999,999 other people who just won't do it.

16   Q.   None of the cases involved a claim against any of the

17   taxing jurisdictions, did they?

18   A.   That -- that wasn't the way to go.

19   Q.   Okay.

20           And, so, the answer is yes, that none of the cases

21   included --

22   A.   No, mine didn't.  I don't know if any others did.

23           MR. BAUMKEL:  Thank you, Mr. Wood.

24           THE WITNESS:  You're welcome.

25           THE COURT:  Any redirect?

1           MR. FRICKLETON:  No, your Honor.

2           THE COURT:  Mr. Woods, I have a question for you

3     procedurally about how the settlement works.  I think you are

4     the person to ask.

5           THE WITNESS:  Maybe.

6           THE COURT:  So, if not, I will pass it over for one

7     of the lawyers.

8           THE WITNESS:  Okay.

9           THE COURT:  You have described a lot of work that may

10    have to be done by the lawyers in their individual

11    jurisdictions in dealing with the revenue department, the

12    Attorney General's Office, you may have to go through an

13    appeals process.

14          As part of the settlement, the way it is structured,

15    fees come off of money recovered and it is 25 percent -- the

16    proposal is -- of whatever monies are recovered.

17          Your fees that you will incur by going through this

18    process in doing the work, are you billing separately for

19    that; or, whatever percentage of the pool that you get out of

20    that 25 percent, do your other activities, are they covered by

21    that?

22          THE WITNESS:  It's the latter, yes.  So --

23          THE COURT:  You are not going to get anything

24    extra --

25          THE WITNESS:  For all the work.

 1          THE COURT:  For the work.

 2          THE WITNESS:  For the extra work.  No, it's part of

 3   the risk we take.

 4          THE COURT:  Okay.

 5          THE WITNESS:  So, there will be some lawyers this

 6   will go smoothly for, and there will be others where it's

 7   probably going to be a nightmare.  But that's just -- and you

 8   really don't know that yet.  But that's the risk you take.

 9          And, you know, it's like that for a lot of cases,

10   though.  Sometimes something settles and that contingency fee

11   thing worked out great.  And sometimes it goes on for years

12   and years and years and you're just wondering why you ever did

13   that.

14          But that's -- in this case, no matter how much work

15   is done, you will get the same amount.

16          THE COURT:  There were references in some of the

17   settlement papers about these individual claims being pursued

18   individually and independently.  Is there an anticipation that

19   other lawyers might have to be brought in from outside of -- I

20   do not know how many are going to share in the --

21          THE WITNESS:  Yes.

22          THE COURT:  -- pot of money that is collected.  But

23   is there an anticipation that other lawyers might have to be

24   brought in to pursue claims; and, if so, how will they be

25   paid?

1          THE WITNESS:  Okay.

2          Now, if I mess this up, please tell me.

3          I'll just tell you my understanding.  And I may be

4    wrong, because I have that same question.

5          I think it comes out of my pocket.  That's the

6    problem.

7          (Laughter.)

8          THE WITNESS:  When we were talking about it, I said,

9    "We better clear that up."

10         (Laughter.)

11         THE WITNESS:  But that is -- that is my

12   understanding, that as we go forward, if we have to bring

13   others in, for whatever reason, that that is our

14   responsibility, as well.  So --

15         THE COURT:  Mr. Robertson, is that correct?

16         MR. ROBERTSON:  Your Honor, the independent counsel

17   provision is designed to be effective in states where only

18   AT&T has the standing to go forward on appeal, and we've

19   undertaken that responsibility.  But for reasons that I can't

20   understand, but they insist on, they don't want me speaking

21   for them.  So, that's what the independent counsel is for.

22         We're going to be doing work behind the scenes, but

23   the independent counsel will be the one actually speaking for

24   AT&T.  They'll have to approve the person, and then we'll have

25   to pay them.

1        THE COURT:  Okay.

2        What I am interested in is who pays them.

3        MR. ROBERTSON:  Well, your Honor --

4        THE COURT:  Does it come out of the 25 percent or are

5   they going to get paid some other way?  Are you going to ask

6   for more than the 25 percent to pay these independent counsel?

7   It was not clear to me from the papers.

8        MR. ROBERTSON:  The papers don't make that clear, but

9   we've anticipated -- that it's one of the reasons that we have

10  asked for what we've asked for -- that we're -- that it's

11  liable to have to come from our pockets.

12       THE COURT:  You are not directly answering my

13  question.

14       MR. ROBERTSON:  Well, your Honor, the answer is

15  that's what we have anticipated.

16       THE COURT:  Okay.

17       MR. ROBERTSON:  But we have read this thing recently

18  and it's not, as you say, clear on that point.  And I suppose

19  I'm leaving open the possibility that there is an

20  extraordinary circumstance that might ask us to come in and

21  say to you, "This was well beyond what we anticipated."

22       But right now, what we believe we're asking you to do

23  on the fee side of things is to create a percentage from which

24  all attorneys' fees going forward will be paid.

25       THE COURT:  Let us assume you collect everything that

Woods -

1  you want to and there is a -- and I approve, which is still a

2  question, the 25 percent and you recover $239 million

3  approximately in attorneys' fees.  I cannot imagine an

4  extraordinary situation where you would come back in and ask

5  for more.

6        MR. ROBERTSON:  Well, your Honor, if that's what you

7  do, let me just make this statement to you today as the lead

8  counsel:  You won't see us back with our hand out.

9        THE COURT:  One other question for either one of you.

10        THE WITNESS:  And, Judge, I think we -- I mean, the

11  way I look at it is if I had to go hire under this independent

12  deal, I'm going to be honest about it.  We would say, "Okay,

13  well, you're -- " I have to find someone who would come in on

14  a contingency basis with me.  So, I would have to then split.

15        So, it's just going to lower everything down, rather

16  than pay someone by the hour out of my pocket.  I wouldn't

17  want to do that if I didn't have to.

18        THE COURT:  What about accountants, experts, CPAs?

19  What if you need non-lawyer specialists?  Where is it

20  anticipated -- because it was not clear to me from the

21  settlement or the proposed fee petition submitted to the

22  Court.  Where is it anticipated that will come from?

23        THE WITNESS:  Well, you know, as a rule, that -- you

24  can -- we can go specifically, but as a rule -- that is

25  fronted by the lawyers and comes off the top as a cost.

1          THE COURT:  Okay.

2          As a cost or comes off of the fees, the 25 percent,

3    what I am referring to?

4          THE WITNESS:  How did we -- do you anticipate that,

5    Chip?

6          MR. ROBERTSON:  Well, your Honor, we think that's a

7    cost of --

8          THE WITNESS:  Yeah.

9          MR. ROBERTSON:  -- litigation outside of the fees.

10   So, if we --

11         THE COURT:  That is something -- because I know you

12   left open in the cost -- there was a footnote in there -- that

13   you might come back and ask for more, in terms of costs.  So,

14   I am trying to get a clear picture of what else is out there.

15         MR. ROBERTSON:  I think the model, your Honor, to be

16   blunt about it, is we're unusual in class actions.  We do

17   contingent fee work.  In a normal contingent fee setting, the

18   accountants and the experts, that sort of thing are expenses

19   that are reimbursed in addition to fees.

20         But, in this case, all of that -- it's a legal fight

21   once we get past the administrative part.  We don't anticipate

22   having to bring accountants in and all the rest of it.  AT&T

23   has been very good about providing us the data that we need.

24   And because of the relationship that they already have --

25   because they pay so much other taxes -- with these departments

```
 1    of revenue, what they hand them is generally trustworthy,

 2    subject to audit.  So, we don't think we're going to have a

 3    lot of those.

 4              THE COURT:  Okay.

 5              Mr. Durkin, did you want to add anything?

 6              MR. DURKIN:  No, your Honor, other than it's clear

 7    AT&T is not paying the independent counsel.  And that's

 8    pursuant to the settlement agreement.

 9              THE WITNESS:  Right.

10              MR. BAUMKEL:  Your Honor, before Mr. Woods steps

11    down, it's not a confrontational question, but it's in

12    relation to your --

13              THE COURT:  Hold on.  Mr. Woods was going to say

14    something else.

15              THE WITNESS:  No, no, that's all right.

16              THE COURT:  No?  Okay.

17              THE WITNESS:  Thank you.

18              MR. BAUMKEL:  If I may on this subject, so I won't

19    have to revisit it later and can conclude it now, the papers,

20    as your Honor knows, state that the fees will be -- I'm not

21    purporting to quote, but to paraphrase -- ten percent of the

22    value of the settlement -- the lesser of ten percent --

23              THE COURT:  Right.

24              MR. BAUMKEL:  -- of the value or 25 percent.  And it

25    uses the terminology "value of the amount recovered."
```

1           I found that to be very ambiguous.  If the intent was

2   to say that -- the latter, the one -- the concept you're now

3   talking about with Mr. Wood is to be 25 percent of the actual

4   money recovered, it seems to me it ought to say that.  Because

5   this concept of value, we spent the whole morning talking

6   about what value means.

7           THE COURT:  Do you have a question for Mr. Woods or

8   are you --

9                   CROSS-EXAMINATION - Resumed

10  BY MR. BAUMKEL:

11  Q.  My question is:  What does that mean as you understand it,

12  Mr. Woods?  Judge St. Eve was just asking you about this 25

13  percent of the amount recovered.

14  A.  What it means to me is 25 percent of the amount recovered.

15  I think the overall value shows -- shows the reasonableness of

16  the fee.

17          THE COURT:  Was the value -- my understanding was you

18  phrased it in terms of value to cover credits.

19          THE WITNESS:  Chip, do you want to address that?

20          I think that with these questions, you may not have

21  Mr. Robertson on the stand -- which is too bad because he's

22  really been looking forward to that, but --

23          (Laughter.)

24          THE COURT:  He is an officer of the court.  So, I --

25          MR. ROBERTSON:  Your Honor, if you would repeat the

1    question?

2            THE COURT:  The question was, why is it -- the

3    question Mr. Baumkel asked Mr. Woods was, why is the 25

4    percent phrased in terms of value as opposed to cash recovery?

5            MR. ROBERTSON:  Well --

6            THE COURT:  My understanding, from reading the

7    papers -- maybe reading between the lines, maybe being --

8    well, from reading between the lines -- was you phrased it in

9    terms of value recovered, rather than cash recovered, to catch

10   the credits where AT&T would be putting cash in but you would

11   not be -- you would be getting a credit from the revenue.

12           MR. ROBERTSON:  Well, I struggled with that, to be

13   honest, because the way the cases talk about it, what's the

14   value of the settlement to the class?

15           And this has two components.  It has this contractual

16   going-forward value, which is -- for which we're claiming no

17   attorneys' fees.  And, then, I always tried to use "cash

18   value" when we were talking about the amount of money that

19   we're going to actually get in.  And that's the amount against

20   which the 25 percent is applied.

21           But what we wanted to do was put a cap on it all,

22   because so much of the value of the going -- of this case is

23   the going-forward part.  It's about two-thirds of it, frankly.

24           THE COURT:  Right.

25           MR. ROBERTSON:  So, the aggregate value is the phrase

1   we used in the papers to describe what cash plus going forward

2   equals.  And just to make it crystal clear, because we thought

3   we had done it in the papers by the examples that we put in

4   there, that what we're talking about is the lesser of 25

5   percent of the actual cash received, but that can't be greater

6   than ten percent when you add it all together.

7            THE COURT:  All right.  And we can get more into that

8   later.

9            Mr. Woods, I do not think there is anything else for

10  you.  Thank you, sir.

11           THE WITNESS:  Okay.  Thank you.

12           THE COURT:  You may step down.

13           (Witness excused.)

14           THE COURT:  Who else do you plan on calling?  It is

15  ten to 1:00 and we are trying to figure out when to break for

16  lunch.

17           MR. FRICKLETON:  I believe we only have two more

18  witnesses, Mr. Robertson and Dean Klonoff.

19           THE COURT:  And?

20           MR. FRICKLETON:  Dean Klonoff.

21           THE COURT:  Okay.

22           How long do you anticipate each of their testimonies

23  to be?

24           MR. ISSACHAROFF:  Your Honor, I think Mr. Robertson

25  will be 20 to 30 minutes on direct.  So, we can start or we

1    can take a break, as your Honor sees fit.

2            THE COURT:  And how about the Dean?  How long do you

3    anticipate?

4            MR. FRICKLETON:  About the same.

5            THE COURT:  All right.

6            Let us break for lunch.  We will up here at 2:00

7    o'clock, please.

8            (Whereupon, a recess was taken at 12:50 o'clock p.m.,

9        until 2:00 o'clock p.m., of the same afternoon.)

10                        *     *     *     *     *

11

12   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

13

14
     /s/ Joseph Rickhoff                    August 31, 2011
15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25

```
1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3  IN RE AT&T MOBILITY WIRELESS        ) Docket No. 10 C 2278
   DATA SERVICES TAX LITIGATION        )
4                                       )
                                        ) Chicago, Illinois
5                                       ) March 10, 2011
                                        ) 2:00 o'clock p.m.
6
              TRANSCRIPT OF PROCEEDINGS - FAIRNESS HEARING
7                 BEFORE THE HONORABLE AMY J. ST. EVE

8  APPEARANCES:

9  For the Settlement          BARTIMUS, FRICKLETON, ROBERTSON
   Class:                       & GORNY
10                             BY:  MR. EDWARD D. ROBERTSON, JR.
                                    MR. JAMES P. FRICKLETON
11                                  MS. MARY WINTER
                               11150 Overbrook Road, Suite 200
12                             Leawood, Kansas  66211

13                             MR. HARRY HUGE
                               1250 24th Street, N.W.
14                             Washington, D.C.  20037

15                             MR. SAMUEL ISSACHAROFF
                               40 Washington Square South, 411J
16                             New York, NY 10012

17 For Karen Wiand:            MARK S. BAUMKEL & ASSOCIATES
                               BY:  MR. MARK S. BAUMKEL
18                             30200 Telegraph Road, Suite 200
                               Bingham Farms, Michigan  48025
19
   For Angela Vrana and        WEINSTEIN LAW
20 Barbara Fisher:             BY:  MR. BONNER C. WALSH
                               518 East Tyler
21                             Athens, Texas  75751

22 For John Gaffigan:          STEWARD LAW FIRM, LLC
                               BY:  MR. JOHN S. STEWARD
23                             5201 Hampton Avenue
                               St. Louis, Missouri  63109
24

25
```

```
 1   APPEARANCES (Cont'd):

 2   For AT&T Mobility:          MAYER BROWN, LLP
                                 BY:  MR. THOMAS M. DURKIN
 3                               71 South Wacker Drive
                                 Chicago, Illinois  60606
 4
                                 MAYER BROWN, LLP
 5                               BY:  MR. ARCHIS A. PARASHARAMI
                                 1909 K Street, N.W.
 6                               Washington, D.C.  20006

 7                               THOMPSON COBURN, LLP
                                 BY:  MR. ROMAN P. WULLER
 8                                    MR. ROBERT J. WAGNER
                                 One US Bank Plaza
 9                               St. Louis, Missouri  63101

10   Court Reporter:             MR. JOSEPH RICKHOFF
                                 Official Court Reporter
11                               219 S. Dearborn St., Suite 1232
                                 Chicago, Illinois  60604
12                               (312) 435-5562

13                  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

14
                          PROCEEDINGS RECORDED BY
15                       MECHANICAL STENOGRAPHY
                     TRANSCRIPT PRODUCED BY COMPUTER
16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  10 C 2278, In Re AT&T Mobility Wireless

2   Tax Data Litigation.

3          THE COURT:  Ready?

4          MR. ISSACHAROFF:  Yes, your Honor.

5          Good afternoon, your Honor, I'm Samuel Issacharoff.

6   I haven't had a chance to address the Court yet.

7          THE COURT:  Good afternoon.

8          MR. ISSACHAROFF:  Our next witness is Mr. Robertson.

9       EDWARD D. ROBERTSON, JR., PLAINTIFFS' WITNESS, SWORN

10                    DIRECT EXAMINATION

11  BY MR. ISSACHAROFF:

12  Q.  Could you state your name for the record, please?

13  A.  Edward D. Robertson, Jr.

14  Q.  And your address?

15  A.  2628 Huntley Place, Jefferson City, Missouri.

16  Q.  Mr. Robertson, you are the lead counsel in this case, and

17  you've been either the primary or one of the primary lawyers

18  from the beginning; is that not right?

19  A.  Well, I have that -- share that -- responsibility with

20  others, but yes.

21  Q.  Okay.

22          MR. ISSACHAROFF:  Your Honor, I'd like to walk the

23  witness with how this case was first uncovered and, with the

24  Court's permission, I'd like it largely to be narrative.

25          THE COURT:  That is fine.

1        MR. ISSACHAROFF:  Okay.

2   BY MR. ISSACHAROFF:

3   Q.  Mr. Robertson, let's start with Exhibit 49, if we could

4   put that up.

5        Could you explain to the Court how it was that this

6   case was first uncovered?

7   A.  Well, this is sort of the Rosetta Stone of this case.

8   This happens to be a Sprint invoice to our law firm that

9   includes on it a data card.  And we began to look at that data

10  card through a consultant we asked to look at our bills.

11       And the Sprint invoice, which you see in front of

12  you -- and perhaps can move it to the next -- you see it goes

13  to our law firm.  It's about -- it's the May -- basically, May

14  of '09 bill.  So, we had that looked at.

15       And you can see a data card down there.  It's now

16  blown up.  Sprint calls it a connection card data plan.  One

17  of them we were paying $66.99 a month for, the other was

18  59.99.  And, as you'll see in a moment, that $7 difference was

19  some insurance that was on there.

20       We also happened to have -- and if we can see the

21  insurance piece, perhaps.

22       Here's the sales tax calculation.  You'll see there

23  in the line "TEP," that's the insurance premium for $7 that

24  dragged this one up to 66.99.  But when you get down to the

25  tax part of it, the tax, if you figure it with the percentages

 1  that are on the bill, is only tax that's charged on the $7.

 2  Q.  Mr. Robertson, one question.  This is a data card, which

 3  means this is exclusively for Internet access?

 4  A.  Exclusively.  It's one of those things you plug into the

 5  side of your computer, so that if you're at the airport and

 6  you don't want to pay for the wi-fi, you can call up whoever

 7  the carrier is and get on the Internet.

 8  Q.  Okay.

 9       Can we go to Exhibit 50, please?

10  A.  This is -- we also had some AT&T cards.  Our main office

11  in Kansas City is within two miles of the Sprint campus and it

12  was not a great place for reception.  So, that's why we

13  started moving to AT&T.

14       And we had a particular data card on this one, as

15  well.  It was looked at.  This was a billing cycle for June of

16  '09.  And there's the data card.  And you can see that it is

17  -- $60.90 is the charge for that data card.

18       And, then, we move to the -- you can see there,

19  again, it's the tax area.  The tax -- Kansas state sales tax

20  -- there is $2.99.  And that was sort of a curiosity to us as

21  to why the Sprint cards had no tax and why the AT&T card did.

22       And, so, we began looking at this with the people we

23  had asked to look at these bills, and they discovered that the

24  Internet Tax Freedom Act had banned the tax on these kinds of

25  cards.

1      And, so, then we started from there and this case

2  moved to where it is today.

3  Q.  So, just to be absolutely clear, the discovery of the

4  problem in this case was purely internal to your law firm when

5  you were doing an internal audit of the -- of your bills for

6  various data services?

7  A.  Correct.

8  Q.  Okay.

9      Can you tell the Court what you did after that?

10  A.  Well, when you see something like this, you begin to sort

11  of wonder how widespread it is.  So, we began to look at other

12  bills and some of the law, thought maybe if it were -- the

13  iPhone, which we had all gotten by then, had $30-a-month

14  charges on it and began looking at that.  And the consultants

15  looked at that for us and showed us that the tax itself was

16  being charged on that $30.

17      And, so, we moved out from our bills to some other

18  bills, called friends and said, "You got an iPhone?  Send us a

19  bill."  We had those looked at.  And it appeared as we did

20  that sort of around, we -- that AT&T was doing this

21  everywhere.

22  Q.  And what did you do next, in terms of once you realized

23  that it was not just in your firm and not just in your

24  community, but around the country?

25  A.  Well, there was a two-pronged sort of attack that we took.

Robertson - direct

1    We began looking first at the law, first in Missouri.  And I

2    had some familiarity with tax law in Missouri.  How could you

3    get the money back and how would you sue AT&T, if that's the

4    route you wanted to go?

5          The other side of the investigation was the financial

6    one.  How big is this problem?  How widespread?  How much

7    money is it?  We began looking at the public filings for AT&T

8    to see what their data sales were.  And it turned out that it

9    was a large number.

10         Now, we knew that that might include other things

11   besides Internet access services, but it gave us sort of a

12   ballpark in which we could deal.

13         So, we started looking at the law internally, and we

14   asked a fellow who we knew to be a telecommunications law

15   expert in Jefferson City to work with us on that.  And we

16   began to see what FCC issues would be involved; began

17   researching all the kinds of cause of actions we might have

18   just in Missouri; and, also, began looking what AT&T might do

19   if this became, you know, an all-out litigation war, what

20   their defenses might be.

21         So, we began doing what you always do:  The due

22   diligence in a case to see whether or not, first, it's

23   worthwhile doing; and, secondly, can we prevail if we go

24   forward?

25   Q.  And what did you do as you started to move beyond

1   Missouri?

2   A.  Well, I had the good fortune of working with Harry Huge on

3   some things and he had been an Arnold & Porter partner and,

4   basically, knew every -- lots of lawyers around the country.

5   And we wanted to assemble high-quality lawyers.

6           And, so, we began working with Harry.  He got some

7   bills from other states.  We looked at those, began finding

8   other counsel that we might be able to bring into the case to

9   assist us, because we thought we have to file in every state

10  and we didn't have the wherewithal to do this ourselves.  We

11  were going to create what I like to call a virtual law firm,

12  which is what we had done in some other litigation.

13          And, so, we began assembling a group of people that

14  would be able to take responsibility in individual states, if

15  that ever became necessary.  And they began doing research and

16  the research continued to come back that this was worth doing.

17  Q.  And the process that was described earlier today in court

18  by Alice London and Grant Woods essentially was reproduced

19  across virtually all states in the country?

20  A.  Yes.

21  Q.  Okay.

22          At this point, can we shift a little bit to how you

23  began to engage AT&T?  And will you describe for the Court the

24  first contact with AT&T and how the litigation and

25  negotiations unfolded?

Robertson - direct

1  A.  Well, it took us from late June, early July of 2009 till

2  November the 24th, is when we filed the first lawsuit.  So,

3  all of that long period of time was doing the diligence and

4  assembling the team and that sort of thing.

5        So, we filed the first case on November the 24th, and

6  we wrote a letter to AT&T at the same time giving them the

7  60-day notice that some of the states' laws required, that we

8  had discovered.  And, then, we filed 10 or 11 more lawsuits.

9        And, then, I just made a cold call to the General

10  Counsel at AT&T and told him that we had sued them and what

11  the claim was and, you know, that if he wanted to talk about

12  it, we could talk about it.  That was in late -- mid to late

13  -- December of 2009.

14  Q.  At what point did you begin to talk to AT&T and did

15  negotiations actually begin?

16  A.  Well, I think we had our first sit-down meeting late

17  January, early February of 2010.  We went down and sort of

18  laid out what the case was to -- I think there were two or

19  three lawyers from their staff there, the head of their

20  litigation and a Mr. Green.

21        And we sort of laid out the case and suggested that

22  we had researched what we think -- thought -- their defenses

23  were and that we were prepared to go forward, but if they

24  thought that there was a possibility of a early resolution

25  that would meet all of our goals, that we would be willing to

Robertson - direct

1  consider that, as well.

2  Q.  What did you have to do in order to test the bona fides of

3  your case once you were in negotiations with AT&T?

4  A.  Well, the first thing we had to ask was, did you keep this

5  tax?  I mean, that's the part of it that we had to find out

6  right away, because it's a different case if AT&T has

7  collected this money and put it in its own pocket, rather than

8  sending it off to the states.

9        And, so, we said one of the first questions we've got

10  to have answered is, do you have this money or does somebody

11  else have it?  Did you pay it to the states?

12        And, so, then we began talking generally about what

13  the scope of the case was and, you know, the difficulty,

14  frankly, of interpreting the Internet Tax Freedom Act, which

15  we subsequently learned was basically passed on the floor of

16  the Senate without a committee hearing.  So, you don't have

17  any notes to help you along as to what they intended when they

18  said some of this stuff, and it's a pretty difficult statute.

19  And we began having discussions with them about that.

20        I'm not sure I'm answering your question fully, but

21  we began the discovery process and had some initial

22  discussions about the causes of action.  They responded in

23  exactly the way we expected they would:  "You know, we've got

24  arbitration clauses and you have to understand we're going to

25  have to feel like you're serious about resolving this case for

Robertson - direct

1   us to walk away from these pretty strong defenses that we

2   think we have."

3   Q.   Including things like nobody had ever established standing

4   under the -- private right of action under the -- Internet

5   Freedom Act and every possible range of defenses we'll talk

6   about a little later?

7   A.   Yes.

8   Q.   Okay.

9        Tell the Court -- there's been questions raised in

10  the hearing and in some of the papers about premature

11  settlement, about settlement without formal discovery.

12  Approximately, how much was spent out of pocket by plaintiffs'

13  counsel on assembling a database, getting all the experts

14  necessary?  I'm not talking about attorneys' fees, time.  Just

15  straight-out out of pocket in putting together this case.

16  A.   Till today or --

17  Q.   Yes.

18  A.   Well, we -- we're pretty close to a million dollars, the

19  group of people that are here, for all of the stuff that we

20  have spent.

21  Q.   And how would you compare the state of the record, in

22  terms of your knowledge of the defendant's practices and the

23  potential liabilities and potential weaknesses at this stage,

24  compared to other cases you've handled in your career where

25  there has been more formal discovery?

Robertson - direct

1  A.  Well, I think we know really much more than we wouldn't

2  have known through formal discovery, because the way the

3  information was given to us and, as you heard Dr. Florence

4  testified, was subsequently verified, it was given to us in a

5  way that you often don't get from a big corporation.  It was

6  not find a particular piece of hay in a haystack.  It was

7  nicely arranged.  It gave us the information that we needed.

8          And they were very forthcoming.  And if we had

9  questions, they answered them.  We got to meet with their

10  computer people, with their tax people, all throughout this

11  process.  So, it was -- they did not hide the ball.

12  Q.  Would you represent to the Court that your experts, in

13  your estimation, had full access to the internal processes of

14  AT&T, to all the relevant databases and to good-faith

15  compliance with -- by AT&T with -- the search for what

16  actually happened to the money, who paid it, and so forth?

17  A.  Well, I think Dr. Florence testified that all the

18  methodologies were cared for and we were able to get all the

19  questions we had answered.

20  Q.  Okay.

21          I want to turn your attention now to the issue that's

22  reflected in Exhibit 7, which is where we stand with the

23  states and what representations have been made.

24          Mr. Robertson, can you tell the Court where we stand

25  in terms of collections, potential collections, negotiations

Robertson - direct

1   with the various states, the state of finality that we have

2   with various state revenue authorities?

3   A.  Well, all of the refund applications that were required to

4   be filed have now been filed.  And, so, that process began on

5   the schedule, for the most part, that the Court indicated was

6   required in its order.

7           From there, we have had lots of contact with lots of

8   different revenue authorities.  One of the things is that we

9   don't have standing in some circumstances because AT&T is the

10  only state that -- I mean the only party that -- can go before

11  a department of revenue.

12          So, for instance, in Missouri, where we're good

13  friends with the Director of Revenue, we're not allowed to

14  talk to the Director of Revenue.  AT&T does that.

15          But we have -- on a daily basis, we get these updates

16  as to where things are.  On a daily basis, we have

17  conversations with various people around the country on

18  questions they bring to us, even in places, frankly, where we

19  probably shouldn't have the discussions, because they call us

20  because we've made inquiry.  And on a regular basis, we're

21  asking AT&T to provide additional information where it's

22  necessary.

23          Now, have we gotten a whole bunch of money?  It's

24  about, you know, a little less than a million dollars when you

25  count the City of Tucson's credit that they've offered.  Is

Robertson - direct

167

1    there a lot more coming?  We think so.  They've required, for

2    instance, amended returns in Illinois.  Florida, which is the

3    second largest state, is undergoing right now a large audit.

4    New York is beginning that process, which is the largest

5    state.  And we've just been, with AT&T, cooperating really

6    unbelievably well with us being -- pursuing these things.

7    Q.  Is there an issue about your capacity to represent

8    conclusively the class in this case before the state revenue

9    authorities or the state whatever -- the commissioner or

10   county-level officials -- before the final approval by this

11   Court?

12   A.  Well, from time to time, we hear, you know, "Until this is

13   finally approved, we're not going to deal with you.  We don't

14   know whether we're going to have to do this or not."  And, so,

15   that's become an issue.

16   Q.  So, Mr. Baumkel asked Mr. Woods earlier today on

17   cross-examination, would it not be better for the Court to

18   wait until all the various state processes have run before

19   certifying the class and entering its approval, if the Court

20   is going to approve the settlement.

21        Is that a viable procedure, in your view?

22   A.  Well, I think that will put at risk a lot of what we have

23   achieved here, largely because these taxing jurisdictions,

24   some of them want to know that this is actually going to be

25   what they're going to have to deal with.  That's first.

1          And, second, even in some states in which we have the

2     standing on behalf of the class members to file, some have

3     said, "Well, you don't really have standing yet until this

4     thing is finally final and you're finally appointed the class

5     representative's lawyer."

6          So, it would not work through, I don't think, if we

7     had to do it the way Mr. Baumkel suggested.

8     Q.   There's also an estimation by Mr. Woods that there could

9     be 50 percent of the work left to go.  What's your estimation

10    on the status of the case right now?

11    A.   Well, I hope he's right.  I'm afraid it might be a little

12    higher percentage.  Because we -- for instance, in California,

13    we got letters that were one-sentence denials:  "Your tax

14    refund request is denied."  And we've had a meeting with the

15    lawyer representing 55 cities who said that's going to be the

16    way it's going to be.  And even though they've denied, these

17    55 cities have met with us and are in the process now, some of

18    them, of beginning audits.  And we have a little while before

19    we have to file lawsuits out there, that we're prepared to

20    file those lawsuits.

21         But a couple of the lawyers for some of these cities

22    have said these cities are not going to pay unless there's a

23    judgment against them in these times.  And that's what we're

24    prepared to do.

25         So, I'm hopeful that we're not going to have more

Robertson - direct

 1  than 60 percent of the work left to do, but I think it's a lot

 2  ahead of us.

 3  Q.  But it could be that lawyers in California having to deal

 4  with municipalities, or in some of the other states that are

 5  more recalcitrant, are going to have a lot of work to do to

 6  chase down the last recalcitrant jurisdiction, right?

 7  A.  I think that's right.

 8       And what's really been interesting so far is that the

 9  smaller amount of money is the most difficult to get.  85

10  percent of the money is within 50 different jurisdictions.

11  There's a lot of cities and a lot of places that -- $600,

12  $700, and you get amazed when you get a letter from a lawyer

13  for a city that owes $500 saying, "We're not going to pay you

14  unless you go through the appeal process."

15       We filed, for instance, about 25 appeals in Colorado

16  from denials and are now in discussions with some of them to

17  have them pay, so that we don't have to go through the process

18  of taking it on up through the court system.

19  Q.  Well, what's to stop lawyers who drew the bad hand --

20  Colorado having to chase cities, California having to chase

21  cities -- from saying, "It's not worth my time, not worth my

22  bother to do that.  I'll just collect my fees on the national

23  settlement and, you know, it's not worth chasing down the last

24  dollar"?

25  A.  Well, everybody who is responsible for a local state gets

Robertson - direct

 1  paid out of that state's fund.  There is no national pot of

 2  money.  It's all 44 different state pots.  And the way we've

 3  arranged it with all these lawyers is, is that your state is

 4  what you have to concentrate on and that's how you will be

 5  paid, if you get paid.

 6  Q.  So, you mentioned to me the term that you think the

 7  internal and external incentives in this case are fully

 8  aligned.  Could you explain to the Court what you mean by

 9  that?

10  A.  Well, the internal incentives are incentives within our

11  group.  The 92 lawyers and all of the staff people that are

12  helping them work understand that internally they get paid by

13  pursuing the claims on behalf of this -- of their subclasses.

14          Externally, we're aligned, I think, with the class

15  because, as the discussion we had earlier this morning, the --

16  we're not going to get paid unless we get cash in.  And, so,

17  the fact that we've gotten already, I think Dr. Landes said,

18  nearly $280 million of value to the members of the class just

19  because of the agreement we reached with AT&T, we're not

20  asking for any money for that.

21          So, the external alignment with the class is we only

22  get paid if the class actually benefits.  And I've been in a

23  few class actions and I have to tell you they're not all like

24  that.

25  Q.  Well, let's tease out that concept, because there was some

Robertson - direct

1   confusion on this issue before lunch.

2          When you say the class benefits.  The class has

3   already benefitted $285 million, according to Dr. Landes,

4   right?

5   A.  Yes.

6   Q.  And our request for fees based upon that $285 million is

7   nothing?

8   A.  It's zero.

9   Q.  It's zero.

10         And of the $2 billion that is the estimation --

11  roughly $2 billion of the estimation -- of the value of the

12  injunctive relief or the prohibition on AT&T collecting this

13  tax through the period before the expiration of the Act,

14  there's also no attorneys' fee recovery on that?

15  A.  That's correct.

16  Q.  Okay.

17         So, the question that was asked by the Court before

18  lunch was, basically, is:  Are we asking the Court to approve

19  what is, in effect, an interim fee award when we ask for 25

20  percent of the cash that we hope to realize that we have not

21  realized yet?

22         Could you respond directly to that question from the

23  Court?

24  A.  Well, I apparently didn't do it very well or you wouldn't

25  be asking it now.  So, no.  The answer is no.

Robertson - direct

1  Q.  I'm accustomed to having to go back to people when their

2  answers to the first question is poor.

3  A.  The answer is no.  I mean, we're -- this is not an interim

4  fee request.  And even though I was sort of lightheartedly

5  saying if there's an exigent circumstance, I told the Court I

6  think at the end, we're not coming back.  This is it.

7       MR. ISSACHAROFF:  Two other points, and then I'll

8  pass the witness.

9  BY MR. ISSACHARAOFF:

10  Q.  A lot of the settlement requires future cooperation by

11  AT&T.  And some of the objectors have pointed out that AT&T is

12  basically off the hook as of the time of the settlement.  I

13  think that that's wrong as a factual matter, but that's the

14  assertion.

15       What's your sense of guarantees of future cooperation

16  by AT&T in this case?

17  A.  Well, we have an agreement in which they've agreed to

18  cooperate and to provide the information we need.  For

19  instance, one is a little city out in California, says, We

20  want to see -- " I'm sorry.  Colorado, said, "We want to see

21  all the individual invoices for all of the people for whom

22  you're claiming this tax."

23       Well, we asked AT&T to do that and they're going to

24  do it.  And that's the kind of cooperation that we think the

25  agreement requires.  And, frankly, that's the kind of

Robertson - direct

1   cooperation we've gotten.  But this has been a real delight in

2   this case to see the way that we have been able to put this

3   together to reach a mutually beneficial result for the people

4   who paid this tax.

5   Q.  It doesn't hurt, does it, that AT&T is dealing with

6   millions of its own customers in this process?

7   A.  Well, it's one of the things you always try and do is sort

8   of figure out what everybody's incentive might be.  Is there

9   an incentive to hide the ball or not?  But this is a highly

10  competitive industry.  A dollar a month or two dollars a month

11  could mean a huge difference in the way that their products

12  appeal to people who are looking to purchase cellphone

13  contracts or Internet access contracts.

14        And, so, we -- they have been -- perhaps out of

15  altruism, but I doubt it; more likely out of the market forces

16  at play here -- really, really cooperative in getting the

17  place where this part that hurts them competitively has been

18  removed.

19  Q.  Finally, Mr. Robertson, the case law in this circuit and,

20  indeed, everywhere asks the Court to inquire from lead counsel

21  as to the views on the settlement and the benefits, the risks,

22  the reasons that the Court is being presented with the

23  settlement.

24        You have the experience of having been a government

25  lawyer, of having been chief justice of your state, of having

1    been in private practice for a number of years.  Can you just

2    give the Court your basic assessment of why this is a proper

3    settlement and why you think the Court should approve it?

4    A.   Well, I think when you weigh all of the Synthroid factors,

5    that I'm sure the Judge is tired of reading from all of the

6    papers we filed, this is a case that was going to be a long,

7    hard-fought case.  We thought we had a chance to do some good

8    in it.  But the truth of the matter is, they had some defenses

9    and this could have gone on for a very long time.

10        And if we'd have just pursued a breach of contract

11   action or something like that, I think we'd be in front of

12   Judge St. Eve eight years from now having fought through the

13   class fight and all the defenses, if we hadn't been thrown

14   into arbitration because the United States Supreme Court had

15   ruled in favor of AT&T in the Concepcion case.

16        So, this would have been a very difficult case, a

17   very expensive case and I don't think, frankly, that we would

18   have done much better at the end of the day than we did with

19   this settlement, in terms of getting relief quickly to the

20   customers, stopping the tax and creating a system which gave

21   them an opportunity to get back a substantial amount of the

22   money that they had paid without doing anything except opening

23   their mailbox one day.

24        MR. ISSACHAROFF:  Your Honor, I have nothing further.

25        THE COURT:  Cross-examination.

Robertson - cross by Baumkel

1    MR. BAUMKEL: I have a few questions, but if there's

2   somebody else, they can go first this time. I don't know if

3   anybody else --

4    THE COURT: Anybody?

5    MR. BAUMKEL: No takers?

6    THE COURT: Go ahead.

7    CROSS-EXAMINATION ON BEHALF OF KAREN WIAND

8   BY MR. BAUMKEL:

9   Q. Good afternoon, Mr. Robertson.

10  A. How are you, Mr. Baumkel.

11  Q. So, California denied your -- or AT&T's -- request for a

12  refund, correct?

13  A. They have so far.

14  Q. So, I don't know what you mean when you said a few minutes

15  ago that we're just dealing with small amounts of money with

16  the denials. I mean, it's 50 million bucks in California,

17  isn't it, or something thereabouts?

18  A. Well, I was talking, frankly, about a lot of the little

19  cities out there.

20  Q. But you don't think $50 million is a small amount, do you?

21  A. No, I don't think that. No, sir, I don't.

22  Q. You don't think the denial in California involves a small

23  amount?

24  A. No. And that's, frankly, why we're going to sue them if

25  we have to.

Robertson - cross by Baumkel

1    Q.   So, if, for some procedural reason, your claim -- which

2    started as a breach of contract claim -- against AT&T is,

3    under this settlement paradigm, unsuccessful against

4    California in your -- I guess, your -- litigation or your

5    sub-counsel's litigation against California, if that's

6    ultimately unsuccessful for some procedural reason -- in other

7    words, the tax was improper, but some procedural reason why

8    you don't succeed and you don't get anything from California

9    -- under the settlement paradigm as you proposed it up to this

10   minute, AT&T, at the end of that day, gets a release, don't

11   they?

12   A.   Well, I'm glad you picked California because the Loeffler

13   case in California prohibits the class from suing AT&T

14   directly.  And the utility tax statute has a specific language

15   in there that prohibits lawsuits against the utility.  And

16   those are the taxes that we've been fighting about over in

17   California.

18        So, the only option we have in California is this

19   case, because the law there as it presently stands prohibits

20   an action directly against AT&T by the people who have paid

21   the tax.

22   Q.   I don't have the time to educate myself to parry with you

23   on that.  So, I'll resist the temptation to engage anyway on

24   that.

25        But there are other states besides California where

Robertson - cross by Baumkel

1   you've had denials already, correct?

2   A.   The only state that we've had is New Hampshire, and it has

3   claimed that it's grandfathered.

4           And Texas, for instance, you brought up this morning,

5   hasn't denied.  The letter as I read it basically says,

6   "Judge, don't tell us what our law is."  But it then goes

7   through a whole series of things.  And if you saw our filing,

8   which Ms. London helped us write, the Texas Attorney General

9   wasn't exactly sure of the Texas law.

10  Q.   Did you read that portion of the letter that said that you

11  have to first -- AT&T first -- has to refund to the taxpayers?

12  A.   Sure.

13  Q.   And that Texas didn't think that taking 250 million or 300

14  million, whatever it is, off the top qualifies?  Did you read

15  that portion of her concerns?

16  A.   I did, but then I had hoped that she would have read the

17  Central -- I can't remember the name of the case, the 1885

18  case from the United States Supreme Court that says in a

19  common fund, the money is all the money that belongs; and,

20  then, if you take attorneys' fees and all off of that, it is

21  basically a payment by the people who have the money.

22          So, I'm not sure an assistant Attorney General in

23  Texas can undo what the court of the United States Supreme

24  Court says in Boeing and in this 1885 case.

25  Q.   Well, those determinations are as applied to these

Robertson - cross by Baumkel

1  proceedings to what Judge St. Eve awards as an attorney fee

2  from the common fund.  They're not related to what a

3  particular state's protocol is as to how they must be

4  satisfied as to a refund to the customers.

5        It's apples and oranges, isn't it?

6  A.  No.

7        I'm glad you brought up Texas, for instance.  There

8  is a procedure that has been approved as the official law of

9  Texas that if the credit -- the person who would get the

10  credit -- tells the State of Texas that they believe they have

11  gotten the credit, that that is sufficient for purposes of

12  granting the refund to the AT&T analog, in any circumstance.

13  Q.  To backtrack for just a second, before I go forward, on

14  California, this fellow who testified earlier today that he

15  was a buddy of yours in some connection -- which doesn't

16  matter to me really, but that's how he first got involved --

17  said that he was doing this because this was a way easier

18  way to get a refund.

19        How is this a much easier way for him to get a refund

20  if California has denied AT&T's request and now he has to sit

21  around while litigation happens for the next who knows how

22  long?

23  A.  Well, maybe I didn't make myself clear earlier.  He is in

24  California, where he couldn't bring the action.

25  Q.  Right.

Case: 1:10-cv-02278 Document #: 257 Filed: 09/02/11 Page 179 of 312 PageID #:5504
Robertson - cross by Baumkel
179

1      He could bring the action against the state, couldn't

2  he?

3  A.  No.

4  Q.  Only -- under this Loeffler case, only AT&T can?

5  A.  Yes.  Only AT&T has standing to bring the case in

6  California.

7  Q.  In whatever states may be successful if, in fact, they

8  have some procedural rights that don't have this Loeffler

9  issue -- that apparently you say California has, and for our

10  present purposes I will accept that.  I don't know.

11      But if there are states that don't have that Loeffler

12  issue and for procedural reasons, at the end of the day, AT&T

13  doesn't get a refund or the taxpayers, through your

14  sub-counsel, don't get a refund, does AT&T nevertheless get a

15  release?

16  A.  If -- the answer to that is yes.  But that's going to

17  require one of two things to happen.  The first is a judgment

18  that the tax was never owed.  The second is a decision by the

19  state that their law is simply not going to apply to the

20  state, itself.

21  Q.  Well, I was -- my question was, if there was some

22  procedural reason, like, for example -- I'm not saying that

23  this would play out; I don't know -- this business about

24  whether or not, under a state's particular view, the $3 00

25  million or $250 million can get lopped off the top and still

Robertson - cross by Baumkel

1    qualify as a refund.

2         I'm not here trying to debate whether that's correct

3    or not, but if that sort of procedural issue -- in other

4    words, the tax is owed -- the state doesn't dispute the tax is

5    owed, only that the procedure undertaken to get it was flawed.

6         And if, at the end of the day, because of some

7    procedural issue like that you lose, putting aside the debate

8    as to whether the settlement is good, bad or indifferent, in

9    that circumstance, does AT&T get a release anyway?

10   A.   Well, I want to address the premise, if you don't mind.

11   And the premise you've said is that this procedural failure to

12   have the credit, the lopping off of the attorneys' fees, is

13   going to prevent procedurally.

14   Q.   As an example.  I'm not saying that that is definitively

15   going to happen or not going to happen, nor do I really intend

16   with my question to debate that.

17        I'm saying -- I'm using that as an example of a

18   procedural type of issue that assumes the tax nevertheless was

19   invalid.  It's my only reason for using that as an example?

20   A.   I appreciate that.  But let me say that we haven't had any

21   of that.  The state courts that have interpreted these kinds

22   of provisions say -- for instance, the one you're talking

23   about -- is it's only designed to prohibit -- or to prevent

24   unjust enrichment.

25   Q.   If you do.  You don't have a crystal ball and I don't have

Robertson - cross by Baumkel

1  a crystal ball.  And you may be the most brilliant former

2  chief judge that ever lived, but you still don't get to read

3  the future.

4       So, if you lose on a procedural issue, does AT&T get

5  a release or don't they?

6  A.  Well, we don't see a procedural issue we're going to lose

7  on.  But if there's one that we -- that someone invents -- we

8  have researched this exhaustively, but we don't see a

9  procedural issue we're going to lose on.

10       But I suppose the answer is, if there's something

11  like that, AT&T will get the release.

12  Q.  So, wouldn't it be prudent and if AT&T is on the up and

13  up, like you have been persuaded they are, for everybody to

14  sit down somewhere in the course of these proceedings -- and

15  assuming Judge St. Eve otherwise embraces what you've

16  submitted to her -- amend this slightly to say the intent

17  wasn't for AT&T to get a release if we don't get money for the

18  people in that state; and, if that happens, the people in that

19  state still have their cause of action as they had it in the

20  first place?

21       If what you're saying is true, that you're confident

22  that will never happen, and if AT&T is on the up and up, why

23  in the world would you want a set of documents that present

24  even the potential for AT&T to avoid millions -- potentially

25  hundreds of millions -- of dollars of exposure for people who,

Case: 1:10-cv-02278 Document #: 257 Filed: 09/02/11 Page 182 of 312 PageID #:5507
Robertson - cross by Baumkel
182

1    in this circumstance, don't get anything?

2           Why not change the document slightly to accommodate

3    that?

4    A.  Well, there's a number of answers to that, and I'll begin

5    with the most obvious one, is that's the agreement that AT&T

6    was willing to reach.  If you think that we just laid down

7    there and said, "Tell us what you want," you're sadly

8    mistaken.

9           But beyond that, they have spent millions of dollars

10   on this already.

11          What do you think it costs -- I'm not asking you

12   questions.  This is rhetorical.

13   Q.  You can ask me a question.  I --

14   A.  No, I don't want to ask you a question.

15   Q.  All right.

16   A.  But --

17          (Laughter.)

18   BY MR. BAUMKEL:

19   Q.  I might not answer as good as you, but I'd like to answer

20   questions, too.

21   A.  Well, this is a rhetorical question.  What does it cost

22   for AT&T to have McDermott, Will & Emery and all of its people

23   filing all of these tax refund claims, for paying for this

24   notice?  They've got millions of dollars in this case already,

25   and they think that's pretty good consideration.

Case: 1:10-cv-02278 Document #: 257 Filed: 09/02/11 Page 183 of 312 PageID #:5508
Robertson - cross by Baumkel
183

1          And, frankly, we tried to talk them out of that.  We

2    did what you wanted to do.  We said, "Just give us the money

3    and you go get it."

4          They said, "We're not willing to do that.  And, by

5    the way, there's some reasons we can't.  In some states, we

6    can't go get it."  So --

7    Q.  Didn't you also do just what I -- I'm convinced you're a

8    smart guy, and so are the people in your group.  Didn't you

9    say to them the obvious:  "Well, if at the end of the day, we

10   have some states that we just don't succeed in for some

11   oddball reason, you guys don't want to be released as to that,

12   do you"?

13          Didn't you broach that with them?

14   A.  Sure.  And the oddball reason that we broached was the

15   ones that we've talked about where the state says, "You don't

16   owe the tax."

17   Q.  But if there's some unforeseen oddball reason?

18   A.  We don't foresee an unforeseen oddball reason.

19   Q.  Okay.

20          (Laughter.)

21   BY MR. BAUMKEL:

22   Q.  The purpose for people hiring lawyers is to draft

23   documents to protect from the unforeseen.  Everybody enters

24   into agreements expecting everything is going to work out.

25   The purpose of the documents is to protect if they don't work

Robertson - cross by Baumkel

1    out in all contractual dealings virtually, isn't it?

2    A.  Well, sometimes we're not all as good at seeing the

3    future.  But we have -- we think we have -- looked around

4    every possible corner.  And irrespective of that, the

5    settlement that's before Judge St. Eve is the one that we were

6    able to negotiate.  And AT&T has not been willing to adjust

7    that settlement.

8         So, if she doesn't approve this one, then we'll all

9    go back to Square One.  But if she does, that's what they've

10   agreed to agree to.

11   Q.  Your original settlement submission last June mentioned

12   nothing about the statute of limitations issue that I started

13   screaming about in my papers.

14        Do you recall that situation?  That is, that you

15   filed something with no mention of the statute of limitations

16   problem and I promptly filed something saying, well, isn't

17   this an issue that has to be contemplated?

18        Do you remember that sequence of events?

19   A.  I don't -- you know, to be honest with you, I haven't

20   studied your stuff as closely as I probably should have.

21   Q.  Okay.

22        Well, do you remember your own stuff?

23   A.  I do.

24   Q.  Well, your own stuff didn't say anything about the statute

25   of limitations issue when you first presented it, did it?

Robertson - cross by Baumkel

1   A.   And one of the reasons is that there we found -- and

2   that's the reason we've asked for the money all the way back

3   to 2005, is that a number of jurisdictions have ongoing audits

4   of AT&T which extend the statute of limitations back.

5          And we didn't want to mislead anybody about -- we

6   said we're going to ask for this money within this period of

7   time, and that's what we said and it was not misleading at

8   all.   That's exactly what we've done.

9   Q.   Well, since then, your papers say, "Well, this stuff

10  Baumkel is shouting about, who cares about that?   It's so

11  trivial that we shouldn't be wasting any of the Court's time."

12         Did you see that chart?   That wasn't trivial, was it?

13         Those millions and millions and millions of dollars

14  before 2007, before the three-year statute that your own

15  papers say is the average statute?   You don't really mean what

16  your papers say, that's such a trivial amount that Baumkel

17  shouldn't be worrying about it, do you?

18  A.   Well, what we're talking about when we talk about it being

19  a minimal amount is per class member.   Most of the people, if

20  not all of them, are going to be part of the statute of

21  limitations.   And Michigan's a perfect example.

22         94 percent of the money in Michigan is what we're

23  going to get back, we believe, if they follow their law.   And

24  that six percent -- because you have a four-year statute of

25  limitations.   And that six percent, when you take it and

Robertson - cross by Baumkel

1    divide it up under the millions of people in the Michigan

2    group, as to the individuals is not a great deal of money.

3           Now, in the aggregate, it might be.  But for the

4    individuals who are going to benefit from this class, we're

5    not talking about a lot of money to them.  And I --

6    Q.  We're not talking about a lot of money to them under any

7    circumstance, are we?

8    A.  Well, some of them are going to get as much as $10,000 --

9    Q.  So --

10   A.  -- because they have a lot of phones.

11   Q.  So, although my principal concern throughout these

12   proceedings has been Michigan, the chart that was put up and

13   the bulk of the -- if you'll forgive me, the colloquial term

14   -- the pitch you guys put together talks about the numbers in

15   the national scope.  It uses national numbers.  And your

16   economics expert talked national numbers.  And the chart that

17   talked about statutes of limit- -- talked about net taxes by

18   year was national numbers.

19          So, putting aside Michigan for a second, I haven't,

20   during my lunch, added up those numbers.  But I can see when I

21   went through that exercise with your class administrator

22   expert, that it was many millions of dollars.  It wasn't a

23   trivial amount.

24          And, so, what I'm getting at, what I want to ask you

25   about, Mr. Robertson, as apart from just arguing to Judge

Robertson - cross by Baumkel

1    St. Eve at the end of the day, is if you have two clients and

2    one of them is, under the paradigm of recovery that you're

3    pursuing, entitled to nothing and the other one is entitled to

4    a hundred percent, is it reasonable for you to tell the one

5    who is entitled to a hundred percent, "I've set up a paradigm

6    under which I'm going to diminish by all those millions of

7    dollars the pot for paying you so I can pay my other client an

8    amount of money that is the same as what I'm going to pay you,

9    even though my other client, under the paradigm I've set up,

10   is entitled to zero"?

11           Do you feel comfortable with that?

12   A.  Well, first, everybody's going to get something.  That's

13   in the papers.  And, second, the answer is yes, it's

14   reasonable.

15   Q.  Doesn't Client 1 -- isn't Client 1 entitled to a separate

16   representation, because Client 2 wasn't entitled to anything,

17   but you're taking money from Client 1?

18   A.  No, because Client 1 is getting something, as is Client 2,

19   and we're settling a breach of contract case and the damages

20   are measured by the taxes.

21   Q.  You mentioned something about the individual law firms

22   throughout the country not getting paid unless they get

23   recovery for the people in the states that they're assigned

24   to, correct?

25   A.  Yes, sir.

Robertson - cross by Baumkel

1  Q.  But the Frickleton firm does, don't they?

2  A.  The Frickleton firm?

3  Q.  Yes.

4  A.  Does it get, what?

5  Q.  Gets paid.  If you collect a hundred million dollars from

6  Ohio, Indiana, Nebraska, but you don't collect anything from

7  Texas, California, Michigan or whatever, your firm still gets

8  paid?

9  A.  We get paid from Michigan, Texas and wherever we get paid.

10  We don't get any money --

11  Q.  Even if your local counsel gets nothing from the other

12  states, correct?

13  A.  The local counsel and we get nothing from any state in

14  which there is no money.

15  Q.  Right.

16         The local counsel just works for one state, right?

17  A.  Yes, sir.

18  Q.  You're assigned all the states, right?

19  A.  We are over the whole group.

20  Q.  So, you get paid from the states that pay, even if there

21  are other states that don't pay, correct?

22  A.  We get state -- paid from the states that pay.

23         MR. BAUMKEL:  That's all.  Thank you.

24         THE WITNESS:  Thank you, sir.

25         MR. BAUMKEL:  Oh, wait.  I have one other question.

1   BY MR. BAUMKEL:

2   Q.  Have you seen these so-called confidential documents that

3   were produced to me as a result of our proceedings a few weeks

4   ago?

5   A.  No.  Mr. Frickleton saw those.

6   Q.  Okay.

7          Well, I looked through them and didn't see anything

8   in the way of any communication from your firm or any

9   sub-group of your class counsel.

10         Are you aware of any communications to the State of

11  Michigan tax authorities from your firm or any sub-counsel?

12  A.  I'd suggest you read Mr. Olsman and Ms. Arndt's

13  declarations, which are before the Court, about the calls that

14  they made to the governor's office in Michigan.  They were

15  then put in touch with an individual in the Michigan

16  Department of Treasury.  That individual was contacted and

17  suggested that despite what Michigan law said -- and you and I

18  have both briefed that side of it -- that they would like a

19  different, more convenient procedure for this kind of a case.

20  Q.  Right.

21  A.  And that's the reason, despite the fact that the law

22  seemed to say that only the consumer had standing in Michigan,

23  that AT&T, in early November, filed the tax refund claim with

24  the State of Michigan.

25  Q.  So, as to these sets of documents that purport to be

1    everything involving the parties to this case, including the

2    State of Michigan, is there anything that you believe is

3    missing?  Is there some written communication from your firm

4    or some other attorney in your group to the State of Michigan?

5    A.  We talked to each other.  You heard the testimony.  We had

6    phone calls.  And most of us don't count those as documents,

7    because the information is traded back and forth and people

8    take responsibilities.

9         But the only way we could have possibly known to file

10   it -- to ask AT&T to file it -- with Michigan, was to have had

11   the contact.  If you had given us the letter that you got in

12   August, we would have known that from you.  But you didn't.

13   And, so --

14   Q.  Well, that's interesting that you mention that.  You know,

15   I was on the books as potentially getting paid zero and you

16   were on the books as potentially getting paid $250 million.

17        So, why is it do you think you weren't getting from

18   the State of Michigan what I was getting on my own back in

19   August?  Why did it take you till November to get that

20   information?

21   A.  Well, we had to file these things by November.  And as the

22   deadlines approached, we began contacting.  Because, as you

23   might imagine, the preparation of the refund for $1.152

24   billion nationally is not something you can do with the touch

25   of a button.  And AT&T was doing its best to get the

Case: 1:10-cv-02278 Document #: 257 Filed: 09/02/11 Page 191 of 312 PageID #:5516
Robertson - cross by Baumkel
191

1   information together.

2          And we met the deadline in the settlement because we

3   had the conversations around the state in -- both in Colorado

4   and Michigan and Pennsylvania and Rhode Island.  States that

5   were on the list for being ones that only the consumer could

6   pay, we went ahead and asked AT&T to go ahead and file.

7   Q.  I'll sit down pretty quickly.

8          But the original settlement documents posited that in

9   Michigan, amongst other states, the procedure was going to be

10  that your group would pursue claims for the individual

11  consumers as opposed to what's now turned out to be the

12  paradigm with AT&T asking for refunds, correct?

13  A.  Yes.

14  Q.  So, I guess -- I don't want this to degenerate into an

15  argument between you and I, but shouldn't you have found out

16  what I found out in August and what you have since found

17  out -- shouldn't you have found out before you drafted these

18  settlement documents purporting to describe what the

19  settlement paradigm was.

20  A.  Well, I guess we --

21  Q.  That's a rhetorical question.  Why didn't you, I guess, is

22  my question.

23  A.  All right.  And I'll answer it.

24          Because we read the law, and we thought the law would

25  apply.  And, you know, Mr. Baumkel -- and I don't want to get

Robertson - redirect

1   in an argument with you, so I won't, but you said the exact

2   same things in the papers that you filed with the Court.

3   Q.  Right, I did.

4   A.  And --

5   Q.  But I found out different.

6   A.  And so did we, in a timely manner.

7   Q.  Okay.  That's all I have.  Thank you.

8   A.  Thank you.

9         THE COURT:  Anybody else, cross?

10        (No response.)

11        THE COURT:  Redirect.  Go ahead.

12        MR. ISSACHAROFF:  Just very quickly.

13                    REDIRECT EXAMINATION

14  BY MR. ISSACHAROFF:

15  Q.  So, there's question that there's this money in the period

16  from before the statute of limitations, somehow we are casting

17  that to the winds.  Does the class have an interest in that

18  money?

19  A.  Well, the individual class members are the ones that have

20  the interest in the money.

21  Q.  Okay.

22        And Mr. Baumkel purports that there are members of

23  the class that are this isolated group.  In fact, what we know

24  from AT&T, isn't it, that most people have been continuous

25  users through this period and that the number of people --

1  class members -- who were around in the pre-statute of

2  limitations period is limited?

3         I don't want to put words in your mouth, but is that

4  your understanding of where the record is?

5  A.  Well, I guess we all learned this the hard way, and so

6  I'll just tell a little anecdote.  I dropped my iPhone and I

7  was not within the two-year window.  Because they'll sell it

8  to you at a substantial discount to get you to sign up for

9  another two years.  And I dropped it and went in and said,

10  "How much can I -- " "I'd like to get another one."  They said

11  it's $699, not $199.

12         And, so, everybody who's bought one of these devices,

13  for the most part, in order to get the device at a substantial

14  discount, has signed a two-year contract with AT&T.  And, so,

15  for someone -- and if you go back to -- you know, this was a

16  fascinating part of this.  If you go back to 2005, this whole

17  thing has moved so fast -- there is no iPhone.  The very first

18  BlackBerry that could actually act as a phone, you had to plug

19  something into your ear and Internet access was something that

20  people didn't do on their phones because it was that old, slow

21  stuff and it was just not practical to do it.

22         And, so, the number of people that would have had a

23  device that could access the Internet and been held --

24  required to hold it for two years will have all, for the most

25  part, fallen into the people that were then, for instance, in

1    Michigan, the four-year statute of limitations.

2          That was a long answer, and I apologize.

3    Q.   The other question I have is:  There's an intimation in

4    the cross -- there was an intimation in the cross --

5    examination that AT&T is basically walking away scot-free

6    here.  Could you just summarize for the Court very quickly

7    what AT&T's consideration for the settlement has been for the

8    class?

9    A.   Well, there's a number of things.  The first is they've

10   paid back all of the vendor's compensation -- or they will

11   upon final approval -- which is the amount they got to keep

12   from the states to collect the taxes for the states.  That's

13   $2.2 million.  That's $2.2 million.

14         The cost of notice.  The cost of preparing all of

15   these returns, which is substantial.  You heard Ms. London

16   testify earlier that her client, a CPA, charges $275 an hour

17   to do what AT&T is doing for 30 million people for nothing.

18         And, then, there is their ongoing responsibility to

19   provide data and make sure that these -- that the things that

20   are necessary for AT- -- for the states to make the refunds

21   happen.  We talked about this when we were negotiating.  They

22   know they're going to get audited when this is over, because

23   the states are going to try and make up some of this money,

24   and, sure enough, there's some audits going on.  Both

25   pre-audits and post-audits are going to take place.

1            And not only that, they've got, you know, law firms

2    on call all the time with whom we can directly deal when we

3    have questions about denials or statements that have come in.

4            So, they are spending a fortune on what's going on

5    here, in addition to making it available for the class members

6    to get this money back.

7    Q.   Well, let me focus on one more thing, and this will be the

8    last point.  This is what Mr. Woods focused on.

9            States are in terrible trouble right now.  We all

10   know that.  And they are leery about having to write a check.

11   So, one of the strengths of the settlement, according to

12   Mr. Woods, is precisely that the states can take this as

13   credit.  Credit is three years that they can -- if we get up

14   to three years -- AT&T will put up the money immediately.

15           How does that calculate in the settlement, in your

16   estimation?

17   A.   There's two pieces of that.  The first piece is the one

18   about the pre-fund -- pre-refund -- escrow account.  If a

19   state says, "We're not going to consider or pay the money back

20   until you show us that you paid the money back," Paragraph 8.7

21   requires AT&T to put all of the money that's going to be in

22   the refund into the escrow account in order to meet the

23   condition precedent.  And in some places that's going to be a

24   substantial amount of money.

25           But as to the point that you raise, AT&T has agreed

Robertson - recross by Baumkel

1   to basically -- when I've talked to a couple of revenue

2   directors, I've said we've got -- this is like the sale at the

3   mattress company.  You've got 90 days same as cash here.  You

4   know, you ought to be willing to take advantage of that.

5          Because AT&T has huge tax liability across the

6   country -- sales tax liability -- and they pay it on a monthly

7   basis in most places.  And, so, these credits will be offset

8   and states are not going to have to reach in; there's not

9   going to have to be an appropriation; and, AT&T has made it so

10  it can be as easy as possible for these states.

11  Q.  Under the terms of the settlement, the first three years

12  are not discounted for the time value of their advancing the

13  money, only in the fourth year does that kick in; is that not

14  right?

15  A.  That's correct.

16  Q.  Okay.

17         And I think the 1883 case is Pettis (phonetic)?

18  A.  Well, Lord knows if you didn't know, I wouldn't know.  So,

19  thank you.

20         MR. ISSACHAROFF:  That's all I have, your Honor.

21         THE COURT:  Any recross?

22         MR. BAUMKEL:  Very briefly.

23         RECROSS EXAMINATION ON BEHALF OF KAREN WIAND

24  BY MR. BAUMKEL:

25  Q.  Mr. Robertson, this credit business that you were just

Robertson - recross by Baumkel

1    asked about by your co-counsel, do you know if Michigan has

2    expressed a willingness to participate in that kind of a

3    procedure?

4    A.   No.  We -- they have to do their initial due diligence.  I

5    mean, that's the one thing that this -- that we're learning

6    from what these people are doing.  This is a huge tax refund

7    request.  They're not going to give the money back without

8    being sure.  So, that's the process that Michigan is in right

9    now.

10   Q.   I've asked Michigan in writing to waive the statute of

11   limitations.  And I think I've had a pretty good relationship.

12   Good enough to get letters last summer from them.  If they

13   accommodate my request, who gets credit, me or you?

14   A.   Well, I know you want it.

15   Q.   I'm asking you something specific.  You want to get paid,

16   too.  So, let's -- that's part of what this is all about --

17   this proceeding this morning -- telling the Judge why you

18   deserve to get $250 million.  So, don't act like I'm

19   mercenary.

20          I'm saying if they provide this value of millions and

21   millions of dollars in response to my request, do you think I

22   ought to get credit for it?

23   A.   I don't understand the request, but if you're asking will

24   they waive the statute of limitations --

25   Q.   No, I'm saying if they do.  I've asked them to do that.

Robertson - recross by Baumkel

1   A.  All right.

2        And they would waive it beyond their four years?

3   Q.  That's what I've asked them.  I've asked them to waive it

4   for the whole settlement time period.  If they do, do I get

5   credit for that or do you?

6   A.  Well, the Judge will be able to make a determination on

7   that.

8   Q.  I'm asking -- you're going to argue this.  Are you saying

9   I should or shouldn't get credit for it, if they do that?

10  A.  I'm not prepared to say.  This is --

11  Q.  All right.

12  A.  You know, it's one of the other things you haven't told us

13  you've done.

14  Q.  Okay.  Thank you.

15       THE COURT:  Mr. Robertson, would you explain to me

16  further the $2.2 million you referenced.  You said that AT&T

17  was paying that back and it is what they were able to charge.

18  I do not understand what that 2.2 is.

19       THE WITNESS:  Well, there's a term called "vendor's

20  compensation," and I'll give you Missouri as an example.

21       THE COURT:  Okay.

22       THE WITNESS:  In Missouri, if AT&T collects a hundred

23  dollars in tax, the state says, "This is a headache for you.

24  You're sending us the money.  You keep two percent of that

25  money."

 1              THE COURT:  Okay.

 2              THE WITNESS:  And that's called vendor's

 3    compensation.

 4              Now, some states cap it.  They say, you know, you can

 5    have two percent up to $3,000, at which point, you know, it

 6    got eaten by other things that AT&T paid.

 7              But in a state like Missouri where it's a flat two

 8    percent, then AT&T will have kept two percent of all of the

 9    money it sent in to the state as compensation for collecting

10    the money for the state.

11              THE COURT:  Okay.

12              And has AT&T paid that back on a state-by-state

13    basis?

14              THE WITNESS:  It's calculated on a state-by-state

15    basis.

16              THE COURT:  All right.

17              Anything else?

18              MR. ISSACHAROFF:  We have nothing further, your

19    Honor.

20              THE COURT:  Thank you, Mr. Robertson.

21              (Witness excused.)

22              THE COURT:  Please call your next witness.

23              MR. FRICKLETON:  The settlement class calls Dean

24    Robert Klonoff.

25               ROBERT KLONOFF, PLAINTIFFS' WITNESS, SWORN

| 1 | DIRECT EXAMINATION |
|----|----|

2  BY MR. FRICKLETON:

3  Q.  Would you give us your name and address, please?

4  A.  Robert Klonoff, 1623 Maple Street, Lake Oswego, Oregon

5  97034.

6  Q.  Lake Oswego is a suburb of Portland?

7  A.  It is.

8  Q.  And your present academic position is, what?

9  A.  I'm Dean and Professor of Law at Lewis & Clark Law School.

10  Q.  Dean Klonoff, Exhibit 31 is your resume.  It's in the

11  binder for the Court's consideration, but I do want to take a

12  little bit of time, because it's pertinent to the subject of

13  class actions, to talk about your background and experience.

14  Undergraduate at Cal Berkeley?

15  A.  Correct.

16  Q.  Yale Law School?

17  A.  Correct.

18  Q.  High honors?

19  A.  Yes.

20  Q.  Arnold & Porter, your first job in Washington?

21  A.  Well, my first job was law clerk on the U.S. Court of

22  Appeals for the Fifth Circuit.

23  Q.  For which --

24  A.  And, then, I went to Arnold & Porter.

25  Q.  Which judge?

Klonoff - direct

1    A.   Chief Judge John R. Brown.

2    Q.   How long were you there?

3    A.   One year.

4    Q.   And, then, went to Arnold & Porter from there?

5    A.   Correct.

6    Q.   How long were you with Arnold & Porter?

7    A.   Just under three years.

8    Q.   And what did you do next?

9    A.   I became an assistant United States attorney.

10   Q.   What sort of work did you do for the United States

11   attorney?  Was it in the District of Columbia?

12   A.   It was.  It was all criminal.  I did a combination of

13   trial and appellate work.

14   Q.   Okay.

15          And after you spent your time there, what was your

16   next position?

17   A.   I became an assistant to the Solicitor General of the

18   United States.

19   Q.   And what years were you with the Solicitor General's

20   Office?

21   A.   1986 to 1988.

22   Q.   And who was Solicitor General then?

23   A.   Charles Fried.

24   Q.   At the end of that experience, what did you do next?

25   A.   I was a visiting professor for a year at the University of

Klonoff - direct

1    San Diego Law School.

2    Q.  And what were you teaching there?

3    A.  Variety of courses.  Contracts, criminal procedure, trial

4    advocacy.

5    Q.  After that experience?

6    A.  I returned to D.C. because two of my colleagues from the

7    Solicitor General's Office had started a Supreme Court

8    practice at Jones, Day.  So, I joined the law firm of Jones,

9    Day in D.C.

10   Q.  And how long were you with Jones, Day?

11   A.  About 15 years.

12   Q.  Did you -- were you part of their Supreme Court practice

13   that entire time?

14   A.  I was.  And I also was part of their informal practice of

15   aggregate class action litigation, and that became a specialty

16   of mine.

17   Q.  Class actions?

18   A.  Correct.

19   Q.  In the course of your experience in the Solicitor

20   General's Office and also in the Supreme Court practice at

21   Jones, Day, did you have the privilege to argue before the

22   High Court?

23   A.  I did.  I've had eight arguments before the Supreme Court.

24   Q.  And, in the course of your experience, how many writings

25   and briefs and petitions have you participated in?

Klonoff - direct

 1   A.  Oh, I'd say with the combination of the Solicitor

 2   General's Office and Jones, Day, hundreds of cert ops, cert

 3   petitions, amicus briefs, merits briefs.  That was an

 4   essential part of what I did.

 5   Q.  In your 18 or so years with Jones, Day, if I remember, in

 6   the course of your practice, how many class action cases do

 7   you estimate you worked on?

 8   A.  Well over a hundred.  And that was a huge part of what I

 9   did day-to-day.

10   Q.  Would those be class action cases for mostly defense or

11   was it a mix of plaintiff and defense?

12   A.  It was mostly defense.  I did some plaintiff class action

13   work at Jones, Day.  I also did -- my first plaintiff class

14   action was at Arnold & Porter.  I was lead counsel for a

15   prisoner class action against the District of Columbia and

16   actually settled the case on a class-wide basis.

17         At Jones, Day, I represented a class of doctors in a

18   lawsuit against the St. Paul Insurance Company that went on

19   for a number of years.

20         But most of what I did was defense work, and I can

21   give you some examples of those.

22   Q.  Please do.

23   A.  I was brought in on the largest class actions that the

24   firm had.  So, for example, I represented R.J. Reynolds in the

25   Engle class action on appeal where the tobacco industry had

Klonoff - direct

1  been hit with a $146 billion verdict in a class action trial,

2  the largest civil judgment in history.  I was lead counsel for

3  R.J. Reynolds and was one of the two lawyers who wrote the

4  brief on appeal, getting that reversed.

5         I was one of the lawyers in the litigation that

6  occurred in this Circuit in the Firestone tread separation

7  case involving the Ford Explorer; was involved at both the

8  trial level and in the Rule 23(f) appeals.

9         I was one of the lead lawyers for Dole Food Company

10  in mass tort litigation filed in the United States and

11  throughout the world that also involved Shell Oil Company, Dow

12  Chemical, Occidental Petroleum, Chiquita, Del Monte.  And I

13  was selected by all of those entities to be the lead lawyer on

14  several of the appellate issues in that case.

15         I've represented Northwest Airlines in antitrust

16  class actions; International Paper in mass tort class actions.

17  I've done a number of employment discrimination cases,

18  representing Westinghouse, Northrop Grumman, CBS.  I've

19  represented Experian in reporting company class actions.

20         That's just a sampling of the cases.  And, in most of

21  those cases, I was the lead class action lawyer on the case.

22  Q.  Did you always have a nascent interest in academia?

23  A.  I did.  And, in fact, through most of the time I was at

24  Jones, Day, I was also a professor at Georgetown, taught class

25  actions.  And it was during that period where I wrote my case

Klonoff - direct

1  book on class actions and my nutshell.

2  Q.  Okay.

3      Now, when did you leave Jones, Day, to go to your

4  first full-time academic appointment?

5  A.  Well, I left to go to University of Missouri Kansas City

6  in the early 2000s, but I also stayed on with Jones, Day,

7  through that period of time.

8  Q.  Working out of Kansas City?

9  A.  Working out of Kansas City, continuing to do class action

10  work and appellate work.  That was what I had structured with

11  the law school, that I'd be able to continue to do that.

12  Unfortunately, when I became dean, Lewis & Clark wasn't

13  interested in having me continue practicing.  And, so, I

14  severed my ties with Jones, Day, at that point.

15  Q.  Okay.

16      And how long were you with the UMKC Law School, my

17  alma mater?

18  A.  That great school.

19      Four years.

20  Q.  All right.

21      What did you teach there?

22  A.  Civil procedure, class action litigation, appellate

23  litigation.

24  Q.  And how long have you been a dean at the Lewis & Clark Law

25  School?

1  A.  I'm just finishing my fourth year as dean.

2  Q.  Do you have teaching responsibilities there?

3  A.  Most of what I've been doing up until now is doing

4  lectures and other people's classes, because of my travel

5  schedule and responsibilities.  So, I've guest lectured in

6  civil procedure classes.  I am going to be teaching the

7  complex litigation class next year.  And I've continued to

8  present at conferences and continued my writing in class

9  action, as well.

10  Q.  In that regard, are you the principal author of one of the

11  leading textbooks in the country on class action -- leading

12  case books on class actions?

13  A.  I am.  It was the first case book on class actions.

14  Q.  Entitled, "Class Actions and Other Multi-Party

15  Litigation"?

16  A.  Correct.

17  Q.  All right.

18      Now, in more recent years, Dean Klonoff, have you

19  been involved in the ALI Aggregate Litigation Project?

20  A.  I have.  I was one of the reporters for the project.

21  There were four reporters.  And I was responsible for the

22  chapter on settlement and attorneys' fees.

23  Q.  And were the ALI principles of the law on aggregate

24  litigation published in hard-back form just last year?

25  A.  Correct.

Klonoff - direct

1  Q.  2010?

2  A.  It was.

3  Q.  Now, your chapter, responsibilities on settlement and

4  attorneys' fees; is that what you said?

5  A.  Correct.

6  Q.  Who were some of the other scholars or contributors to the

7  ALI Institute aggregate litigation textbook?

8  A.  Well, we had three other very distinguished reporters,

9  including Sam Issacharoff, who is here; Richard Nagareda; and,

10  Charles Silver, three of the most prominent class action

11  scholars in the United States.

12          We then had a much larger group of advisers, and that

13  included Judge Diane Wood from this circuit, Judge Anthony

14  Scirica from the Third Circuit, Jack Weinstein, Judge

15  Rosenthal from the Southern District of Texas, Judge Barker

16  from the federal district court in Indiana.

17          We had some of the premiere defense lawyers in the

18  country, including Sheila Birnbaum and John Beisner from

19  Skadden.  We had Elizabeth Cabraser and other very prominent

20  plaintiff lawyers.  And we had many other academics, including

21  Mary Kay Kane, Bill Rubenstein, Arthur Miller, Howard

22  Erichson.  These are people who were really very famous and

23  accomplished in class actions.

24          They were all among our advisers who were appointed

25  by the Director of the American Law Institute.

Klonoff - direct

1   Q.  And this was a five-year project?

2   A.  Five years, correct.

3   Q.  Now, sometime in August or September of last year, after

4   the Court issued its preliminary order, did we contact you

5   with a request to consult with us to draft declarations and

6   offer your views on both the merits of this settlement and

7   attorney fee issues?

8   A.  You did.

9   Q.  Okay.

10          Now, do you do that often?

11  A.  No, I don't.  Obviously, with the responsibilities of

12  being dean and, before that, a professor, I have only a

13  limited amount of time to do any kind of expert work.

14  Q.  And, so, what sort of criteria do you apply to those

15  requests?

16  A.  Well, the first thing, obviously, is I want to look at the

17  papers and make sure that I can legitimately opine in a manner

18  that I'm being asked to.  And I've turned down many matters

19  because I don't feel that the position that I would be asked

20  to take is correct as a legal matter.  So, that's Point 1.

21          Point 2, even if I like the position in the case, I

22  look for cases that are going to be interesting, important and

23  that are going to help me as a scholar.

24          This happened to be a very interesting case for a

25  number of reasons:  The size of the case, the issues that were

 1   involved and because, when I first read the settlement

 2   agreement, it so dovetailed with the concepts and principles

 3   we had identified at the American Law Institute and that had

 4   been unanimously adopted by the entire American Law Institute.

 5           This settlement resonated in many ways to me because

 6   the way it was structured was consistent with how the American

 7   Law Institute and its principles of aggregate litigation has

 8   said settlements ought to work.

 9   Q.  And I want to ask you about just that.  But for record --

10   keeping purposes, I want to quickly identify Exhibit 32 lists

11   the documents that you've reviewed; is that correct?

12           There's a notebook on the -- there's supposed to be a

13   notebook there.

14           MR. FRICKLETON:  May I, your Honor?

15           THE COURT:  Yes, you may.

16           (Document tendered.)

17   BY THE WITNESS:

18   A.  Yes.

19           And, then, I would add to that the Colorado and Texas

20   letters that you gave to me subsequent to preparing this list.

21   BY MR. FRICKLETON:

22   Q.  And you've authored and we have filed two declarations,

23   and they are Exhibits 33 and 34.  And, of course, they're in

24   the court's docket record, correct?

25   A.  Correct.  I was asked to first draft something on

Klonoff - direct

 1  attorneys' fees and, then, to draft something on the fairness.

 2  Q.  All right.

 3        Let's look to the fairness issues first.

 4        Did you reach an opinion about the fairness of this

 5  settlement?

 6  A.  I did.

 7  Q.  All right.

 8        And did you analyze class action law all over the

 9  country, but, in particular, Seventh Circuit law on those

10  issues?

11  A.  I did.

12        And let me say, in terms of the ultimate opinion -- I

13  mean I recognize this is your decision, not mine.  And my goal

14  as an expert is not to opine on the ultimate questions, but

15  just to provide the basis of my experience and knowledge as a

16  scholar and a practitioner.

17        But yes, I did -- I did reach my own conclusion that

18  the settlement is fair and reasonable.

19  Q.  In that regard, there are certain criteria that we find in

20  the case law on those issues; is that correct?

21  A.  Correct.

22  Q.  And I've put up a slide with a paraphrase of those

23  criteria and I want to ask you about those.

24        First of all, is there one of those criteria that is

25  said to be the most important of the factors?

1  A.  Well, the strength of the case compared to the amount of

2  the offer is obviously of critical importance in the analysis.

3  Q.  Now, you spent a great many years defending some of our

4  largest companies in this country in class action litigation.

5  Would you just comment on the nature of the strength of this

6  case and try and do that from what the cases call an ex ante

7  basis?

8  A.  Sure.

9       Well, certainly, in terms of the argument about

10 whether the statute allowed these taxes, I think the

11 plaintiffs had a good argument that the taxes weren't properly

12 collected, the facial argument.  But it's a case that has

13 enormous complications.  The arbitration agreements.  The

14 voluntary payment doctrine is a huge problem.  The standing

15 and private right of action issues, enormously difficult.

16      So, in my declarations, I give this really a low

17 probability of success.  Less than 50 percent, very

18 conservatively.  I think this is a case AT&T could have spent

19 years litigating one issue after another, motions to dismiss,

20 motions for summary judgment, class certification issues, Rule

21 23(f) appellate issues on class certification.  This could

22 have gone on a long time, even assuming they weren't

23 successful on the arbitration.

24      So, when you look at the case -- that was really an

25 uphill battle from the beginning for the plaintiffs versus the

Klonoff - direct

1    result for the class -- I think this is an exceptional

2    settlement.  The class is getting -- has already gotten

3    going-forward relief worth about $2 billion, and they have the

4    prospect now for recovering a substantial portion of

5    out-of-pocket losses.

6    Q.   There's been substantial discussion today about AT&T's

7    arbitration provision, but included in the AT&T service

8    contract is also an anti-class action clause --

9    A.   Correct.

10   Q.   -- is that correct?

11   A.   That's correct.

12   Q.   And we know that the Court, in the last year, has issued

13   its Nielsen decision in the commercial context and there is a

14   case pending.  Did you see that as a major road block for the

15   plaintiffs?

16   A.   It was a huge problem.  And if this couldn't be done on a

17   class basis, either as a court case or as an arbitration, the

18   reality is most of these people wouldn't have pursued it and

19   most of these people would never have gotten relief.  And

20   that's why I think this is such an important settlement and

21   why I think it's such a good settlement.

22        And I commend AT&T for the way they've stepped up

23   from the beginning and have really handled this with great

24   corporate responsibility.

25   Q.   Well, you've talked about the difficulties in the case,

Klonoff - direct

1  and that needs to be compared to the proposed offer of

2  settlement.

3          Would you comment on that side of it?

4  A.  Well, as I said, the proposal is an exceptional one under

5  the circumstances.  I would have expected and probably would

6  have advised my client, if I had been representing AT&T, to do

7  no more than the going-forward relief.  And that would have

8  been terrific relief for the class.  And the fact that they're

9  doing all of these other things that we've talked about:  The

10  vendor's compensation, which is the out-of-pocket money that

11  they received for administering and collecting the taxes; the

12  costs of notice that they've spent; putting money into escrow

13  if it's required that they make the payment first; and, then,

14  the point that Sam brought out in situations where the tax

15  authority gives a credit, basically giving that money all up

16  front to the taxpayers and, if it's three years or less, at

17  full value, not discounting it and, then, discounting to the

18  present value anything beyond three years.

19          So, the class is getting recovery very quickly.  And

20  that was an important concept in the ALI.  Because, as we

21  said, this case could have gone on for many years.  Not only

22  many years of lawyers spending money, but the important thing

23  to remember is many years of AT&T collecting those taxes.

24          And, so, this settlement put a stop to that and

25  basically put a cap on the damages that were being suffered by

1    the class.

2            So, I think for all those reasons, it was really an

3    exceptional settlement.

4    Q.  One of the other criteria is to examine the amount of

5    opposition to the settlement.  What are your views on that?

6    A.  Very, very little opposition.  There were 10 objections

7    filed, I think, representing a total of 16 people, about 235

8    opt-outs.  As I presented in my declaration, usually in a case

9    like this, you'll see -- with potentially 35 million class

10   members, you'll see -- thousands of opt-outs.  In fact, it's

11   not uncommon for lawyers to go around soliciting mass opt-outs

12   where you get many, many thousands.  And it's so not uncommon

13   to have, under some of these agreements, a provision that if

14   too many people opt out, the settlement's no longer valid,

15   because defendants don't want to have another class action or

16   a whole bunch of follow-on litigation by opt-outs.

17           So, you can't read too much into these things

18   because, I mean, I get notices of class actions all the time

19   and sometimes I just don't bother.  But I do think with a case

20   this large, with -- this prominent and such a small number of

21   objections and opt-outs, that that's significant.  And I think

22   that that is some evidence that this is a fair settlement.

23   Q.  And how did you evaluate the criteria concerning the

24   opinion of competent counsel?

25   A.  You know, I give some weight to that.  I mean, obviously,

Klonoff - direct

1   you and the lawyers for AT&T have negotiated it and you want

2   it to go through.  And, so, I discount that to some extent.

3           But I think it's significant that we have 92 lawyers

4   across the country.  And that's a feature of this that, I

5   think, is a very strong feature of the settlement:  The

6   protection by having state-by-state counsel and the fact that

7   lawyers from across the country representing subclasses have

8   done their own due diligence.  I was very impressed with the

9   testimony today, for example, by the Texas and Arizona

10  counsel.

11          I think that does add.  They're officers of the

12  court.  And I think for these lawyers across the country to

13  come in and support the settlement should be given some

14  weight.

15  Q.  Is having state-specific counsel in that circumstance

16  among the things that were discussed and reported by the ALI

17  group?

18  A.  That is an important concept.  It's important -- whenever

19  you have multi-state class actions, it's important -- to have

20  representation by people who can opine and focus on particular

21  state law to avoid conflicts among the class.  And, so, I do

22  think that's an important principle and one that we refer to

23  in our document.

24  Q.  Some have criticized this settlement as being too soon,

25  with the lack of formal discovery.  What is your view on that?

Klonoff - direct

216

1   A.  We actually -- this is one of the things that I feel most

2   passionately about because this was a point we made in our ALI

3   project, which, again, got unanimous review.

4          There was a case out of the Ninth Circuit that we

5   discuss in Chapter 3 where the Ninth Circuit found to be a

6   negative factor that the settlement occurred early.  And they

7   dinged the settlement because they said it should have taken

8   longer.  And we specifically responded to that in the ALI and

9   quoted from a concurring opinion by Judge Graber on that panel

10  who said that it's a good thing to settle early, as long as

11  you've done your due diligence.

12         And, so, I think the fact that it settled quickly is

13  a good thing.  As I said, the worst thing for the class would

14  have been for this to go on for years, with these taxes being

15  assessed year after year and no payments being made.

16         So, your other question --

17         THE COURT:  Have any circuits contradicted that Ninth

18  Circuit opinion?

19         THE WITNESS:  That's the first case that I've seen to

20  actually express it in those stark terms.

21         THE COURT:  Me, too, which is why I ask.

22         Has any case come out --

23         THE WITNESS:  I haven't seen anything since then

24  that's either supported Judge Graber or the majority in that

25  case, specifically.  I'm hoping, though, that when people

1    think about the issue now, particularly given the strong

2    position we took at the ALI, that people are going to opt for

3    Judge Graber's approach.

4          I mean, it's a factual question.  In some cases, yes,

5    you might settle too early.  If there's been no discovery, if

6    it's a case that involves documents that the parties haven't

7    even exchanged and the settlement is proposed, that can be a

8    real problem.

9          But I think what I was responding to was the absolute

10   rule that the Ninth Circuit majority had that wasn't fact

11   specific.  And what Judge Graber was saying is you have to

12   look at the facts of the particular case.  And I don't -- I

13   don't know any circuit since then that's really weighed in on

14   that.  But, as I said, we think Judge Graber had it right.

15         Here, the informal discovery that was done was really

16   everything that would have been done in discovery.  I'm not

17   sure what else would have gone on for the next five to seven

18   years except litigation.  There wouldn't have been any more

19   learning.

20         And one of the reasons I was impressed with the work

21   of plaintiffs' counsel here is that they went right to the

22   business of figuring out what this case was about.  And, as

23   was said, AT&T was very forthcoming in the information it

24   provided.  If AT&T had stonewalled and you had come to the

25   Court with a settlement really not having the facts, it would

Klonoff - direct

1    be a different situation.

2           But with AT&T being very forthcoming to give the

3    information that you requested -- and it sounds like you

4    requested all of the information that you needed -- I think

5    the fact that it settled quickly is a good thing and actually

6    favors the settlement.

7    BY MR. FRICKLETON:

8    Q.   In terms of comparison to the other class action cases

9    you've been involved with and the settlements that you've

10   seen, how would you say this settlement compares.

11   A.   This is one of the best settlements I've ever seen.  And I

12   was trying to think, have I ever seen a stronger settlement

13   from the standpoint of the class?  And the only ones I can

14   think of are cases that aren't like this.

15          I would say this is the strongest consumer settlement

16   I've ever seen, in terms of value to the class.  I've seen

17   some strong employment discrimination settlements where

18   there's been structural relief that I've been impressed with.

19   But I haven't seen a case on the consumer side that's given

20   this much value to the class.

21          And one of the cardinal principles of Chapter 3 was

22   really a critique of all of the class action settlements where

23   the lawyers get a lot and the class ends up getting nothing.

24   And that was our principal goal in Chapter 3, was to figure

25   out procedures so that that would not happen.

1          And that's happened in the context of coupon

2     settlements, for example, where the lawyers count the face

3     value of the coupon in figuring out their fees.  It's happened

4     in reversionary settlements where a pot of money is created;

5     very few class members claim on the pot; the lawyers get their

6     fee based on a percentage of the pot; and, then, most of the

7     pot goes back to the defendant.  We criticize those kinds of

8     settlements.

9          I point out in my declaration that it's very rare in

10    these kinds of cases for the class to get more than 15 percent

11    of their recovery, and I cite statistics in securities class

12    actions.  This is a case that, as I've said, gives enormous

13    value to the class, the going-forward relief alone worth

14    approximately $2 billion and the chance of recovering these

15    additional amounts.  So, this is an exceptional settlement and

16    much stronger than most of the settlements that I've seen, if

17    not all consumer settlements.

18    Q.   Let's segue, then, to your views on the attorney fee

19    request.  Okay?

20    A.   Sure.

21    Q.   Did we ask you to opine on the reasonableness of the

22    attorney fee request?

23    A.   You did.

24    Q.   And have you done all of the research that you feel you

25    need to do and have you examined all of the documents that you

Klonoff - direct

1   feel you need to examine to come to such an opinion?

2   A.  I have.

3   Q.  And I don't want to be too repetitive, but you understand

4   what the papers say about the fee request?

5   A.  I do.

6   Q.  25 percent of the cash only that's recovered?

7   A.  Right.

8         And, then, it's set with the ten percent alternative,

9   which isn't going to arise here because that would only arise

10  if the refunds exceeded the amount of the going-forward

11  relief.  And I give various hypotheticals in my declaration to

12  explain that.  And, then, I use that in order to calculate

13  what the actual percentage is.

14  Q.  I've got a slide here that sort of summarizes your

15  declaration, in terms of the attorney fee opinions.  But --

16  so, let me ask you about these issues.

17        First of all, in your declaration, you state that you

18  believe that the percentage-of-fund approach in this case

19  under these circumstances is the most appropriate approach.

20        Could you explain why?

21  A.  Well, this, again, ties back to the ALI and the

22  significant work we did looking at the debate between the

23  percentage-of-fund versus the lodestar approach.  And the ALI

24  came out very strongly in favor of the percentage-of-fund

25  approach in common fund cases.

Klonoff - direct

1          The lodestar provides incentives for lawyers to keep

2    on putting in time long after they need to or should be.  It

3    doesn't really correlate with the value of what's been

4    obtained for the class.  There are a variety of criticisms of

5    the lodestar.  And we think the percentage-of-fund is a better

6    method because it best aligns the incentives of the lawyers

7    and the class.

8          There are a number of cases from the Seventh

9    Circuit -- although the court, in its opinion, says the court

10   has discretion to go either way, the recent trend in the

11   Seventh Circuit itself and in the many district courts has

12   been to prefer the percentage-of-fund approach for precisely

13   the reasons that we've articulated.

14         I view this as a fund.  It's a fund that's based on

15   two parts:  The actual money that's collected and the going-

16   forward relief.  As we point out in the ALI project and as the

17   Seventh Circuit just held in Trans Union, injunctive relief

18   can be a fund if it can be valued.  And we heard this morning

19   Dr. Landes provided testimony on how to value that going-

20   forward relief.

21         So, this is a fund by any stretch of the imagination.

22   And, therefore, my initial conclusion was that the Court ought

23   to apply the percentage-of-fund method, not the lodestar.

24   Q.  And the fee request itself, in evaluating it either as 25

25   percent of the cash or the entire fund, and to summarize what

Klonoff - direct

1    your declaration says in evaluating it, based on the entire

2    fund, the maximum fees that could ever be paid if every penny

3    of potential tax revenue was actually collected is 8.1 percent

4    of the value of the settlement?

5    A.   Correct.   That's assuming -- putting aside the portion

6    that's time barred under the statute of limitations.   What I

7    did is I figured out the rest of the amount assuming every

8    penny was recovered.   I added to that the amount of going-

9    forward relief, and then I calculated the percentage based on

10   that and it works out to about eight percent.

11         What's interesting is if you recover less than the

12   amount that I assumed, which was every penny that's not time

13   barred, the fee percentage goes down.   And I've worked through

14   that in my declaration to explain that.

15         So, eight percent is really the maximum, and it's

16   likely it will be something below eight percent.   It's really

17   important.   I get a little nervous when I hear people talking

18   about the 25 percent number because when you start talking

19   about 25 percent, you're talking about the average of common

20   fund awards, the median and mean that -- in these studies that

21   I've done.   And one of the things that so impressed me about

22   this settlement is that the actual percentage is so far below

23   the 25 percent.

24         So, I prefer to talk about the eight percent and not

25   the 25 percent, because the 25 percent is only 25 percent of

Klonoff - direct

1  the cash, but the cash is just one part of the overall

2  settlement.

3  Q.  Let's talk, then, about a maximum fee of 8.1 percent of

4  the value of the case, which may go down.

5        How does that relate to what the cases say in terms

6  of the market price for these type of legal services?

7  A.  Well, there's now overwhelming empirical work.  The

8  original, real cutting-edge work was done by Professors

9  Eisenberg and Miller and now Professor -- Professor

10 Fitzpatrick at Vanderbilt has updated that with what, I think,

11 is an even better, more comprehensive study.  He basically

12 looked at every class action settlement over a two-year

13 period.  And the statistics he came up with are in the mid-20s

14 for median and mean percentages awarded in common fund cases.

15       I distinguish in my declaration between the typical

16 case and what I call mega-fund case.  A mega-fund case is

17 somewhere in the order of a hundred million and above.  And

18 those numbers go down for mega-fund cases.  All of the

19 empirical evidence supports that.  But they're still well

20 above eight percent.  Eight percent is low, even for mega-fund

21 cases.

22       And I raise a question in my declaration about

23 whether this should even be treated as a mega-fund case,

24 because we've got 44 different jurisdictions.  Most of those

25 jurisdictions, the total amount is less than a hundred million

Klonoff - direct

1    dollars.  So, they wouldn't be treated as mega-fund cases.

2            So, whether you're looking at the largest

3    settlements -- and I give examples of cases with some of the

4    largest class actions in history.  Whether you're looking at

5    the largest class actions in history or the run-of-the-mill

6    class settlements that were the basis for the mean and median

7    figures by Fitzpatrick and Eisenberg and Miller, 8.1 percent

8    is very, very low.

9    Q.  You mentioned the subclasses and the fact that if you

10   evaluate this as 44 separate subclasses.  And I think I

11   understand you to say based on the research that's out there

12   in the published studies and the case law, a fee request of

13   8.1 percent of the total value would be very much on the low

14   end for those individual classes?

15   A.  Correct.

16   Q.  Okay.

17           In your declaration, you commented on a couple of

18   things as it relates to the attorney fees.  And one of them

19   are the benefits to the class.

20           Now, you've already talked about the benefits of the

21   class as it relates to the fairness of the settlement.  How

22   does that relate to the attorney fee issues?

23   A.  Well, obviously, you look at, you know -- in deciding

24   what's a fair percentage, you want to look at the outcome in

25   the case to give yourself comfort that this is a fair

Klonoff - direct

 1   percentage.

 2         Eight point -- eight percent fees in a settlement

 3   that doesn't really get anything for the class compared to

 4   what they could have gotten is very different than eight

 5   percent where the class is also doing very, very well.  So,

 6   that's how it ties in.  It's just an additional factor.

 7         I should go back, though.  There are several other

 8   things that weigh in on the market value --

 9   Q.  Please do.

10   A.  -- that I didn't comment on.

11         One is the contingent fee agreements.  And there are

12   several class representative documents that show contingent

13   fee agreements of -- in the neighborhood of -- 33 percent.

14   And, so, people who hired lawyers for these cases saw it being

15   perfectly reasonable to pay a third of any recovery in fees.

16         Now, the Trans Union case says that in a large class

17   action, you should only give limited weight to that.  But it

18   does have some significance.

19         The auction cases are cited by the Seventh Circuit.

20   Not nearly the body of evidence for this Court to look to as

21   you have in these empirical studies, but the Trans Union

22   district court case looked at a number of auction cases that

23   were originally discussed in a case from the District of New

24   Hampshire, and the range in auction cases was 3 to 23 percent.

25         So, the eight percent, even if you're just looking at

Klonoff - direct

1  auction cases, is comfortably on the low end of the auction

2  cases.  Most of those auction cases are securities fraud

3  cases, which, I think, frankly, are easier cases.  A lot of

4  them involve significant government work at the front end with

5  less risk, I think, going forward.

6          I handled a number of securities fraud cases.  And

7  looking at AT&T and the strength of their case versus some of

8  the issues in a securities fraud case, I would think that the

9  fees here would justifiably be higher than in a typical

10  securities fraud case.

11          So, those are the main things, I think, that would go

12  into the market value of services.

13          I would only note one other thing on this market

14  value approach; and, that is, that the Seventh Circuit, more

15  than any other circuit, in my judgment, has worked hard to

16  make sure that the fees are fair.  And, so, you see something

17  you don't see often in other circuits.  You see a number of

18  cases where the Seventh Circuit has actually reversed the

19  district court for not awarding enough fees.  The Sutton case

20  is an example.

21          And that's driven by the market approach.  I think

22  that the philosophy that the Seventh Circuit has adopted is

23  lawyers should be treated fairly for the work that they've

24  achieved for the class and there shouldn't be any arbitrary

25  cap or limit on attorneys' fees.

Klonoff - direct

1  Q.  One other question in that regard, Dean Klonoff, and it

2  relates to this concept of incentives.

3        How does the fact that the only way any lawyer is

4  going to get paid in this case is to make sure that money is

5  recovered from the states, how does that play into the

6  incentive to proceed forward and the reasonableness of the

7  fee?

8  A.  Well, it's exactly what I talked about with our ALI

9  project wanting the lawyers' interests to align with those of

10  the class.  I mean, you have a goal of recovering every penny

11  because you're going to get part of that, and that's exactly

12  what you want in a settlement like this.  You want the lawyers

13  to continue to do the hard work, to not drop the ball after

14  the settlement.

15        This is an unusual feature of the settlement.  In

16  most class action settlements, the only thing that remains

17  after the court approves a settlement is administering the pot

18  and distributing it.  Your job is much more difficult, and

19  that's why -- one of the reasons why -- I said I didn't think

20  a lodestar cross check made sense here:  Because we have no

21  idea how many more hours are going to be necessary.

22        Your interest is in litigating however you have to --

23  Grant Woods described it so well -- to make sure, whether it

24  means going to the high court of the state, that you're going

25  to pursue those funds.  And that's exactly what you need

Klonoff - direct

1    lawyers to do if they're going to adequately represent the

2    class.

3    Q.   Now, Dean Klonoff, do you have an opinion about the

4    reasonableness of the incentive payments that have been

5    requested for the class representatives?

6    A.   I do.

7    Q.   Could you explain that, please?

8    A.   I think they're reasonable under the circumstances.  We're

9    talking about, in the scheme of things here, given the

10   benefits that have been achieved for the class, a very small

11   amount of money.  In the empirical work that I cite in my

12   declaration, the average incentive payment is around $16,000.

13   The median incentive payment is about 4,000.  So, we're right

14   in the ballpark.

15        You can't have a case without clients.  You needed

16   people from every jurisdiction in order to pursue the case,

17   which you have.  These people, at the beginning, had no idea

18   what they'd be required to do, but they agreed to step up and

19   participate in discovery; to be here today, as we had one

20   appear; and, to do whatever it took to make sure that the

21   settlement achieved the result for the client.

22        I think it's easy administratively in these

23   circumstances to have one amount applying across the board,

24   rather than to have lengthy hearings to figure out if somebody

25   should get 4,000 or 6,000.  And I've cited examples of courts

Klonoff - direct

1   that do that.

2           So, given the history of class actions where

3   incentive payments of this amount have been awarded, and given

4   the commitments that the class made, and given the fact that

5   they facilitated bringing this case in the first place, I

6   think those are reasonable.

7   Q.  One final area, Dean.

8           Did you look at the objections that were filed with a

9   critical eye to evaluate whether any of the issues raised

10  might affect your opinion?

11  A.  I did, very carefully.  And, in fact, I wanted the Court

12  to know I looked at them carefully.  So, I addressed every

13  single objection myself.

14          And without going through each one, what struck me

15  was that -- and this is -- again, this is -- a big theme in

16  our ALI project.  You want objectors that are going to improve

17  the settlement.  I didn't see anything in the objections that

18  was an "ah-hah" for me, that this is a great idea that would

19  make the settlement so much better.

20          A lot of the things that the objectors were arguing

21  about were things the Court had already ruled upon.  They were

22  just relitigating issues, such as the fact that AT&T could

23  start collecting taxes, again, whenever it wanted.  The Court

24  already addressed that.

25          One objection said that attorneys' fees should be

Klonoff - direct

1    capped at a hundred thousand dollars.  I mean, that position

2    is really sanctionable, given Seventh Circuit law that I

3    described, that in a case involving billions of dollars, fees

4    should be capped at a hundred thousand dollars.

5         So, I didn't really see anything that I thought, as

6    an expert, that I would urge the Court to take into account

7    and rely upon.

8         And I've had -- as a lawyer for defendants, I've had

9    -- objectors who have made meaningful contributions and have

10   had no problem in the end, as part of the settlement, asking

11   the Court to allow them to get some of the proceeds because of

12   the significant impact they've had on improving the

13   settlement.

14        But I just don't see here any of the objections

15   coming up with things that would improve the settlement.  In

16   fact, what I see is that what if the Court were to agree with

17   the objections and invalidate the settlement, the end result

18   would be the class would suffer.  Because of the 36 million

19   people, I would say you probably have hundreds at most that

20   would pursue the arbitration or other remedies.  The rest

21   would be left without anything.

22        So, I was not persuaded by the objections.

23   Q.  Thank you, Dean.

24        MR. FRICKLETON:  Nothing further, your Honor.

25        THE COURT:  Did you look at the objections from the

Klonoff - direct

1   states, as well, including the two that were received

2   yesterday?

3           THE WITNESS:  I did.  I don't know if the ones you're

4   mentioning yesterday were the ones that I already had.  I had

5   the Colorado letter and the Texas letter.  And I'm not sure

6   which ones came in yesterday.

7           THE COURT:  Did you give him the ones that were --

8   that I gave you this morning?

9           Colorado was one.  It was their second letter,

10  though.

11          THE WITNESS:  Oh, no, I haven't seen it.

12          THE COURT:  And Ohio was the other one.

13          THE WITNESS:  I haven't seen that, either.

14          MR. FRICKLETON:  No.

15          THE COURT:  Let him read those.

16          And if you need another copy, I can get it.

17          Let us do cross-examination first and, then --

18          THE WITNESS:  Sure.

19          THE COURT:  -- before you leave today, I would like

20  you to read those and see if that changes any of your

21  opinions.

22          THE WITNESS:  Sure.  Absolutely.

23          THE COURT:  Cross-examination?

24          MR. WALSH:  Yes, your Honor.

25          THE COURT:  Mr. Walsh, go ahead.

1    CROSS-EXAMINATION ON BEHALF OF ANGELA VRANA AND BARBARA FISHER

2    BY MR. WALSH:

3    Q.  Good afternoon, Dean.  How are you?

4    A.  Good afternoon.

5    Q.  I just had a few questions for you.  Let's start in the

6    area of opt-outs.

7         An AT&T customer like my clients, Ms. Vrana and

8    Fisher, as long as they meet the class definition, they're

9    class members as long as they don't opt out; isn't that

10   correct?

11   A.  Correct.

12   Q.  And Rule 23(e)(5) provides that any class member may

13   object to a settlement; isn't that correct?

14   A.  Unless you opt out.  You have to do one or the other.

15   Q.  Right.

16        But my clients didn't opt out.  Therefore, they have

17   the right to object; would you agree with that?

18   A.  Sure.

19   Q.  Okay.

20        And it doesn't provide an exception to the right to

21   object when the class members could have opted out of the

22   class, does it?

23   A.  No.  You have a perfect right to be here and question me,

24   and we acknowledge that in the ALI project.

25   Q.  Okay.

Klonoff - cross by Walsh

1          And -- well, I think you answered that question.  I

2  can skip along here a little bit.

3          So, you're not saying in any way that a failure to

4  opt out constitutes a waiver to object to a class action, are

5  you?

6  A.  No, not at all.

7  Q.  Okay.

8          And you raise in your declaration several times, in

9  response to my clients' objections, that they could have opted

10  out.  But you're not claiming that they, therefore, waived

11  their objections, are you?

12  A.  No, not at all.  The point I was making -- and this -- I

13  don't remember whether this goes to your specific objections.

14  But some of the objections where they're claiming, for

15  example, that under Texas law there's going to be no recovery,

16  I don't know why a lawyer would advise their client to stay in

17  a settlement like that.  I mean, if -- or there was -- this

18  may have been yours, where you're saying that the right of

19  arbitration was undercut.  I think that was your objection.

20  Q.  Actually, both of those were mine.

21  A.  Okay.

22          Well, I mean, if I were advising a client and I

23  thought arbitration was better, your premise is that

24  arbitration is better than litigation.  If I believe that, I

25  would advise my client to opt out and pursue arbitration.

Klonoff - cross by Walsh

1      So, the point I was making is not that you've given

2  up any rights to object by not opting out, but if you truly

3  believed some of the positions that you've taken in your

4  objections, in my judgment, the better approach would have

5  been to opt out rather than to take a chance that the Court

6  was going to approve a settlement which you claim is going to

7  be disadvantageous for your clients.

8  Q.  Okay.

9      Let's talk a minute about my objections.  We objected

10  that the alleged payments from Texas are illusory and that you

11  responded at Paragraph 46 in your latest declaration that was

12  filed on the 8th, I believe.  You said, "In all events, if

13  this possibility that Texas tax authorities would not treat a

14  payment into escrow as a refund concerned them, objectors

15  could have opted out of the class."

16      And just to be clear for the record, you're not

17  claiming that my clients waived any objection by not opting

18  out?

19  A.  No, not at all.  No.

20  Q.  Thank you.

21      And the fact that the -- that my objectors could have

22  opted out has no other relevance to the merits of their

23  objections, does it?

24  A.  Well, I want to emphasize at the beginning, I'm not saying

25  anything at all about you personally.  But in my experience in

Klonoff - cross by Walsh

1    these cases, when objectors come in and take positions that I

2    don't think are meritorious and if they were meritorious, the

3    logical approach would be to opt out, it's often a red flag to

4    me that what's really going on is the objector lawyer is

5    trying to get fees in the case.

6         And we deal with that in our ALI project.  We

7    distinguish between good objectors and we give examples, like

8    public citizen is a great example of an objector that comes in

9    and really tries to make the settlement better.  And, then, we

10   give examples of bad objectors.  And we encourage courts as an

11   institute to be more aggressive in sanctioning lawyers who

12   bring objections that are without merit in the hope that

13   they're going to get fees.

14        And I've seen this happen many, many times as

15   counsel.  I've had cases where I've been up past midnight with

16   objectors who were trying to get payoffs to go away.  And I

17   think that's an abuse of the objector process.

18        And, again, I'm not at all making any accusation

19   against you.  But it often is a red flag when somebody makes

20   objections and they don't just opt out their clients.  Because

21   if I'm a lawyer, my number one interest is representing my

22   client.  And if I'm coming into court saying they're going to

23   get zero under a settlement and could do really, really well

24   with arbitration, why am I giving up arbitration?

25        So, that's the point I was making there.

Klonoff - cross by Walsh

1   Q.  Okay.

2           I believe you mentioned the Trans Union case just a

3   minute ago.  That was the case that was in Judge Gettleman's

4   court?  Is that the one you were referring to?

5   A.  Yeah.  It was just decided about a month ago --

6           THE COURT:  January.

7           THE WITNESS:  Yeah.

8   BY THE WITNESS:

9   A.  -- two months ago -- by the Seventh Circuit.

10          And it was -- there was a lengthy analysis by the

11  special master, and then it went to the district court, who

12  reversed the special master.  It's a rather complicated

13  procedure.  But it ended up, I think, having instruction for

14  this particular lawsuit.

15  BY MR. WALSH:

16  Q.  And are you familiar with what the original settlement in

17  the Trans Union litigation was?

18  A.  I'd have to go back and look at the case.  I can't give

19  you the terms off the top of my head.

20  Q.  Are you aware that the Seventh Circuit recently ruled in

21  that case at 629 F.3d 741, that the case was originally

22  settled for $40 million, but as a result of an objection to

23  that settlement, the new settlement was for $110 million?

24  Were you aware of that?

25  A.  I wasn't.  It doesn't surprise me.  As I said, there are

Klonoff - cross by Walsh

1   good objections.  And all power to objectors who can do things

2   like that.

3        I don't see any -- I haven't seen a single objection

4   here that says if you had done X, you could have recovered a

5   lot more money and the defendants would have agreed to it.

6        But I have no doubt that happens, and that's a good

7   thing when it happens.

8   Q.  Right.

9        So, you're not disputing in any way it's possible for

10  a class to receive a benefit because someone has objected?

11  A.  Oh, we say that directly in the ALI, and we say that

12  objectors who achieve a positive benefit for the class should

13  be compensated.

14       In fact, if I could just add to that, we go even

15  further than that for the first time, because there was

16  something that had bothered all of us reporters in the law;

17  and, that is, if you're too good at objecting and the whole

18  settlement unravels, then you don't get anything because

19  there's no pot to share from.  And, so, one of the things we

20  did in our ALI project is to create a procedure where if a

21  lawyer objector is successful in actually invalidating the

22  entire settlement, they can still go in and get fees.

23       So, we absolutely believe that in some cases,

24  objectors can make a positive difference.

25  Q.  Let's move to the Texas refund claim for just a minute.

1        The settlement basically eliminates AT&T's liability

2   in exchange for a potential recovery from states or other

3   taxing authorities.  Is that the gist of the settlement?

4   A.  Right.

5   Q.  And at Paragraph 46 of your declaration, you state that,

6   "The Vrana objection also expresses concern the settlement

7   does not comply with Texas law, which they assert requires the

8   party that collected the taxes to refund the taxes before

9   seeking a refund from the state."

10        By saying the words "they assert," are you

11  disagreeing with the assertion that Texas law requires AT&T to

12  refund the taxes to class members before it can receive

13  anything?

14  A.  Well, I'm not an expert on Texas law.  All I was saying

15  was that this is your argument that somehow this settlement is

16  not going to be effective in allowing recovery for the class

17  because the money actually has to be turned over as opposed to

18  being put in an escrow account.

19        I was impressed with the testimony of the Texas

20  lawyers, and it sounds like that issue has been thoroughly

21  investigated by Texas counsel.  And, frankly, I was struck

22  that you didn't have any questions for her about that, because

23  that would have been the place to flesh it out, not with me,

24  because I had not at any time purported to be an expert on

25  Texas law.

1   Q.   Okay.

2           So, when you made your declaration, you didn't do any

3   investigation of whether or not our assertions as to Texas law

4   were correct?

5   A.   No.

6   Q.   Okay.

7           And you weren't aware that under the Texas Tax Code,

8   Section 111.104(f), that AT&T may not obtain a refund unless

9   it has "refunded all the taxes and interest to the person from

10  whom the taxes were collected"?

11  A.   Well, you're asserting that, but the Texas counsel

12  determined that the law was just the opposite.  And we've

13  heard testimony from Chip and testimony from the Texas lawyer,

14  none of whom were challenged by you.  So, if you believe that

15  the law is otherwise -- I certainly wasn't persuaded by what

16  you wrote that that was the law.  I mean, it was just a

17  conclusory comment.

18          If you really wanted to pursue that, I think the

19  people to ask would have been the Texas counsel and

20  Mr. Robertson, who really had looked into this issue.

21  Q.   Well, to your knowledge, though, AT&T is not actually

22  paying any money directly to class members under settlement

23  until the State of Texas refunds something to them?

24  A.   Well, they're putting it in an escrow account, which has

25  -- functionally, that's what an escrow account is.  I mean,

Klonoff - cross by Walsh

1    this made perfect sense to me that this is the way for AT&T to

2    comply with the law and at the same time have some protection.

3          It's how real estate transactions are conducted.

4    This was a very clever but, I thought, straightforward use of

5    an escrow account.  And I know the Court addressed it in her

6    original opinion, as well, and discussed it.  It didn't raise

7    any red flags for me.

8          And all I'm saying is I didn't see from your

9    submission anything in Texas law that suggested that it

10   wouldn't work.  And I heard testimony from the Texas lawyers

11   that they looked into this very carefully.  And I think that

12   she was probably right that you wouldn't have gotten all these

13   lawyers to sign up for all that's involved in this case that

14   the lawyers have to do if they thought that it was a

15   non-starter because of some provision of Texas law.

16   Q.  Let's talk about that escrow account for a minute.

17         Do you have any knowledge about how the escrow

18   account works?

19   A.  Just what I've read in the agreement.  I certainly don't

20   have the working knowledge that the lawyers for the class

21   have.

22   Q.  Fair enough.

23         Is it your understanding -- who do you understand to

24   have an interest in that escrow account?  AT&T or the

25   consumers?

Klonoff - cross by Walsh

1  A.  Well, both.  I mean, the purpose of an escrow account is

2  that everybody has some protection.  So, in effect, this is --

3  this ought to convince the state that there's a genuine, good-

4  faith attempt to reimburse the class members.  AT&T still has

5  an interest, as well.  I mean, that's how escrow accounts

6  work.

7          I'm in the process of buying a piece of property

8  right now, and the title company is holding escrow in case

9  there are any disputes over the property.  So, I would say we

10 both have an interest in it.  But I feel very good knowing

11 that that money is being held in a third party's hands, even

12 though the seller also has an interest in that account.

13 Q.  Isn't it true in this particular instance, though, whether

14 or not the money is refunded by the State of Texas, the escrow

15 money goes back to AT&T?

16          Maybe I should break that up into two parts.

17          Let's say that this escrow money is sitting there in

18 the account.  It's ultimately decided by the State of Texas

19 they're not going to pay a dime.  What's your understanding

20 happens to the money that AT&T has put in that escrow account?

21 A.  I think that it would go back to the state.  But I think

22 if the state pays, then AT&T gets its money back, but the

23 class is compensated, as well; and, that's what it was

24 designed to do.

25 Q.  But with the escrow account, in any event, whether a

Klonoff - cross by Walsh

1  payment is made by the State of Texas or not, the money that's

2  in escrow goes back to AT&T; isn't that correct?

3  A.  Right.  But in my real estate transaction, the money is

4  going to go to the seller.  I mean, there are very few

5  circumstances where it would go to the buyer.  I don't see any

6  difference between this escrow account and what it's designed

7  to do than your typical escrow account.

8  Q.  Well --

9  A.  It's not a freebie for AT&T, in the sense that the whole

10  purpose of it is to provide assurances to the state so that

11  the state refunds the money and, then, that money goes to the

12  taxpayers.

13  Q.  However, if the state required the money to be refunded to

14  the consumer before a state would refund AT&T, isn't it just

15  illusory to say that there's an escrow account where money

16  doesn't change hands except from AT&T back to AT&T?

17  A.  Well, it's not illusory to say there's an escrow account.

18  I guess what you're --

19  Q.  Fair enough.

20  A.  -- saying is, is that escrow account doesn't qualify under

21  Texas law as payment to the taxpayers.

22  Q.  Correct.

23          But you don't have an opinion whether or not the

24  payment to that pre-refund escrow account would satisfy

25  Texas -- the Texas tax code, do you?

Case: 1:10-cv-02278 Document #: 257 Filed: 09/02/11 Page 243 of 312 PageID #:5568
Klonoff - cross by Walsh
243

1   A.  No.  I'm not an expert on Texas law.

2   Q.  And you haven't done any research to look into that, have

3   you?

4   A.  No.

5   Q.  You did mention you had reviewed the letter from the Texas

6   Attorney General's Office, Doc. 158 in this case, I believe?

7   A.  I don't know what document number it is.  It was the

8   lengthy -- the lengthy letter.  I looked at that, and I looked

9   at the one from Colorado.

10  Q.  Okay.

11          In your review of the letters received from the --

12  that was received from the Texas Attorney General's Office,

13  were you aware that Texas has taken the position that the

14  settlement structure does not constitute a payment to the

15  customers from whom the taxes were collected?

16  A.  Well, I'm not surprised at all that states are going to

17  take whatever positions they can to hold onto their money.

18  So, that doesn't surprise me.  I don't think it affects the

19  outcome here.  I don't think this is an official position of

20  the state, and it certainly isn't binding as this case

21  proceeds and appeals are taken.

22          I think Grant Woods gave a really insightful account

23  of how this all plays out.  And, so, that's why I don't give

24  too much weight to these letters.

25  Q.  Okay.

Klonoff - cross by Walsh

1        Assume that the State of Texas takes the position

2   that they're never going to pay this money and they're just

3   not going to pay it to the consumers.  Would that change your

4   opinion regarding whether Texas class members are going to

5   receive the benefit in this case?

6   A.  Well, I don't know.  It depends on what the Texas courts

7   decide.

8   Q.  Fair enough.

9   A.  Just because the State of Texas as a litigant takes a

10  position doesn't mean it's right.

11  Q.  Let's talk a little bit about the future relief in this

12  case.  I believe you had a different name for it.  I want to

13  use your terminology.

14  A.  Going forward.

15  Q.  The going-forward relief.

16       As you stated in Paragraph 47 of your declaration,

17  you agree that Paragraph 8.2(b) of the settlement allows AT&T

18  to resume collecting taxes only if, "federal, state or local

19  laws, statutes, regulations, administrative decisions,

20  pronouncements or the interpretation of any of the foregoing

21  specifically requires, authorize or permits the collection and

22  payments of Internet taxes."

23       So, did you agree with that statement that was in the

24  settlement agreement?

25  A.  Well, I agree with the Court's analysis of that term and

Klonoff - cross by Walsh

 1   what I said previously:  That I don't think it allows AT&T

 2   tomorrow to start collecting taxes, again.  I think it was

 3   just in there so that if the law is changed, then they're

 4   authorized to resume.

 5          I don't think AT&T has any strong interest, by the

 6   way, right now in starting to tax, again.  I mean, it's a

 7   competitive industry and the last thing they want to do is be

 8   taxing and turning over money to the state and raising the

 9   price of their service.  They're just going to have other

10   people looking at their bills and switching companies or

11   having their auditors question it.  They wouldn't want to do

12   that.

13          That was a logical provision, in my judgment and what

14   the Court said, just in anticipation that the law does change,

15   and no more.

16   Q.  But that provision in the settlement agreement doesn't say

17   whose interpretation, does it?

18   A.  What do you mean whose interpretation?

19   Q.  Well, for instance, it doesn't limit the interpretation of

20   those tax provisions to a governmental entity's

21   interpretation, does it?

22   A.  I could be -- I could assure you that if AT&T just makes a

23   bogus interpretation and starts taxing, again, there are going

24   to be plenty of lawyers out there willing to bring another

25   case.  So, I doubt if they're willing to go out on a limb,

Klonoff - cross by Baumkel

 1   unless the law is pretty clear.

 2   Q.  Dean, thank you for your time.  I'll pass you on to the

 3   next guy.

 4   A.  Thank you.

 5          THE COURT:  Further cross-examination.

 6           CROSS-EXAMINATION ON BEHALF OF KAREN WIAND

 7   BY MR. BAUMKEL:

 8   Q.  Whether you or -- I'm sorry.  Good afternoon, Dean.

 9   A.  Good afternoon.

10   Q.  Whether you or class counsel or anybody else agree with

11   these various states who have expressed these concerns, you're

12   aware now that they have expressed those concerns?  You've

13   seen at least some of letters, haven't you?

14   A.  Are you talking about the states or about the objections,

15   generally?

16   Q.  The states.

17   A.  The states, yes.  Yeah, I've seen -- as I said, I had seen

18   the original Texas and Colorado letters.

19   Q.  And you've heard today that there are other letters, also?

20   A.  I did.

21   Q.  So, did you look at those portions of class counsel's

22   brief where they said that I was a cynical chicken little for

23   expressing a concern that states would likely rise up and

24   express concerns about funding this settlement?  Did you read

25   those portions of the various briefs?

Klonoff - cross by Baumkel

1   A.   You're talking about the classes?

2   Q.   Yes.

3   A.   If this is something that was just filed, I didn't.   I

4   read the brief they filed in support of the fairness.

5        Are you talking about something that was just filed?

6   Q.   No, no.   This has been in the briefs all along.

7        You don't recall ever reading about that?

8   A.   You mean just a general language that you're being overly

9   concerned?

10  Q.   Well --

11  A.   About --

12  Q.   I don't know that we need to belabor it.   I guess it's

13  more of a rhetorical question.

14       These cases that you identified that you've been

15  involved with -- the St. Paul case, was that a settlement?

16  A.   No, that one was not.

17  Q.   The Dole Foods case, were you involved in a settlement in

18  that case?

19  A.   Yeah, there were -- parts of that case did settle.   We had

20  a settlement program.   I was involved in the Attorney General

21  tobacco settlements.

22       The EDS case, which was one of the largest class

23  actions I did, I was extensively involved in settlement.   I

24  argued the issues before the Fifth Circuit.   In fact, we

25  discussed that case in our ALI project as a settlement class.

Klonoff - cross by Baumkel

1    I've settled securities cases.  The Lowin (phonetic)

2    case that I mentioned, which was styled In Re Monumental Life,

3    I settled that case on a class basis.  I mentioned the D.C.

4    prisoners case that I settled on a class basis.  The

5    employment cases, which were ADEA cases -- collective action

6    cases -- I participated in extensive settlement proceedings

7    there in the form of ADR.

8        So, I've had vast experience personally settling

9    cases and arguing on behalf of settlements.

10   Q.  How many cases have you settled where you were one of the

11   plaintiff counsel?

12   A.  One of the plaintiff counsel?

13   Q.  Yes.

14   A.  Just the prisoner case.

15   Q.  And what was the gravamen of the damages or relief in that

16   case?

17   A.  In the prisoner case?

18   Q.  Yes.

19   A.  Money.  Money to the class members.  And I -- after the

20   money was distributed, I was contacted daily for many months

21   by prisoners wanting me to take on other cases.  So, they

22   obviously were happy with the recovery that they got.

23   Q.  So, they got a recovery?

24   A.  They did.  But it was pennies on the dollar.  It was a

25   tiny fraction.  And this is -- you know, it's interesting that

Klonoff - cross by Baumkel

1   you mention that case.  This was my first class action.  And I

2   got asked to take over this case when the other lawyers left.

3   And it was a case that really was not all that strong of a

4   case to begin with.  And it had gone on for years and trained

5   legions of lawyers in the D.C. government, putting up every

6   stonewall possible.  It was, to me, a model of class actions

7   gone wrong.

8           And I settled it.  I settled it for pennies on the

9   dollar because it was just bleeding my law firm.  It was a pro

10  bono case.  Nothing was happening.  The judge was getting

11  frustrated.  And I thought this was a good resolution.

12          But would I compare that settlement to this one?

13  It's not even close.  It was pennies on the dollar.

14  Q.  Okay.

15          Well, I was trying to find out which of the cases

16  that you've been involved with where you were a plaintiff

17  lawyer and you settled a case that had any kind of factors

18  that are at issue here.

19          Are there any?

20  A.  That had, what?

21  Q.  Any factors that are at issue here.

22          Have you ever been a plaintiff lawyer --

23  A.  Well, when you say "factors at issue here," Rule 23(e)

24  governs all class settlements.  And, so, all of the issues are

25  relevant in terms of the fairness.  Circuits differ on how

Case: 1:10-cv-02278 Document #: 257 Filed: 09/02/11 Page 250 of 312 PageID #:5575
Klonoff - cross by Baumkel
250

1  they articulate that.  But fairness, that was the principal

2  issue in the EDS case.

3  Q.  Were you ever a plaintiff lawyer in a case that settled

4  where somebody other than the defendant paid the money for

5  funding the settlement?

6  A.  No.

7  Q.  Do your ALI notes identify any such cases?

8  A.  Although I must say that isn't exactly what this

9  settlement is.  I think, as I've pointed out and as the other

10  testimony has made clear, AT&T is putting up a lot of money

11  here.  So, it isn't -- to describe this as a settlement where

12  some third party is paying it all is simply not an accurate

13  portrayal of this settlement.

14  Q.  Are there cases -- are there states, rather -- within the

15  settlement group here where the funding to class members

16  depends on whether those states provide funds into the

17  settlement?

18  A.  That's true for all of them.  I mean, in terms of the

19  monetary piece, it depends on whether or not --

20  Q.  The states --

21  A.  -- the class --

22  Q.  -- the third party --

23  A.  Yeah.

24  Q.  -- pays the money?

25  A.  For that -- for that piece of it.

Klonoff - cross by Baumkel

1  Q.  Have you ever -- do your ALI notes have any cases where

2  the defendant -- where somebody other than the defendant paid

3  the money that the settlement was funded with?

4  A.  I don't know of another case like this.  This is -- here's

5  what's unusual about this case --

6  Q.  Well, that's what I was getting at.

7  A.  No.

8  Q.  There are no others, are there?

9  A.  Right.  And that's why I was so impressed with this.

10  Because I think they did such a creative job in reaching the

11  settlement here.  What's unique about this case, contrary to

12  every other class action that I've handled for the defendant,

13  is that the defendant didn't profit here.  That's the key.

14  That's what I think you're missing in all of your questions.

15        In most cases, it makes perfect sense to say the

16  defendant should disgorge its wrongful profits.  This was a

17  pass-through.  AT&T collected the money and, other than these

18  small fees, they got nothing out of this.  So, the idea that

19  they should be ponying up billions of dollars and that the

20  settlement isn't fair because they're not paying billions of

21  dollars out of AT&T's coffers is simply unrealistic and

22  doesn't really grapple with the nature of this case.

23        So, the reason I can't give you a case like that is

24  because I don't know of another case where a defendant is

25  being held responsible where all of the profit has gone

Case: 1:10-cv-02278 Document #: 257 Filed: 09/02/11 Page 252 of 312 PageID #:5577
Klonoff - cross by Baumkel
252

 1   somewhere else.

 2   Q.  I very much appreciate the objective, neutral assessment

 3   of this entire litigation.

 4        But all I was trying to explore is whether, in all of

 5   your very distinguished experience, you've ever encountered in

 6   your ALI notes or your research a paradigm like this one.  And

 7   I'm gathering no, you haven't.

 8        Is that correct?  That's my only question.

 9   A.  That's correct.

10   Q.  Were you in court earlier today when the chart was up that

11   showed how many millions of dollars in Internet access fee

12   taxes were paid farther back than the average statute of

13   limitations applicable to refund claims?

14   A.  Yes.

15   Q.  So, if a class member objector -- let's call that person

16   Mrs. Wiand -- argued from the beginning of these proceedings

17   that it was not very good to have a settlement that purported

18   to go back to 2005, but yet cut out all those funds, that

19   objector was advocating to improve the pot; wasn't that

20   objector?

21   A.  It may be.  I mean, I --

22   Q.  Well, why did you say that you saw nothing in any of the

23   objections where there seemed to be any concern about

24   improving the settlement?

25   A.  Because I didn't see that in the papers that you talked

Case: 1:10-cv-02278 Document #: 257 Filed: 09/02/11 Page 253 of 312 PageID #:5578
Klonoff - cross by Baumkel
253

1  about.  There were some questions that you raised about that

2  you were the one who surfaced the statute of limitations as an

3  issue.  And Mr. Robertson wasn't even able to confirm that

4  that was something you did.  I don't have any knowledge if

5  that's something you did.

6          And I'll say the same thing to you that I did to the

7  other counsel.  I'm not in any way impugning you personally.

8  I'm talking about my experience generally in class actions.

9          If you've done something that's meaningful for the

10  settlement, then by all means, you're entitled to go to the

11  Court and seek compensation.  I just didn't see anything in

12  the papers that I thought was helpful.

13  Q.  Whoa.

14  A.  And, in fact --

15  Q.  Whoa.

16  A.  If I could just --

17  Q.  I haven't asked for compensation.  My question isn't

18  designed --

19  A.  If I could just finish.

20  Q.  -- to justify compensation.

21          THE COURT:  Wait.  Mr. Baumkel, let him finish his

22  answer, please.

23  BY THE WITNESS:

24  A.  In fact, I've read all of your pleadings.  Not just the

25  latest objection, but all these pleadings back and forth where

1    you use just the worst ad hominem language that I've ever

2    seen -- that I tell students never to use in a brief -- that,

3    I think, is really counter productive in this process.  And

4    what you keep asking for is that the Court unravel the

5    settlement.

6            And, as I said, I think that would be a true

7    disservice to the class.  And, so, that's where I disagree

8    with you.  If you were coming in with something that was

9    creative to fine tune this, to make it work better or more

10   efficiently, I would be in here, you know, as your champion

11   for fees.

12   Q.  I'm not asking for fees or for you --

13   A.  Well, I'm --

14   Q.  -- to be my champion.

15   A.  But I don't -- I don't know what you're asking for.  But

16   my point is --

17   Q.  I'm asking you a question --

18           THE COURT:  Mr. Baumkel, please let him finish.  You

19   both cannot talk at the same time.  You make Joe's difficult

20   job ten times harder when you do that.

21           MR. BAUMKEL:  You're right, your Honor.  I apologize.

22           THE COURT:  I am always right in here.  But on this

23   one I am definitely right.

24           (Laughter.)

25           MR. BAUMKEL:  I just wanted you to know that I

Klonoff - cross by Baumkel

 1  agreed.  I know you're right.

 2          THE COURT:  Please let Professor -- or Dean --

 3  finish.

 4  BY THE WITNESS:

 5  A.  So, all I was saying is from what I read of what you

 6  wrote, I didn't see anything that I thought would improve the

 7  settlement.

 8  BY MR. BAUMKEL:

 9  Q.  Okay.

10  A.  I may be wrong.

11  Q.  So, if additional monies were obtained to cover the period

12  that goes back beyond the statute of limitations -- if as you

13  take, again, a great leap of faith that in my first pleadings

14  I advocated that, at a minimum, AT&T should step into that

15  breach -- if that had happened, that would have been an

16  improvement, wouldn't it?

17  A.  If you're expanding the pot, that's an improvement.

18  Q.  Okay.

19          You were present when Mr. Woods was testifying,

20  weren't you?

21  A.  Yes.

22  Q.  And do you remember him testifying to the effect that AT&T

23  wasn't really acting out of malfeasance, that these tax

24  collections were simply a mistake?  Do you remember --

25  A.  Sure.

Klonoff - cross by Baumkel

1  Q.   -- him testifying --

2  A.   Yeah.

3  Q.   -- to that effect?

4  A.   Sure.

5  Q.  So, given that the impression, apparently, of class

6  counsel is that this was just a mistake, not malfeasance,

7  wouldn't you surmise when that mistake was pointed out --

8  "Hey, this is illegal, AT&T" -- that they would, of course,

9  stop doing it?  They wouldn't need to go through federal court

10  litigation to stop doing that?

11  A.  You've used in several of your briefs this idea that it

12  was illegal, that it's criminal and, therefore, it's not

13  consideration.  I don't see how you could plausibly say that

14  anyone here committed a crime.  If it wasn't for this law

15  firm, millions and millions of people -- including AT&T, its

16  legions of lawyers in states across the country -- all thought

17  this was perfectly acceptable, notwithstanding the federal

18  statute.  I could certainly tell you that as a former

19  prosecutor, I would not prosecute somebody here for a criminal

20  violation.

21       I think AT&T acted in good faith from everything that

22  I've seen.  And when it was pointed out to them they made a

23  mistake, they stepped up in a responsible way to correct it.

24  And to use the word "crime" in that context to me just makes

25  no sense at all.  It is as far from a crime as anything I

1    could imagine.

2    Q.  Okay.

3         Well, now we can talk about my question.

4         THE COURT:  Mr. Baumkel, I'm sorry, do you have a lot

5    more left?  I need to give Joe a break in a minute.  I have

6    been --

7         MR. BAUMKEL:  I don't.

8         THE COURT:  -- pushing him for over two hours.

9         MR. BAUMKEL:  I don't, and I am sensitive to that.

10   So, let me -- I just have a very --

11        THE COURT:  You can take as long as you want.

12        MR. BAUMKEL:  I understand.

13        THE COURT:  But if it is going to be a lot longer, we

14   are going to break and come back.  I am not trying to cut you

15   off.  I am just --

16        MR. BAUMKEL:  I know.

17        THE COURT:  -- sensitive to Joe's --

18        MR. BAUMKEL:  So, if I say it's just going to be a

19   few more minutes --

20        THE COURT:  Let us try a few more minutes.  And if

21   not, then we will break and we can come back and you can

22   finish, if you need to.

23   BY MR. BAUMKEL:

24   Q.  So, my question was not for you to go off into a diatribe

25   about your assessment of all my filings in this case.  But my

Klonoff - cross by Baumkel

1   question is:  If we take Mr. Woods at face value that this was

2   just a mistake, wouldn't you surmise that upon pointing out

3   the mistake, that would be the end of the mistake?

4   A.   In terms of --

5   Q.   AT&T collecting the tax.

6   A.   Well --

7   Q.   It was just a mistake, right?

8   A.   Well, I think they have argu- -- legal arguments that they

9   could make.  I mean, it's -- you know, in my experience in

10  litigation, if somebody points out something to you, you don't

11  just say, oh, my gosh, and throw in the towel.  They had a lot

12  of arguments.  There was a lot of -- there were a lot of

13  hurdles between the beginning of this case and a successful

14  outcome for the plaintiffs.

15        And, so, I'm not at all surprised that they didn't

16  just immediately, you know, start -- you know, stop

17  collecting, because this was a piece they knew would be part

18  of their leverage in settling the case.

19  Q.   Oh, okay.

20        So, if they perceived that they had leverage in doing

21  it again, why wouldn't they do it again if the settlement

22  agreement permitted them?

23        You just told the other cross-examiner that that's a

24  ridiculous concern that would never happen?

25  A.   Well, as I said, they don't really want -- they thought

Klonoff - cross by Baumkel

1   they had to collect the taxes legally.  Otherwise, it would

2   have put them in a competitive disadvantage to be the only

3   ones doing it.  I just don't envision a situation where they

4   would want to go back and do it if they didn't have to.

5   Q.  Unless they could get some leverage?

6   A.  I don't understand what kind of leverage you're talking

7   about.  I'm just not following you.

8   Q.  The same kind of leverage that arose when they had

9   leverage in this case that you thought prompted them to want

10  to keep doing it, even though the mistake had been pointed

11  out.

12  A.  That was because they had been doing it and they were

13  about to be sued for billions of dollars and they were trying

14  to figure out how to handle it.

15          And, by the way, you know, when you're saying it was

16  so clear they should have just stopped, if it was that clear,

17  it never would have started in the first place.  There were

18  still, as I understand it, arguments that can be made.  There

19  are grandfathering issues.  There are all sorts of

20  complexities that I don't think are factored into your

21  questions.

22  Q.  Okay.

23          So, to wrap up, given what you've just told me and

24  given your supposition that AT&T, as far as you can tell,

25  would have no logical reason for wanting to reintroduce this

Klonoff - cross by Baumkel

1  tax in the future in the absence of some specific legal

2  authority, it would be your desire and those of your ALI

3  reporting colleagues that the settlement, as specifically as

4  can be reasonably done using the English language, say that

5  they won't do it, again, unless the applicable law so permits?

6         That would be the goal, correct?

7  A.  And that's exactly what the Court did in her opinion.

8  It's exactly what she said.  And I think if AT&T post these

9  events were to just start willy-nilly collecting the tax, they

10  would be acting contrary to this Court's interpretation of the

11  settlement agreement.

12  Q.  Right.

13         I'm just saying that you'd want language that made

14  that clear in the settlement agreement itself, correct?

15  A.  Well, the Court thought the existing language made it

16  clear.  And if there was any doubt about how to interpret the

17  language, she's interpreted the language.  And, to me, that's

18  the end of it.  I just don't see AT&T having any maneuver here

19  to do these sorts of bad-faith things that you're predicting

20  they're going to do.

21  Q.  I'm not predicting.  I'm just asking you a question as to

22  how the agreement should be drafted.

23         So, on that subject, if the Court reached some

24  conclusion -- I don't have the Court's previous opinion in

25  front of me -- and an objector thought the Court might have

 1  been mistaken, it's perfectly okay for the objector to say,

 2  "Judge, you made this decision, but I still object and I want

 3  to tell you at the final hearing why you can make your ruling

 4  on this better," that's a fine thing for an objector to do,

 5  isn't it?

 6  A.  Well, it is a fine thing.  But if the -- the Court already

 7  had the benefit of that argument having been made.  That's why

 8  she addressed it in the opinion.  And she responded to it.

 9  And, candidly, I don't see any benefit here to rehashing the

10  same things that you've already argued.

11       So, it was an issue that you already raised, you gave

12  it your best shot and the Court addressed it in her opinion.

13  And I don't see that you've added anything to the debate here

14  at this final hearing.

15  Q.  So, if the objection was that the Court was mistaken and

16  that by things at this hearing we can address that mistake and

17  you agree that's an appropriate thing to do, let me then in

18  that regard ask you if you have language in the settlement

19  that says that this can be reintroduced if permitted by any

20  federal, state or local law requiring or authorizing, and if

21  the intent is that it not be reintroduced unless the

22  applicable taxing jurisdiction permits it, wouldn't it be an

23  improvement to say that instead of having this disjunctive,

24  saying if this happens or that happens or something else

25  happens?

Klonoff - cross by Baumkel

1    Shouldn't it say more precisely just what you

2  understand and just what Judge St. Eve understood was the

3  intent?

4    Shouldn't the language follow the intent articulated

5  by the Judge and as testified by you?

6    Wouldn't that be the goal of the language in the

7  document?

8  A.  All I'm saying is you don't need that, because the Court

9  has interpreted the language.  If you want to change the

10 language, sure.  If you want belt and suspenders, fine.  I'm

11 just not -- I'm just telling you I'm not worried about that

12 issue, given that the Court is on record having interpreted

13 that very language in response to the same argument that you

14 already made.  I think the record is absolutely clear on that.

15    MR. BAUMKEL:  Okay.  Thank you.

16    THE COURT:  We will pick back up -- we are going to

17 take a break -- at about 25 after.

18    Dean, would you please look at the March 9th Colorado

19 letter and March 9th letter from the Ohio Attorney General --

20    THE WITNESS:  Sure.

21    THE COURT:  -- during the break.

22    We will pick back up in about 15 minutes.

23    (Brief recess.)

24    THE COURT:  Did you have enough time?

25    THE WITNESS:  I did.

1          THE COURT:  Redirect?

2          MR. FRICKLETON:  There's no redirect, your Honor.

3          THE COURT:  Okay.

4          Dean, you had the opportunity to look at the two

5   March 9th letters?

6          THE WITNESS:  I did.

7          THE COURT:  Is there anything in either of these

8   letters that changes any of your opinions?

9          THE WITNESS:  No.  They're really consistent with the

10  earlier Colorado letter and with the Texas letter.

11         THE COURT:  Do you have any opinion on the states'

12  request to file an amici brief?

13         THE WITNESS:  I mean, I don't -- I don't see the harm

14  in allowing a brief.  I do wonder why they didn't come in

15  earlier, given the notices under CAFA.  One of the papers

16  tries to explain that, but --

17         THE COURT:  Yes.

18         THE WITNESS:  So, they are partially at fault for

19  putting the Court in the position of coming in frantically.

20  But, you know, it wouldn't hurt.

21         I mean, I'm not at all surprised that the states

22  where they have budget crisis are going to be concerned and

23  are going to look for every possible way to try to avoid

24  paying this.  But I ultimately agree with the expert testimony

25  that was put into the record and the testimony today, that

Klonoff -

264

1   once the law is determined, the states will follow the law.

2           And if it turns out the law is, as these letters

3   imply, that the taxes were properly paid, then the class

4   members didn't have a claim to begin with.  So, this really

5   doesn't change anything from what I said before.

6           THE COURT:  One more question for you.

7           There is some ambiguity about what happens in this

8   case with money that is left over.  So, claims that, for some

9   reason, a check is not cashed.  In typical cases there is a cy

10  pres account and it ends up going to a charity or something of

11  the Court's selection or the parties' agreement with the

12  Court's blessing.

13          Do you have any -- and here, there has been some

14  suggestion that if there is any leftover money, it should go

15  back to the states.

16          Do you have an opinion one way or the other on that?

17  And if you do not, that is fine.

18          THE WITNESS:  No, I do.  Actually, one of the most

19  cited provisions of our ALI project, much to our surprise, is

20  the cy pres section.  And we deal with this in -- pretty

21  extensively on how this ought to work.  And the last place it

22  ought to go to is the state.

23          The highest priority would be to give more money to

24  the class members who already had claims.  And if there's

25  enough that makes it viable to mail out checks to the people

1    who have already claimed so that they get more money, then

2    that would be the first priority.  If that cannot be done,

3    then the idea would be to fund something that would benefit as

4    many people as possible.

5         So, you know, we cite this taxi cab case in the ALI,

6    for example, where the taxi company had overcharged and there

7    was no way to reimburse people.  So, then they lowered the

8    prices going forward.

9         So, I would think the next best remedy might be for

10   AT&T to give an across-the-board discount to its Internet

11   users for some period of time until that money is exhausted.

12   If that's not viable, then only then would I look at some

13   charitable organization.  The ALI takes a pretty negative view

14   on just giving the money to legal aid or something like that.

15   We don't think that's suitable.

16        THE COURT:  Okay.  Thank you.  That is all I had.

17        Do you want to follow up on anything?

18        MR. FRICKLETON:  No, your Honor.

19        THE COURT:  Mr. Baumkel, Mr. Walsh --

20        MR. BAUMKEL:  No, your Honor.

21        MR. WALSH:  No, your Honor.

22        THE COURT:  -- do you want to follow up on anything?

23        Okay.  Thank you, Dean.

24        THE WITNESS:  Thank you.

25        (Witness excused.)

1          THE COURT:  Do you have any additional witnesses?

2          MR. FRICKLETON:  We have no other witnesses, your

3    Honor.

4          THE COURT:  Okay.

5          Anybody else have any witnesses they want to put on?

6          (No response.)

7          THE COURT:  No?  Okay.

8          MR. BAUMKEL:  I want to give you the documents we

9    talked about at the beginning.

10         THE COURT:  You can bring the documents.

11         MR. BAUMKEL:  If I could make a brief statement, your

12   Honor?

13         THE COURT:  Tell me what these are and what the

14   relevance you think is to the issues before the Court, please.

15         MR. BAUMKEL:  Yes.

16         The Court will recall a few weeks ago we had a

17   hearing that arose because I wanted to present the de bene

18   esse testimony of the person I discerned to be in charge of

19   what was going on in Michigan.

20         THE COURT:  Right.

21         MR. BAUMKEL:  And the way that -- the upshot of all

22   that was that we agreed -- and the Court entered a stipulated

23   order -- that in lieu of that, I would get all the documents

24   that had been exchanged amongst the settlement parties and

25   State of Michigan.  And at the date agreed to and as provided

1  in the Court's order, I got a FedEx from AT&T that enclosed

2  the documents I just gave to your reporter.

3        And I looked at those and I'm not in any way

4  purporting to quote any of them, but just to paraphrase, the

5  gist of those consist of -- it appears to primarily be --

6  requests by AT&T to initiate this refund process.  And as far

7  as I can discern, the CDs or DVDs that are in those records

8  are lists of the individual subscribers.  So, I don't discern

9  that the CDs or DVDs are particularly relevant to what I'm

10 about to explain, but they're just part of everything I got.

11       The point of my --

12       THE COURT:  And did you give me -- these are not

13 originals?  These were copies that were given to you?

14       MR. BAUMKEL:  Those are originals.

15       THE COURT:  Well, I doubt they gave you originals.

16       MR. BAUMKEL:  Oh, the originals that were given to

17 me.  I don't know if they're the originals.  I assume that

18 you're right, that they're not the originals.  But those are

19 the originals I received.

20       The reason I wanted to give the Court the originals

21 is, as I stated when I first started talking this morning, is

22 that they're all stamped "confidential."  That's part of what

23 I wanted to address.  I also want to answer your question as

24 to what they have to do with anything.

25       But as to the confidentiality, I don't want to be in

1    the situation -- I don't necessarily have the same high regard

2    for AT&T that some of the other people here do. I don't want

3    AT&T accusing me of doing anything with these documents six

4    months from now. So, I'm making a record.

5          You have them. They're part of these proceedings. I

6    am tendering them in lieu of actually calling a witness. And,

7    so, that's why I'm presenting them to the Court. To the

8    extent they've been marked "confidential," I don't want the

9    onus on me of having copies or --

10         THE COURT: Are you saying you did not make any

11   copies?

12         MR. BAUMKEL: Correct.

13         THE COURT: You did not retain any copies?

14         MR. BAUMKEL: That's correct. I did not retain any

15   copies.

16         Now, concerns I have in that regard are these look

17    like pretty garden variety documents that are the gist of

18    these whole proceedings. The paradigm for settlement here is

19    that AT&T and/or class counsel will go to the various taxing

20    jurisdictions and do what they profess to be the appropriate

21    thing to have the class members get money. Why that should be

22    confidential, why that shouldn't be shouted from the rooftops

23    utterly escapes me. Why AT&T should be able to mark those

24    what they did to carry out and effectuate the settlement, why

25    that should be confidential I cannot discern for the life of

1   me.

2          So, there are protocols and procedures in our

3   confidentiality agreement that we entered in haste, but

4   nevertheless as to which I agree I'm bound, that spell out

5   that if I want to use those in some way other than

6   confidentially, I should broach that with the Court in certain

7   time parameters.  I'm not trying to do that.

8          I'm just saying that ultimately, as part of this

9   record, at such time as it perhaps gets to the appellate

10  court, if that ever happens, then that should be part of the

11  record.  And I'm not asking you to look at it right now, but I

12  would ask that insofar as whether they get to retain this

13  confidentiality, if there's some other way you want me to

14  broach that, then I'll be happy to do that.

15          THE COURT:  I do not -- I am sorry.  I do not

16  understand what you are asking.

17          Are you asking me -- are you just saying, "Here they

18  are.  I wipe my hands.  I am not going to do anything with

19  these.  I do not want to be accused by AT&T of doing

20  something"?  Or are you saying, "Look at these.  I don't think

21  they should be confidential.  You make the determination"?

22          MR. BAUMKEL:  Both.

23          THE COURT:  Or are you saying that these are somehow

24  relevant to what is before the Court, the motion for final

25  approval of settlement?

1    MR. BAUMKEL:  All three.

2    THE COURT:  Okay.

3    MR. BAUMKEL:  The first part is --

4    THE COURT:  I have the first one.

5    MR. BAUMKEL:  Right.

6    The second part is because I think they're germane,

7    whether or not what's being done adequately fulfills --

8    assuming we otherwise agree with everything that's happening,

9    adequately fulfills -- the responsibilities of the settlement

10   parties to effectuate that.  And what they've done to

11   effectuate that to date is reflected in these documents.  The

12   Court ought to determine that shouldn't be confidential.

13   THE COURT:  What is -- why are you seeking a

14   non-confidential determination on these?  You have now given

15   them to me.

16   MR. BAUMKEL:  Yes.

17   THE COURT:  You do not have them.  What do you want

18   to do with them, that you do not have, that you want me to

19   make this determination?

20   MR. BAUMKEL:  Well, they will be part of the record.

21   And, then, that gets to the third part as to, you know, "What

22   difference does this make anyway from your point of view,

23   Mr. Baumkel?"

24   And that is, from the beginning, I had the impression

25   -- and I've argued it, I think, in various ways -- that class

1  counsel were moving this case forward in a way that didn't

2  give adequate attention to the responsibilities that were

3  inherent in the undertaking that they took upon themselves in

4  a variety of ways; for example, one of which was mentioned

5  earlier today, that -- the paradigm for recovery from the

6  State of Michigan.

7          If I'm purported to get $250 million and finalizing

8  things in a certain way, then I ought to know what the state

9  will do insofar as how I effectuate that.  And it didn't seem

10 to me they had fulfilled their obligation in that in the way

11 that they talked about in some of the witness exchanges

12 earlier today.  And I think this further reinforces that, that

13 there's nothing in there that reflects any kind of exchange

14 between class counsel and the State of Michigan.

15         My feeling, that I will argue, I suppose, in more

16 detail -- maybe I won't need to since I'm arguing it now -- is

17 that it's incumbent on somebody who professes to be adequate,

18 when they're putting before the Court this kind of monumental

19 settlement undertaking, that they do certain homework, whether

20 you want to call it discovery or whatever you want to call it.

21         But that if the paradigm they're going to pitch to

22 the Court is, "We're giving up our suit against AT&T in lieu

23 of this kind of a strange animal, that even the ALI Institute

24 head has never seen before, under which we get monies from all

25 these taxing jurisdictions," then we ought to go to those

1    taxing jurisdictions and educate ourselves what in the heck is

2    going to happen if that's the way we go. And these files

3    reflect that there's none of that.

4          The exchange that we had from the witness stand and

5    from some of class counsel was, "Well, we had a local lawyer

6    who made some phone calls and he gave you declarations, Judge

7    St. Eve." And I'm saying when you're asking for a 1.2 or $2

8    billion settlement, $250 million of fees and the exchange with

9    the taxing authority -- the third party that you're relying on

10    to fund this settlement -- is devoid of any inquiry by you as

11    to how this is going to happen, that's relevant.

12          And to the extent that your Honor will consider

13    whether counsel was adequate as they ought to have been, I

14    mean, that's part of what the Court, I think, should consider,

15    and so should the appellate court.

16          Now, the reason I've given it to you without keeping

17    a copy is because, as you've pointed out to me recently in

18    these proceedings, you're the judge and what you say is how we

19    conduct proceedings here. So, you will decide: A, whether it

20    deserves to be confidential; and, B, whether it's relevant to

21    anything.

22          THE COURT: I still do not understand why I need to

23    determine if it is confidential. You said so it is part of

24    the record. It will be part of the record. It is part of the

25    record now. Does it matter if it is confidential?

1          MR. BAUMKEL:  Well, I suppose --

2          THE COURT:  Are you saying you want me to make a

3    designation or determination that these are not confidential

4    and give them back to you, so you can do something with them?

5          I do not understand.

6          MR. BAUMKEL:  They should be part of the public

7    record, not a sealed record.

8          THE COURT:  Well, I would never file these on the

9    docket.  It is like exhibits.  I am not filing these on the

10   docket, either.

11         MR. BAUMKEL:  I'm not suggesting they get filed on

12   the docket like a pleading.  I'm just suggesting that as

13   things now stand, they're supposed to be under seal and not --

14   and subject to all the kinds of confidentiality that would

15   normally apply to those kinds of documents.  And I'm saying if

16   you look at these, they don't -- there's nothing about these

17   that would put them in that kind of -- that would entitle them

18   to that kind of treatment.

19         So, I guess I haven't thought through exactly how I

20   would access them or somebody else would access them as part

21   of the court file.  But they ought to at least be part of the

22   court file in a way that isn't under seal, because they don't

23   have any attributes that would warrant that.  They're simply a

24   demonstration, to the extent that it is demonstrated, what the

25   settlement parties have done vis-a-vis the State of Michigan.

1          So, that's the only actual evidence I have to offer,

2    and I'll hold off any other argument until we get to that

3    point in the proceedings.

4          THE COURT:  Okay.

5          Mr. Robertson, I have a couple questions for you.

6          Do you want to respond, Mr. Durkin, to this, the

7    confidentiality issue?  I have not looked at them.  I do not

8    know --

9          MR. DURKIN:  I still don't know what the -- how they

10   are going to be relevant.

11         THE COURT:  I am not sure either, because I have not

12   looked at them.

13         MR. DURKIN:  My understanding is there's personal

14   data encrypted on the disc that you have.

15         THE COURT:  Okay.

16         MR. DURKIN:  The rest of it is marked "confidential"

17   because it was deemed confidential by the Michigan state

18   authorities.

19         THE COURT:  Okay.

20         Mr. Robertson, can you tell me in a little bit more

21   detail -- we've touched on it today, but it has been the

22   thrust of some of the objections made before the Court.

23         What type of informal discovery took place in this

24   case?

25         Because one of the objections, as you know, has been

1    no discovery, you are coming in too quickly.  Obviously, you

2    have gotten a lot of data from AT&T.

3         I assume no formal depositions have taken place, but

4    it sounds like you have had access to AT&T personnel who have

5    met with you, talked to you, given you the answers that you

6    might otherwise ask them in depositions, but, because you were

7    doing it informally, you did not have to go through that.

8         And if you are not the appropriate attorney to

9    address this, I do not care who addresses this --

10        MR. ROBERTSON:  Well, your Honor --

11        THE COURT:  -- at counsel table.

12        MR. ROBERTSON:  -- I guess what happened was, in the

13   course of this, we began to ask questions.  And the questions

14   that we asked are set out in the declaration that I filed.

15   The first one is:  Did ATTM pay taxes to the taxing

16   authorities?

17        And we met with people who knew the answer to that,

18   their tax counsel.  They queried the people in their system

19   that would provide the answer to that.  And we were given

20   assurances through discussions in the same sense that we

21   would, I suppose, except for the oath, that they had.  And

22   that was subsequently verified when we began to see all of the

23   taxes that they had collected.  And we began to put together

24   the information that was going to be necessary, both for the

25   agreement and, ultimately, for the tax refund claims.

1          Second question:  How many customers were involved?

2     We tried to get the answer to that.  And part and parcel of

3     that, how are we going to discover which people were charged

4     and which weren't?  And that's the -- Dr. Florence talked

5     about that at some length.  We went through the SOC codes and

6     all the rest of that.

7          And met with the computer people.  How are you going

8     to query your machine?  They got computers.  Then they got

9     Pricewaterhouse to come in and do an independent review on top

10    of that, to which we were privy.

11         So, how much money was collected?  We -- frankly,

12    that was a moving target.  But we asked them at the beginning

13    to give us a snapshot of two years.  And, then -- because they

14    said, you know, "We're collecting this along the way.  It

15    takes a long time to cut the tax off because it's very

16    complicated."  And, so, we were given that information.

17         How many customers, we got that information, as I

18    said.  To whom was the tax paid?  We got then a list of the

19    people that were -- received -- the cities and the counties

20    and the states that got the taxes.

21         Could you identify how much was going to be owed to

22    individual customers, so that we would be able to get the

23    money back to them?  And they said "Yes."  And the way they

24    ultimately did this was they went and got the taxes actually

25    paid off of each individual bill, rather than what was the

1    theoretical tax.

2         So, they started at the back end and said, "Here are

3    the people who paid the tax individually on a monthly basis

4    going back all the way to 2005." And we got that information.

5         So -- and, then, the one question we asked:  How did

6    AT&T make this mistake?  And we learned that what happened

7    was, is that because text messaging is not part of Internet

8    access services under the definition for the federal, that

9    they just accidentally put it all together as part of the

10   data.  And, so, that was our indication that it was an

11   accident, it was a mistake, as Attorney General Woods said.

12        So, how long would it take to stop collecting the tax

13   was information we had to have.  And they told us.  They got

14   all these legacy systems, as Dr. Florence said.  And they had

15   to get all that put together and figure out all of these SOC

16   codes for, now you've heard, 30-some million people, and

17   that's a big task.  And, so, they began -- as soon as we got

18   to the place where we reached an agreement, they began that

19   process.  Actually, began it beforehand.

20        And, then, what information did they keep about

21   former customers?  Because it's pretty easy to track your

22   current people.  How do you get to the former people?  Well,

23   they were able to provide us with how they had that

24   information set up.  By addresses.  They kept e-mails where

25   those were appropriate.  And, so, we were able to get to the

1    former customers.

2           And, then, the final question was about the vendor's

3    compensation, that we talked about when I was on the stand.

4    How much of that was paid?  So, we got all of that

5    information, which, you know, frankly, this is one of the few

6    cases, I think, except for the volume, that the limit on

7    interrogatories would actually work.  It's a very narrow set

8    of information, but it's very, very deep.

9           THE COURT:  Did you feel that you got all of the

10   information you needed?

11          MR. ROBERTSON:  Yes, your Honor, we do.  And it was

12   ultimately verified when they, under oath, submitted these

13   refund claims to the various taxing jurisdictions.  They're

14   the ones that now face the penalties if this information is

15   incorrect.

16          THE COURT:  Am I correct, there are 235 opt-outs?  Is

17   that right?

18          MR. ROBERTSON:  Yes.  And that includes eight cities,

19   your Honor.  And we think they may have thought they could opt

20   out of paying back if they opted out.  So --

21          (Laughter.)

22          THE COURT:  I am not sure it works that way.

23          The incentive compensation for each named plaintiff,

24   how many named plaintiffs are there?

25          MR. ROBERTSON:  57.

1          THE COURT:  57.

2          And I have seen in the briefing the reference to up

3    to $5,000.

4          MR. ROBERTSON:  Yes, your Honor.

5          THE COURT:  Is it your intention that each of the 57

6    get 5,000 or are you going to divide it up somehow or do some

7    get one, some get two?  What is your intention?

8          MR. ROBERTSON:  Our intention, your Honor, is to

9    follow the Court's order.  But having said that --

10         THE COURT:  Are you asking for me to make that

11   decision, then?

12         MR. ROBERTSON:  Yes.

13         THE COURT:  I know I have to decide it --

14         MR. ROBERTSON:  Right.

15         THE COURT:  -- and whether or not the proposal is

16   fair and reasonable.  And that is one of the issues in here.

17         But I cannot tell if you were advocating for 5,000

18   each or --

19         MR. ROBERTSON:  We are advocating for 5,000 each,

20   subject to the Court, as it will for any fee request in this,

21   to make its ruling on the Seventh Circuit doctrine that tells

22   you what you have to look at.

23         THE COURT:  Right.

24         MR. ROBERTSON:  These people came forward and put

25   themselves on the line for a very, very big case.  Frankly,

1    they all were kept informed.  They read the settlement

2    agreements and signed pieces of paper for you, and they filed

3    declarations.  And you have to decide, your Honor, whether

4    that, in a case of this size, is worth $5,000.  But we don't

5    intend to distinguish between a man who comes and testifies

6    here and somebody who didn't come.

7              THE COURT:  Okay.

8              Since a lot has been made of this, what is the

9    proposed tax refund procedure for Michigan residents that you

10   have?

11             MR. ROBERTSON:  I didn't -- I'm sorry?

12             THE COURT:  What is the procedure you are following

13   in Michigan for tax refunds?

14             MR. ROBERTSON:  The procedure that we were -- we

15   didn't --

16             THE COURT:  That you are following.

17             MR. ROBERTSON:  Right.

18             All of these -- there's no magic to this.  All of

19   this is on Internet sites now.  You can get every state's

20   codes and forms for filling these things out.  Michigan law,

21   oddly enough, said that we, as class counsel, would have to

22   file the tax refund request.  And if you'll look at -- I think

23   it's the exhibit that has the seven states -- Michigan is on

24   there.

25             And we believed that that's what was going to have to

1    happen.  And we were prepared to do that.  But we learned in

2    discussions with some other states that there's an

3    administrative problem with them getting it that way.  And,

4    so, where these really big refund requests come in -- and

5    Michigan is the perfect example -- they say, "We don't care

6    what our law says or what our code -- the administrative code

7    -- says.  We want you to do it this way."

8            So, this is an informal procedure that we and

9    Mr. Baumkel identified independently of one another of how

10   they wanted to handle a claim of this size.  Because it's just

11   a lot easier for them than to get 1.4 million pieces of paper,

12   which we are prepared to provide in some states where we have

13   the computer people ready to do that, if that's necessary.

14           So, that's why it went this way.  And that was a

15   surprise to us.  And, in fact, when we learned that

16   information, we said that's contrary to the statute.  And they

17   said, "Don't worry about that.  That's how we do this."  So,

18   that's what we learned in Michigan.

19           Mr. Baumkel's letter -- the August letter -- exactly

20   what they told us and what they confirmed when we had

21   telephone conferences with them and when we've had

22   person-to-person -- sorry, face-to-face -- meetings.  I didn't

23   attend the meeting in Michigan.

24           THE COURT:  Okay.

25           The fees here.  Please give me -- it is a huge

1    number, if you look at it just as a number.  I know there are

2    ways to calculate it.  I know there is evidence in the 8.3

3    percent number.  You could calculate it different ways and get

4    different percentages.

5           Give me a better understanding, please, of that

6    number and how it is going to be divvied.  I know there are 92

7    lawyers.  I do not know if -- and I do not want to know -- you

8    are getting X percentage, somebody else is getting Y

9    percentage.  I am not asking for that.

10          But out of the 92 lawyers, are there 92 separate law

11   firms there?  Out of the 92 lawyers, are there ten lawyers

12   from one law firm that are going to get X percent?

13          That is a huge number you are asking me to approve.

14   I need more from you to justify that.  So, explain it to me a

15   little bit more.

16          MR. ROBERTSON:  Well, it's a pure contingent.  You've

17   heard that over and over today.

18          THE COURT:  Yes.

19          MR. ROBERTSON:  It's a pure contingent fee.  And we

20   have an agreement with all of these local counsel law firms

21   that they will get a percentage of the fee for that state in

22   which they have undertaken the representation.

23          THE COURT:  How many different contingency agreements

24   do you have?

25          MR. ROBERTSON:  44.

1          THE COURT:  So, when you talk about 92 lawyers, it

2    might be that for one state there are three lawyers working

3    from the same firm under one contingency agreement?

4          MR. ROBERTSON:  Yes, ma'am.

5          THE COURT:  Okay.

6          Do you have any sense if this were a billing

7    matter -- or an hourly billing -- of how many hours have been

8    put into this or what the amount of fees would be if it were a

9    billing?

10          And I realize it is contingency, so you probably have

11    not been keeping track of it that way.  I could ask AT&T what

12    their hours have been.  I know they keep track of it that way.

13          Just a ballpark.  Do you have a sense of number of

14    hours and amount of fees?  And maybe you do not, which is

15    fine.

16          MR. ROBERTSON:  Well, your Honor, the last thing I

17    want to do is say something that's not accurate.

18          THE COURT:  I do not want you to do that.

19          MR. ROBERTSON:  And, so --

20          THE COURT:  That is why I am saying maybe you do not

21    know that.

22          MR. ROBERTSON:  So far, there are thousands of hours.

23    But I don't know whether that's 20 or 10.  I just don't know.

24          THE COURT:  That is fine.

25          MR. ROBERTSON:  I know personally, this is about all

1    I've done for the last year-and-a-half.  And, unfortunately, I

2    took 13 years off when I was a judge.  And, so, I have to make

3    up for that.  And there's a lot of hours being spent.  I know

4    you don't work the way I did.  I was on an appellate court.

5    It's much easier.

6           But having said that --

7           THE COURT:  This might go to the Seventh Circuit, so

8    be careful what you are saying.

9           (Laughter.)

10          MR. ROBERTSON:  Well, your Honor, I used to make a

11   speech around -- in Missouri, the Supreme Court only takes

12   cases it wants to take.  And I used to make a speech around

13   saying there's a flaw in the constitution; and, it is, that it

14   allows people who are paid a flat wage to determine their

15   workload.

16          (Laughter.)

17          MR. ROBERTSON:  The big part of this case that we

18   don't know about is what's to come.  These letters from these

19   states have indicated that these are not going to be

20   lay-downs, even though we think the law in the end is -- and

21   we think we're going to be in court a lot of places and we're

22   going to be spending a lot of time.  And whatever we've spent

23   to now is, I believe, no more than half of what's going to be

24   ahead of us.

25          And I think that's why Dean Klonoff said a lodestar

1  approach is not a good idea here, because it's not going to

2  account for this.  This settlement is unusual in a number of

3  ways.

4           THE COURT:  And my question was not meant to suggest

5  I think that is an appropriate way to go.  I am just trying to

6  get a sense, given the largeness of the number, of where you

7  might be.

8           MR. ROBERTSON:  Well, the truth is, Judge, we sort of

9  read what Judge Easterbrook wrote and what Judge Posner has

10 written and said, you know, this is the circuit in which what

11 would the contingent fee contract have looked like before we

12 knew it was going to turn out the way it's going to turn out?

13           And you have the testimony of Dean Klonoff --

14           THE COURT:  Yes.

15           MR. ROBERTSON:  -- and all the rest.

16           And I'm not trying to avoid the question.  I just

17 don't know the answer.

18           THE COURT:  Okay.  And that is fair.  That is fair.

19           Looking at the costs here, there are a lot of travel

20 expenses.  Give me a better sense of why.

21           MR. ROBERTSON:  We went to Atlanta an awful lot.  We

22 went to different states an awful lot.  And those are all --

23 you know, we flew to New York to meet with Professor

24 Issacharoff.  We went to different places like that to meet

25 with the people who were witnesses here.  We met with some

1    class representatives a couple of times to make sure that they

2    were getting the information that they should be getting from

3    their local attorneys.

4         Most of us, as a direct result of this case, are

5    automatic A's on Southwest Airlines now.  That's what we've

6    been doing.  We had to meet with ARPC.  We've had to meet with

7    the Bank of New York Mellon.  We've had to go an awful lot of

8    places.  And that was a major expense in this case.

9         THE COURT:  What is Advanced Telecom Services?

10        MR. ROBERTSON:  That's a large bill, and I

11   think that's the -- we paid for the 800 number.

12        THE COURT:  Okay.  That is what that is.

13        MR. ROBERTSON:  Yes.

14        THE COURT:  Did you pay for that --

15        MR. ROBERTSON:  Yes.

16        THE COURT:  -- or did AT&T pay for that?

17        MR. ROBERTSON:  No, we paid for that.

18        THE COURT:  I thought AT&T was going to pay for that.

19        MR. ROBERTSON:  No.  They paid for the notice part,

20   but we had to pay for the Web site construction and all the

21   rest of that.

22        THE COURT:  There are three large bills in connection

23   with that.  Okay.

24        What about some of these five-star restaurants?

25        MR. ROBERTSON:  Well, your Honor, we did eat well.

```
 1              THE COURT:  You did eat well.

 2         (Laughter.)

 3              MR. ROBERTSON:  But we were tired at the end of the

 4    day, your Honor.

 5         (Laughter.)

 6              MR. ROBERTSON:  And, you know, we gave you the whole

 7    list.  We didn't hide the ball.  And if you think some of

 8    those are inappropriate, if we should have been at McDonald's,

 9    that's your call.

10              THE COURT:  I am not saying you should have been at

11    McDonald's, but McDonald's is here, Tru is here.  There is a

12    lot in between.

13         (Laughter.)

14              MR. ROBERTSON:  There is a lot in between, your

15    Honor.  But you don't get as much at Tru.  You have to keep

16    getting --

17         (Laughter.)

18              THE COURT:  All right.

19              I think those are the only questions I had for you.

20    Let me just make sure.

21              Can I borrow your ALI book?

22              They may have one in the library here.

23              MR. ISSACHAROFF:  Your Honor, may we provide one to

24    the Court, if that's --

25              THE COURT:  I do not know if that is proper or not.
```

```
 1    I can donate it to our library probably.  If not, I will mail
 2    it back.
 3            MR. ISSACHAROFF:  I will have the ALI send you one.
 4    That would be proper.  We've sent it to a lot of judges.
 5            THE COURT:  Great.
 6            MR. ROBERTSON:  Judge, I'll hand you this one right
 7    now.
 8            THE COURT:  I will --
 9            (Document tendered to the Court.)
10            MR. ROBERTSON:  And you may use that, obviously, as
11    long as you want.  The only thing I'd say is Dean Klonoff and
12    Sam autographed it.
13            THE COURT:  I do not want to take that then.
14            MR. ROBERTSON:  No, no, no.  Listen --
15            THE COURT:  Have ALI send me one.  I am not going to
16    read it tonight.
17            Here, I do not want to take that from you.
18            MR. ROBERTSON:  We believe this may be the only one
19    ever sold.
20            (Laughter.)
21            MR. ISSACHAROFF:  I object.
22            (Laughter.)
23            THE COURT:  But did they autograph it at Tru or --
24            (Laughter.)
25            MR. ROBERTSON:  Go ahead and take that one off,
```

1   Judge.

2           THE COURT:  Okay.  I do not have any more questions

3   for you.

4           But I have read all of your submissions.  I am not

5   going to rule today.  I do have one more question, but I will

6   get to that.  It is not substantive.  I am not going to rule

7   today.  You will get an opinion on this, which, I think, given

8   all the issues, it certainly deserves one.  I am working on

9   it.

10          Is there anything else you want to say or add or

11  argue?  You do not need to regurgitate what you have submitted

12  to me.  I have read it all.  I am sure I will read it all at

13  least one more time and probably more.  But I am happy to hear

14  anything anybody wants to add, anything you want to argue.

15          Mr. Durkin, you have been very quiet.

16          MR. DURKIN:  We have nothing -- Judge, we wrote a lot

17  of pages in our briefs.

18          THE COURT:  Yes.

19          MR. DURKIN:  As recently as yesterday, we got a

20  letter from Washington and had to file it to the Court by

21  yesterday afternoon.

22          THE COURT:  I was very impressed with how quickly you

23  turned that around.

24          MR. DURKIN:  We couldn't get you something for the

25  ones that got filed last night.

1        If the Court is going to entertain amicus briefs from

2   the entities --

3        THE COURT:  Yes.

4        MR. DURKIN:  -- from the governmental entities -- we

5   would ask to file a single response after those are in, rather

6   than respond to the two letters that came in last night.

7        THE COURT:  That was my other question for you.

8        I am going to permit amicus briefs from them.  I am

9   not going to give them until May 13th as requested.  I think

10  that is excessive, because they have known about this for

11  quite sometime.  I do not want to delay this process that

12  long.  And I will give you an opportunity to respond.  I will

13  give you a date before you leave here.

14       But do you want to argue anything?  Do you want to --

15  for the objectors, as well?  Again, I have read your

16  submissions.  I am happy to hear anything else you would like

17  to add.  I just ask that you not regurgitate what you -- and

18  spit back to me everything that you have given me, because I

19  have read it.

20       MR. ROBERTSON:  Your Honor, we're not -- we have no

21  intention of arguing anything.  We would make one request --

22       THE COURT:  Yes.

23       MR. ROBERTSON:  -- subject to the Court's -- and that

24  is, that there be a separate -- if the Court approves the

25  settlement, that there be a separate -- fee order.  So that in

1  the event that there is an appeal that follows on the fees, we

2  will not hold up the --

3          THE COURT:  Okay.

4          MR. ROBERTSON:  -- merits part of it.

5          THE COURT:  Okay.

6          MR. ROBERTSON:  And that's all I have to say.

7          THE COURT:  I can do that.

8          MR. ROBERTSON:  Thank you.

9          MR. DURKIN:  I was going to make the same request,

10  your Honor.

11          And we would ask whatever time you give the

12  governmental agencies to file an amicus brief, we need two

13  weeks following that to --

14          THE COURT:  That is what I was going to give you.

15          MR. DURKIN:  Okay.

16          THE COURT:  Do you want to argue anything in addition

17  to what is in your papers or --

18          MR. DURKIN:  No, Judge.  Everything we've covered has

19  either been covered by witnesses or in our papers.

20          We did make note that there was an issue regarding

21  certain Nevada local jurisdictions --

22          THE COURT:  Yes.

23          MR. DURKIN:  -- in our papers.

24          THE COURT:  Yes.

25          MR. DURKIN:  And I think our suggestion is still the

1     same, that we have to re-serve that group so that they would

2     be given the opportunity to opt out as others have, unless

3     there's a separate suggestion from the plaintiffs.  But I

4     think that was our suggestion.

5           THE COURT:  So, do you want to come back in on

6     another motion for preliminary approval of a Nevada subclass

7     or --

8           MR. DURKIN:  I think it would be -- I think we'd have

9     to go procedurally -- it would be brief, but it would be

10     preliminary approval.

11           Can I confer with my co-counsel?

12           THE COURT:  You may.  You can all confer.

13           MR. WALSH:  Your Honor, I just had a few remarks.

14           THE COURT:  Yes.

15           MR. WALSH:  I had a few closing remarks, but actually

16     I kind of have a unique situation going on.  My wife and I are

17     expecting our second baby and I've got to get out of here

18     right away if I'm going to make it.  So, I was just going to

19     ask the Court if I have any further closing remarks that

20     aren't repeating themselves, could I just send those into the

21     Court, since there's going to be additional briefing?

22           THE COURT:  You may.

23           You better not be late.

24           MR. WALSH:  I know.

25           May I be excused, your Honor?

1           THE COURT:  You are excused.

2           MR. WALSH:  Thank you.

3           MR. DURKIN:  Judge, just on that single issue, I

4    don't know that you need to do preliminary approval, because

5    you have approved --

6           THE COURT:  Right.

7           MR. DURKIN:  -- form of notice, all the things that

8    would go out to Nevada that were approved already.  It's just

9    simply procedurally doing it.

10          THE COURT:  I will let you guys figure it out.

11          MR. DURKIN:  All right.

12          THE COURT:  And file what you feel like you need to

13   on Nevada.

14          MR. DURKIN:  Fine.

15          THE COURT:  Yes?

16          MR. STEWARD:  Judge, I represent John Gaffigan.

17          THE COURT:  State your name, please.

18          MR. STEWARD:  My name is John Steward.  I'm one of

19   the four attorneys representing John Gaffigan.

20          THE COURT:  Yes.

21          MR. STEWARD:  I will make this short.

22          THE COURT:  Okay.

23          MR. STEWARD:  Of course, the Court knows we submitted

24   our papers --

25          THE COURT:  Yes.

1          MR. STEWARD:  -- on the 2nd with eight exhibits.

2          Dean Klonoff made a comment in response to our

3  objection that he felt that the better course of action --

4  actually, the proper approach -- for Gaffigan and his counsel

5  is not to object to the settlement, but to file an application

6  for attorneys' fees and incentive award.

7          I can't say that I disagree with Dean Klonoff.  In

8  fact, with regard to what we styled as an objection, we make

9  no objection to any of the merits of the settlement itself.

10  Our main objection is to the exclusion of Gaffigan from the

11  incentive award -- because he, obviously, did as much as any

12  of the other named plaintiffs in this case -- and the

13  exclusion of us from the -- any fee or cost award.

14          Ultimately, in our papers, that's the relief that we

15  request, is some fair and adequate incentive award for our

16  client.  We have substantially litigated the case in Missouri.

17  It's still pending in the Eastern District of Missouri.  It

18  was filed five months -- four or five months, I believe --

19  before the last lawsuit filed by cooperating counsel.  It was

20  filed in January of 2010.  So, it wasn't a latecomer to the

21  game.

22          It was filed, I think -- it predated five of the

23  other cooperating lawsuits and 12 of the 14 non-cooperating

24  lawsuits.  It was different, and I hope I can enlighten the

25  Court a little bit about why we thought it was different.

1   There were factual overlaps, obviously.  The reason our

2   lawsuit was different is because we have been down this road

3   before.

4          A few years ago, I was appointed lead counsel in

5   Missouri on a case -- a class action lawsuit -- which we

6   believe was the first of its kind in Missouri.  It was a

7   bilateral class action lawsuit for the recovery of

8   erroneously-collected state sales taxes.  What we had was a

9   plaintiff class of about 125,000 Missourians versus a

10  defendant class of about 400 separate businesses in the State

11  of Missouri who were all charging, erroneously, sales tax on

12  items that were not subject to sales tax.

13         So, we brought the case -- me and one other attorney,

14  who is my co-counsel in this case.  And we utilized the

15  theories that we've used in this case.  Our theories in this

16  case are somewhat different than what were proposed by class

17  counsel.  They do have some overlap, but they were different.

18  And the reason that we used those theories is because they

19  worked.  And we knew they worked because we've been through

20  the process.

21         We resolved that case.  In that case, we coordinated

22  the filing of tax refund applications for over 400 separate

23  businesses to get that money back to the plaintiff class.

24         So, I've been down that road before.  The reason we

25  filed what we did instead of what class counsel filed is

1    because of the experience we had through that case.

2            Notably, in that case, we had multiple meetings with

3    the Missouri Department of Revenue's attorneys, obviously

4    represented by the Missouri Attorney General at that time.

5    During the course of the that litigation, the Attorney General

6    raised many of the same issues that you see from the states

7    recently that have come up.  And most of it came from just a

8    general misunderstanding of the terms of the settlement.

9            The first argument we got is, you can't have a class

10   action by consumers for refund of sales taxes; you can't sue

11   the state for that.  And Missouri is like a lot of

12   jurisdictions, where only the actual business who remitted the

13   tax to the state has standing to sue them.

14           Finally, after multiple meetings, it was demonstrated

15   that's not what this is.  We're suing a business and we're

16   asking for mandatory injunctive relief and unjust enrichment.

17   The mandatory injunctive relief we're seeking is to make them

18   go apply for these refunds.

19           Once the Department of Revenue and Missouri Attorney

20   General who was prosecuting the case at that time -- or

21   defending the case at that time -- saw that, you know, the

22   doors opened up.  There were -- they understood that all the

23   people were doing was complying with Missouri tax law in the

24   refund process.

25           I think that's what's happening here.  I can't speak

1   from any other jurisdictions.  But the one good thing that

2   came out of all that is the assistant Attorney General that

3   was defending that case is now the Missouri Director of

4   Revenue.  So, she's vastly familiar with this process.  We

5   have a good relationship with her.  And we do stand ready to

6   assist if they need us to help facilitate any of these further

7   claims.

8         Again, we have not made any objection to the merits

9   of the case.  We did a lot of litigation in this case in

10   Missouri because the JPML excluded our case from this MDL.  It

11   was only one of two cases that were excluded.  We took no

12   position on that.  And, in fact, we told AT&T we'll consent to

13   a stay while they decide it.  We filed nothing with the JPML.

14   They ultimately decided we're not in.  So, we're left with

15   having to litigate our case as we see fit.

16         The only thing that we find out about this case is

17   when AT&T files a copy of the settlement agreement -- I

18   believe it was in July -- and the first thing we see is our

19   case at the very top of that included in there and all the

20   claims are being released and, of course, our client isn't

21   being compensated as a named plaintiff.  We're not the in the

22   attorneys' fees portion of it, although most of the litigation

23   that occurred in Missouri happened before the settlement

24   agreement was presented.  Almost all of the litigation in

25   Missouri happened before the case was preliminarily approved.

1          I will say for the team of lawyers that I'm working

2     with, myself, Mr. Joe Neill -- he's been practicing 33 years,

3     Jim Holloran, who -- I don't know how long he's practicing,

4     but I think most of the attorneys here at least from

5     Missouri know him.  And I would say he's been practicing

6     longer than -- or since the Dead Sea's been sick.  We also

7     have Judge Ronnie White who, like Mr. Robertson, is also a

8     former chief justice of the Missouri Supreme Court.

9          I think -- I know for myself personally and I think

10    -- I can speak for all those other attorneys and my client,

11    John Gaffigan, that we have never objected to any of the class

12    action settlement.  We're not people that come in and object

13    to these things.  All we're asking for is to be treated fairly

14    for the work that we did.

15         AT&T admitted that our case added risk to them.  Is

16    it the reason they settled?  No, it's not the reason they

17    settled.  Did it contribute to that?  We believe that it

18    contributed in some manner to that.

19         They also -- mostly it was because we were able to

20    exclude ourselves in the JPML.

21         THE COURT:  Mr. Steward, have you talked to Mr.

22    Robertson about this issue?  Because you indicated that the

23    first you heard about that you might be included is when the

24    settlement agreement was filed with the Court.  Since that

25    time, have you had any discussions with Mr. Robertson to see

1    if this is something --

2            MR. STEWARD:  I have not personally had any

3    discussions with Mr. Robertson other than about an hour ago,

4    and I told him I would like to talk to him afterwards.  I

5    believe that reasonable minds can resolve things, and I hope

6    that he and I can come to an agreement.  And, as of right now,

7    there is no final agreement.  But I think that reasonable

8    minds, obviously, should be able to.

9            Again, what we're looking for is a reasonable and

10   fair incentive award for Mr. Gaffigan and a reasonable and

11   fair portion of the -- just the Missouri subclass, not an

12   overall fee.

13           If the Court wants to know what we believe is

14   reasonable, I would say whatever the Court feels is

15   reasonable.  You have our papers.  You saw all the work that

16   we did in that class, including motions to compel arbitration,

17   class certification, motions to strike, motions -- you know,

18   we had multiple hearings there.  This was not a case where we

19   just filed it and sat down and waited.

20           And it was not because we elected to stay out of the

21   MDL.  It was not because we engineered the case to stay out of

22   the MDL.  We merely prosecuted the case because we thought

23   that the theories that we presented had worked in the past and

24   we did not feel that the ITFA -- we had a serious question of

25   whether it applied to Missouri, number one; but, number two,

1    we didn't need it under Missouri law because the Missouri

2    revenue statutes gave us full relief.  And they also didn't

3    have some of the drawbacks that the ITFA had; specifically,

4    the Section 1109(a) and (b) provisions of the ITFA.  None of

5    those existed in Missouri.

6          And, again, as we said in our papers, we're not

7    trying to take away from any of the efforts of class counsel.

8    We think they have done a good job in settling this case.  We

9    have admiration for them.  But at the end of the day, I think

10   we can all agree on one thing:  All of us here are -- want to

11   do good jobs for our client.  At the end of the day, we'd all

12   like fair compensation, and that's all we're looking for.

13          THE COURT:  Okay.

14          MR. STEWARD:  Thank you.

15          THE COURT:  Do you want to respond?  I do not know

16   that you did in your submission, your revised or corrected

17   memorandum.

18          Do you want to respond to this in writing or see if

19   you can work something out and, then, respond in writing?

20          MR. ROBERTSON:  Your Honor, we have had discussions.

21          THE COURT:  Okay.

22          MR. ROBERTSON:  We didn't believe we could resolve

23   anything since it was styled an objection.

24          Now they're going to style it, as I understand it, as

25   a --

1        MR. STEWARD:  Judge, maybe I didn't make that clear.

2  The reason it was styled as an objection is because we did not

3  want to lose the ability to make that based upon a

4  technicality merely because we were not a party to the MDL,

5  since our case was excluded.  To the extent the Court can,

6  should or will take that as a motion for attorneys' fees and

7  reasonable incentive award, I would encourage the Court to do

8  so.

9        THE COURT:  I can certainly convert it to that.

10        Here is what I want you to do.  I will give you until

11  April 1st to respond to this -- to the motion for attorneys'

12  fees, which I can convert it.

13        And in the interim, talk and see if you can work

14  something out.

15        MR. ROBERTSON:  Yes, your Honor.

16        THE COURT:  If you cannot, respond to it and I will

17  take it up.

18        MR. ROBERTSON:  And we're not taking him to Tru

19  tonight to do that.

20        (Laughter.)

21        THE COURT:  Well, if you do, it is on your dime.

22        (Laughter.)

23        MR. STEWARD:  That would have been a good negotiating

24  tool.

25        (Laughter.)

1          THE COURT:  Okay.

2          Mr. Baumkel?

3          MR. BAUMKEL:  Thank you, your Honor.

4          Your Honor, you've been very gracious in allowing me

5    the opportunity to express myself throughout these

6    proceedings, and I appreciate that.  And I will try to reward

7    you by being very brief at the conclusion here.

8          A few points.  The text notice that was testified

9    today and indicated earlier in these proceedings was supposed

10   to have gone out.  I submitted evidence a few months ago

11   suggesting some doubt as to that having been effectuated.  And

12   the response was, from the settlement parties, "Tell us,

13   again, the numbers and also tell us the names, and we'll check

14   that out and make sure that all of the millions of people who

15   were supposed to get the text notice got it, including those

16   people."

17         And I received written correspondence suggesting that

18   was going to happen in these proceedings today and nothing

19   like that happened.  And that's why sprinkled out throughout

20   the questions I was asking people if they knew anything about

21   this text notice, and so forth.

22         So, apart from any substantive objections I have to

23   this settlement, in any settlement or proceeding of this

24   nature, obviously notice is important.  Especially if the

25   Court has ordered a particular kind of notice, it's important

1    that it be effectuated.

2            I was one of the people that was on that list.  My

3    client, Mrs. Wiand, was on that list, and a few other people

4    that we knew.  You know, we weren't in a position to get

5    millions of dollars of fees, so we didn't have the resources

6    to go out and hire a firm to do a survey.  But if, in our

7    small circle, we didn't get the text notice and several others

8    we know didn't get it, that's at least suggestive of a

9    widespread problem.

10           And it was, as I said, indicated that there would be

11   some showing, if not on the record, then at least to me

12   privately, today to address that, and it didn't happen.

13           So, that's the one point that I wanted to make in

14   conclusion.

15           Secondly, this business about the lodestar.  You

16   know, I've handled lots of class actions and typically we'll

17   ask a court for a percentage award.  And some courts do that.

18   I've never seen or heard of or read of class counsel who

19   didn't keep time records.  I just find that astonishing that

20   -- that's de rigeur in every class action I've ever

21   encountered.

22           THE COURT:  I do not know if he said he did not keep

23   them.  He did not have the numbers off the top of his head.

24   He may not have kept them, but --

25           MR. BAUMKEL:  That may well be, your Honor.  All I'm

1   suggesting is that given the early date in these proceedings

2   and, again, putting aside substantive objections, if we're

3   getting to the point of awarding fees even remotely

4   approaching the enormous number that's been suggested, that

5   for the Court to gently inquire as to, you know, what the

6   lodestar information is, it's just shocking to me that the

7   response would be, in effect, "Well, we're not really prepared

8   or interested in telling you that."

9          That's just shocking to me.  It's just a check so

10  that your Honor can do what it sounds like your Honor wants to

11  do:  To see if those fees remotely resemble the actual effort

12  that was put into the case, apart from whether the Court

13  thinks that the outcome is a good outcome.

14         Briefly, this does slightly reiterate something

15  that's touched on, but I'll be very, very short.  This going-

16  forward language.  Your Honor, I understood the intent that

17  you were addressing when you talked about that in your

18  preliminary approval papers.  It's obvious the language

19  doesn't comport with the intent that the parties say they have

20  and that the Court is inferring they have.

21         And it's just baffling to me why they wouldn't want

22  to straighten out that language.  It's one sentence.  It ought

23  to say something like they won't do it, again, unless the

24  applicable taxing jurisdiction permits it, period.  Not they

25  won't do it, again, unless somebody permits it or somebody

1  else permits it or some other person permits it.  Because that

2  is clearly ambiguous.  It's clearly contrary to the intent

3  that your Honor was graciously inferring to the settlement

4  parties.

5        Now, that may seem like a trivial issue, but since

6  class counsel made a big to-do with experts valuing the going-

7  forward value of these proceedings, then I'm just baffled as

8  to why they wouldn't want that to be as precise and specific

9  and comport as closely as possible to what everybody's saying

10  the intent is.  And as it's worded right now, it just doesn't

11  do that.  It just tortures the language.

12        And I'm not ascribing any bad motives to your Honor

13  or anybody else.  I'm just saying please look at that more

14  carefully as part of my final pitch to the Court.

15        The statute of limitations information that we

16  learned -- or at least that I learned -- for the first time

17  when I saw the charts that were circulated last night and got

18  a chance to look at them when they were blown up earlier today

19  suggests something really contrary to the spirit of the class

20  settlement proponents' papers, pooh-poohing my concerns in

21  that regard all along as just being almost laughable and

22  trivial.

23        They could have said, as I think they started to in a

24  knee-jerk way responding to that today that, "Well, yeah,

25  that's a big number that Mr. Baumkel's concerned about, but

1   you shouldn't be as concerned as he is, your Honor, because we

2   think that if the data was analyzed, it would show that most

3   of these customers continued as customers into the more recent

4   period covered by the settlement."

5          But they intimated that that's the way you should

6   interpret those gigantic numbers as -- so they argue, as --

7   inconsequential.  And I would say a couple of things.  Those

8   were gigantic numbers.  I mean, it may have been into the

9   hundreds of millions.

10         So, if it's supposed to be deemed so trivial as they

11  pooh-pooh me in responding to me saying, then it ought to have

12  been incumbent on them to quantify this argument that they're

13  making, that going into the period covered by the statute of

14  limitations, most of the money that was outside that period is

15  for the same customers.  That's their pitch today.

16         So that if there's anybody that was just in that

17  early period were where those huge excluded numbers are, those

18  people are so tiny a proportion of the settlement that it

19  wouldn't unbalance the pot, so that current people were

20  prejudiced by having those old people thrown in.  They're

21  arguing that those old people are really the current people,

22  also, but they haven't quantified that.

23         All we know is we have huge numbers that are excluded

24  with only one or two of the proponents saying, "Don't worry

25  about it, they're all the same customers."  And I just don't

1    know how they can say that.

2         On face value, that presents a real conceptual

3    problem.  As I tried to indicate in cross-examining one of the

4    esteemed experts, if you've got instead of 2 million clients,

5    two clients, one of whom stands to get a hundred percent from

6    the paradigm of settlement that you've outlined, one who

7    stands to get zero, and you say, "I equally represent both of

8    you.  I love both of you.  I'm going to take Mr. Zero and give

9    him a portion of Mr. Hundred Percent's money," well, I would

10   say, come on, you've got to be kidding.  Mr. Hundred Percent

11   needs his own attorney if that's what's going on.

12        Not that this might not be a reasonable resolution to

13   a difficult problem, but it's only a reasonable resolution to

14   a difficult problem if all of the factions that have a stake

15   have adequate representation separate from each other.  The

16   numbers that were put forth in the charts show just the

17   opposite.

18        In response, all we have is, "Don't worry about it,

19   Judge.  Those people are recent people and/or old people."

20   That just doesn't get it, given that conflict.  I think it

21   must be viewed just as I just suggested, that it's as if you

22   have John and Mary, not as if you have a million Johns and

23   Marys so we can just sort of forget about it in the wash.

24        This release business.  Mr. Robertson and I were

25   dancing around on this for a long time.  To me, it's like --

1  inescapable.  How can you have a settlement where the alleged

2  wrongdoer gets to walk away at the end of the day if the

3  people that are supposed to benefit from the settlement don't

4  get anything?

5        I understand that Mr. Robertson is saying, "We've

6  looked at the law carefully and we don't think that's likely

7  to happen."  But all these letters from these states'

8  Attorneys General at least suggest that this isn't some Mark

9  Baumkel fantasy, that there could turn out to be problems

10  collecting from the states.  The Court could well do an

11  analysis of Colorado law or Texas law that's more astute than

12  the assistant Attorney Generals who professed to analyze it in

13  their letters.

14        And I'm not questioning the ability of the Court or

15  the Court's staff to do that.  I'm only saying that that

16  illustrates the point that I've, at various times in these

17  proceedings, tried to emphasize deserved more attention.  That

18  is, at the end of the day, if, for whatever reason, that none

19  of us -- none of us are clairvoyant; none of us can predict --

20  that one or more of these taxing jurisdictions doesn't pay

21  into the pot, even though under the law of that jurisdiction,

22  it was unlawful to collect the tax, then the Court ought to

23  say, "You know, everybody, as -- I'm okay with the settlement,

24  except for that part where if, at the end of the day, the

25  people in Kansas don't get anything, you can't have it where

 1   AT&T gets a release."

 2          And, so, I would just say that I understand the deal

 3   is their deal; it's not the Court's deal.  But it's certainly

 4   within the realm of doability for the Court to say, "I'm

 5   adjourning these proceedings to let you mull over whether you

 6   want to structure a mild revision to accommodate this

 7   concern," which we now know is not an academic concern.  We've

 8   got states coming forward, some of them denying the claim,

 9   most of them not responding to the claim, some of them overtly

10   writing caustic letters criticizing the settlement.

11          So, to conclude on that issue, I just think with all

12   that in mind, you can't allow the settlement without that

13   slight revision.  And I don't think if push came to shove,

14   everything I've heard, AT&T would -- at the end of the day, I

15   think they'd be okay with that.  It sounds to me like

16   everybody expects there to be a collection.  So, if that's

17   true, what's the problem here?

18          Why not have the language make sure that's what

19   happens:  That AT&T doesn't get the release if somebody who is

20   entitled to payment doesn't get it because the state finds

21   some procedural way to avoid doing it; or, you know, even more

22   farfetched perhaps -- but not so farfetched perhaps in this

23   state; I don't know -- there's all kinds of talk in the

24   current Congress about changing bankruptcy laws so the states

25   and municipalities can file bankruptcy.  It's a very

1    controversial subject, but given the state of the finances in

2    some of these tax jurisdictions, it's not as farfetched as it

3    might have seemed at some point in the past.

4            So, AT&T shouldn't get a release if any of those

5    things come to pass where they don't actually collect for

6    somebody for some jurisdiction where the tax was, in fact,

7    illegal.

8            In conclusion, regarding the documents I offered into

9    evidence, the gist of those, Judge, is what they don't

10   contain.  There's nothing earth shattering about what they do

11   contain.  It's what they don't contain that I want as part of

12   the record.  So --

13           THE COURT:  Okay.

14           MR. BAUMKEL:  Thank you very much.

15           THE COURT:  Thank you.

16           Anybody else?

17           (No response.)

18           THE COURT:  Okay.

19           I am going to give any of the states who want to file

20   an amicus brief until April 1st to do so.  That is a little

21   over three weeks.  And your response is then due April 15th.

22   You can do one joint response, and if it goes over 15 pages,

23   that is fine.

24           And you can wait, if you would like, and respond.  I

25   do not know that we are going to get separate briefs from

1    Colorado and Ohio.  Colorado certainly suggests that they will

2    file one.  If not, you can respond to the March 9th letters in

3    that response, as well.

4           MR. DURKIN:  Judge, may I add one thing for the

5    record?

6           THE COURT:  Yes.

7           MR. DURKIN:  Exhibit C to our memorandum in support

8    of the final approval of settlement --

9           THE COURT:  Yes.

10          MR. DURKIN:  -- is a -- contains a declaration from a

11   guy named John Throckmorton from AT&T which notes -- and we

12   attached to his affidavit -- the fact that the four people who

13   claim they never got notice had notice on their bills.  We

14   attached copies with appropriate redactions of the bills

15   themselves.  And he swears under the affidavit that three of

16   the four received text messages.  We're not sure about the

17   fourth one.

18          But I don't think there is any credible claim that

19   proper notice was not given to the millions of people who we

20   said would get notice.

21          THE COURT:  Thank you.

22          MR. DURKIN:  It's redundant -- much of the notice in

23   this case have been redundant where you have billing notice,

24   text notice, postcards and publication, which used to be fine

25   by itself.

1        THE COURT:  One other thing I would like on -- were

2  you done?

3        MR. DURKIN:  I am.

4        THE COURT:  On April 15th, can you submit to the

5  Court an updated version of Exhibit 7, please?  The charts.

6        MR. FRICKLETON:  Yes, your Honor.

7        MR. ROBERTSON:  Yes.

8        THE COURT:  Thank you.

9        Anything else?

10        (No response.)

11        THE COURT:  All right.  Thank you.

12        MR. DURKIN:  Thank you, your Honor.

13              *   *   *   *   *

14

15  I certify that the foregoing is a correct transcript from the
record of proceedings in the above-entitled matter.

16

17
  /s/ Joseph Rickhoff             September 2, 2011

18  Official Court Reporter

19

20

21

22

23

24

25